BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
    fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
    achang@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:   (858) 914-2002

*Counsel for Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| DINKO MIHAYLOV, JOHN HANCOCK, SHASHANK BAGUL, JOHN SPADARO, MUSTAPHA HOTAIT, and MARCO STARACE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>TATTOOED CHEF, INC., SALVATORE GALLETTI, STEPHANIE DIECKMANN, CHARLES F. CARGILE, EDWARD GELFAND, PAULA CIARAMITARO, MARIE QUINTERO-JOHNSON, SARAH GALLETTI, and BDO USA, LLP,<br><br>                    Defendants. | Case No. 2:22-cv-9311-GW-E<br><br>Class Action<br><br>**Plaintiffs' Memorandum of Points and Authorities in Opposition to the Individual Defendants' Motion to Dismiss the First Amended Class Action Complaint**<br><br>Judge:      Hon. George H. Wu<br>Date:       December 12, 2024<br>Time:       8:30 a.m.<br>Courtroom: 9D, 9th Floor |

**Table of Contents**

I.      INTRODUCTION ........................................................................................1

II.     ARGUMENT ..............................................................................................3

        A.      Plaintiffs Have Sufficiently Stated a Section 10(b) Claim for
                Securities Fraud ...............................................................................3

                1.      Defendants' Statements Were Materially False and
                        Misleading...................................................................................3

                        a.      Defendants Claimed That the Company Had
                                Achieved 645% Growth with "No Spending on
                                Marketing Promotion," and That the Company
                                Could Maintain the Growth Rate by Increasing
                                Spending on Marketing, Without Disclosing That
                                Its Marketing Expenses Would Have to Be
                                Booked as Reductions to Revenue .............................4

                        b.      Defendants Made False Statements in the Annual
                                and Quarterly Reports ................................................8

                        c.      The Statements About the Company's Internal
                                Controls Were False and Misleading........................15

                        d.      Plaintiffs Have Alleged False Statements About
                                the Line of Credit........................................................19

                2.      Plaintiffs Have Adequately Alleged Scienter ....................21

                3.      Plaintiffs Have Adequately Alleged Loss Causation .......27

        B.      Plaintiffs Have Stated a Section 20(a) Claim for Control-
                Person Liability..............................................................................30

        C.      Should the Court Grant the Individual Defendants' Motion,
                the Court Should Grant Leave to Amend ....................................30

III.    CONCLUSION..........................................................................................31

i

# Table of Authorities

**Cases**

*Bajjuri v. Raytheon Techs. Corp.,*
   641 F. Supp. 3d 735 (D. Ariz. 2022)..............................................................................29

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) .........................................................................................................3

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008)....................................................................................26, 28

*Black v. Snap, Inc.,*
   2023 U.S. Dist. LEXIS 188695 (C.D. Cal. Sept. 26, 2023) ............................................31

*Brody v. Transitional Hosps. Corp.,*
   280 F.3d 997, 1006 (9th Cir. 2002)...................................................................................3

*Brown v. Ambow Educ. Holding Ltd.,*
    2014 WL 523166 (C.D. Cal. Feb. 6, 2014)......................................................................28

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.,Inc.,*
   856 F.3d 605 (9th Cir. 2017)...........................................................................................21

*DCD Programs, Ltd. v. Leighton,*
   833 F.2d 183 (9th Cir. 1987)...........................................................................................30

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005) .........................................................................................................3

*Evanston Police Pension Fund v. McKesson Corp.,*
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ............................................................................26

*Fecht v. Price Co.,*
   70 F.3d 1078 (9th Cir. 1995)...........................................................................................18

*Foman v. Davis,*
   371 U.S. 178 (1962) .......................................................................................................30

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.,*
   63 F.4th 747 (9th Cir. 2023) ......................................................................17, 19, 21, 22

*Goldman Sachs Grp. v. Ark. Teacher Ret. Sys.,*
   594 U.S. 113 (2021) .......................................................................................................28

*Hemmer Grp. v. Sw. Water Co.,*
   527 F. App'x 623 (9th Cir. 2013) ....................................................................................13

*Howard v. Everex Sys., Inc.,*
   228 F.3d 1057 (9th Cir. 2000)........................................................................................30

*In re Alphabet, Inc. Sec. Litig.,*
   1 F.4th 687 (9th Cir. 2021)..............................................................................................26

*In re Apple Computer Sec. Litig.,*
   886 F.2d 1109 (9th Cir. 1989)................................................................25

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................8

*In re Credit Suisse First Boston Corp.,*
   431 F.3d 36 (1st Cir. 2005) ..................................................................18

*In re Daou Sys., Inc.,*
   411 F.3d 1006 (9th Cir. 2005)..........................................................27, 28

*In re Intuitive Surgical Sec. Litig.,*
   2017 U.S. Dist. LEXIS 161098 (N.D. Cal. Sept. 29, 2017).........................18

*In re Quality Sys., Inc. Sec. Litig.,*
   865 F.3d 1130 (9th Cir. 2017)..........................................................15, 18

*Jedrzejczyk v. Skillz Inc.,*
   2023 WL 2333891 (N.D. Cal. Mar. 1, 2023) ...........................................29

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
   416 F.3d 940 (9th Cir. 2005)..................................................................3

*Lloyd v. CVB Fin. Corp.,*
   811 F.3d 1200 (9th Cir. 2016)................................................................27

*Loos v. Immersion Corp.,*
   762 F.3d 880 (9th Cir. 2014)..................................................................27

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
   540 F.3d 1049 (9th Cir. 2008)..........................................................27, 28

*New Mexico State Inv. Council v. Ernst & Young LLP,*
   641 F.3d 1089 (9th Cir. 2011)................................................................21

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,*
   774 F.3d 598 (9th Cir. 2014)..................................................................18

*Police Ret. Sys. of St. Louis v. Constr. Inc.,*
   2021 U.S. Dist. LEXIS 257297 (N.D. Cal. Sept. 16, 2021)...........................8

*Police Ret. Sys. v. Intuitive Surgical, Inc.,*
   759 F.3d 1051 (9th Cir. 2014)................................................................22

*Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc.,*
   445 F. Supp. 2d 170 (D. Mass. 2006) .....................................................19

*S. Ferry LP v. Killinger,*
   542 F.3d 776 (9th Cir. 2008)..................................................................26

*Saeger v. Pac. Life Ins. Co.,*
   94 F. App'x 544 (9th Cir. 2009) ..............................................................8

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016)................................................................21

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011)...............................................................3

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009)...............................................................8

*In re Taleo Corp. Sec. Litig.*,
  2010 U.S. Dist. LEXIS 13696 (N.D. Cal. Feb. 17, 2010) ................................24

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
  690 F. Supp. 2d 959 (D. Ariz. 2010)......................................................30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................21

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ........................................................................13

*United States ex rel. Tamanaha v. Furukawa Am., Inc.*,
  445 F. App'x 992 (9th Cir. 2011) .........................................................31

**Statutes**

15 U.S.C. §§ 78j(b).............................................................................1

15 U.S.C. § 78t(a) .............................................................................1

15 U.S.C. § 78u-4(b)(2) ......................................................................21

15 U.S.C. § 78u-5(c)(1)(A)(i) ................................................................19

**Rules**

17 C.F.R. 240.10b-5 ..........................................................................24

17 C.F.R. 240.10b5-1 ......................................................................2, 28

C.D. Cal Local Rule 11-6 .....................................................................1

Fed. R. Civ. P. 9(b) ..........................................................................31

Fed. R. Civ. P. 15 ...........................................................................30

Fed. R. Civ. P. 12(b)(6)......................................................................21

Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace ("Plaintiffs") respectfully submit this memorandum in opposition to the September 10, 2024 motion (Dkt. No. 102) of Defendants Salvatore Galletti, Stephanie Dieckmann, Edward Gelfand, Paula Ciaramitaro, Marie Quintero-Johnson, and Sarah Galletti (the "Individual Defendants") to dismiss Plaintiffs' First Amended Class Action Complaint ("FAC") (Dkt. No. 64).[1]  The Court should deny the Individual Defendants' motion because, as discussed below, Plaintiffs have stated claims under Sections 10(b) and 20(a) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## I.    INTRODUCTION

The Individual Defendants' motion lacks merit.[2]  Plaintiffs' claims arise from an egregious case of accounting fraud that resulted in the bankruptcy of Tattooed Chef, Inc. ("Tattooed Chef" or the "Company"), wiping out the value of its stock held by Plaintiffs and other public shareholders.  Having gone public through a special purpose acquisition company ("SPAC") during the heyday of SPACs, Tattooed Chef's internal financial controls were deficient from the start.  *E.g.*, ¶¶ 24–25, 58–59, 73, 76, 78.[3]  The Individual Defendants orchestrated the fraud through a relatively unsophisticated accounting scheme

---

[1] Plaintiffs incorporate by reference all arguments made in their oppositions to the motions of Defendants Charles F. Cargile and BDO USA, LLP ("BDO") to dismiss the FAC (Dkt. Nos. 99, 100).

[2] Substantive defects aside, the Individual Defendants' motion is procedurally defective because it includes an Appendix A in violation of Local Rule 11-6's word limitations.  Just like a similar appendix submitted in *Jiangchen v. Rentech, Inc.*, another securities-fraud case defended by the same law firm representing the Individual Defendants here (and cited in their motion), the Appendix A here "allows [the Individual] Defendants to make further arguments" and is thus subject to be stricken.  *See* 2017 U.S. Dist. LEXIS 222743, at *10 (C.D. Cal. Nov. 20, 2017) (Wu, J.).  In light of the fact that this is a repeat violation, striking the Individual Defendants' entire motion is proper.

[3] The allegations in the FAC are cited as "¶ ___."  Unless otherwise noted, all emphases in quoted texts are added.

1

of misclassifying promotional and slotting fees as "operating expenses" instead of reductions to revenue, as required by GAAP.[4] *E.g.*, ¶¶ 47, 58, 71–75, 83–86, 92–104; *see also* Defs.' Mem. at 5. This allowed Tattooed Chef to report inflated revenue growth rates, temporarily satisfying stock analysts and allowing Defendant Salvatore (Sam) Galletti to engage in insider selling. ¶ 81.

The Company was ultimately forced to restate its financial results, admitting that its prior results were materially false. ¶¶ 54, 71–75, 89, 93–94, 105–106, 116, 122, 142–147. Defendants' scienter is particularly alleged through detailed "confidential witness" ("CW") allegations, as well as Sam Galletti's suspicious, unusual Class-Period stock sales. ¶¶ 81–82; *see also* ¶¶ 122, 138–139, 166–168. Galletti, who had never before sold any shares, disposed of 1.3 million shares on April 15, 2021 — not pursuant to a Rule 10b5-1 plan. ¶ 82.

Plaintiffs also sufficiently allege loss causation because in response to the Company's corrective disclosures in October–November 2022, the price of Tattooed Chef's stock immediately declined by 9.8%, 14.7%, 12.4%, and 10.6%, respectively. ¶¶ 148, 153, 156, 159. All told, Plaintiffs have stated a claim under Section 10(b).

Plaintiffs have also stated a claim for control-person liability under Section 20(a). The Individual Defendants fail to challenge the sufficiency of the allegations regarding their control over Tattooed Chef and its financial reporting. *See, e.g.*, ¶¶ 19, 34, 188, 198. Instead, their argument for dismissal of the Section 20(a) claim is entirely predicated upon the sufficiency of Plaintiffs' Section 10(b) claim. As such, the Court should deny Defendants' motion with respect to the Section 20(a) claim.

Accordingly, the Court should deny Defendants' motion in its entirety and allow Plaintiffs to prosecute their meritorious claims.

---

[4] Generally Accepted Accounting Principles.

2

## II.    ARGUMENT

### A.    Plaintiffs Have Sufficiently Stated a Section 10(b) Claim for Securities Fraud

To state a Section 10(b) claim, a plaintiff need only plead that: (1) defendants made a material misrepresentation or omission; (2) the misrepresentation was in connection with the purchase or sale of a security; (3) the misrepresentation caused plaintiff's loss; (4) plaintiff relied on the misrepresentation or omission; (5) defendants acted with scienter; and (6) that plaintiff suffered damages. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  Here, the Individual Defendants challenge only the FAC's sufficiency with respect to three elements: falsity, scienter, and loss causation.  As discussed below, their challenges to the pleading sufficiency of the FAC are meritless.

#### 1.    Defendants' Statements Were Materially False and Misleading

With respect to falsity under Section 10(b), a plaintiff must show that the defendant made a statement that was "misleading as to a material fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988).  A statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  A misrepresentation "is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  Generally, whether a statement is misleading is a mixed question of fact and law to be decided by the jury unless the disclosures are so obviously immaterial that reasonable minds could not differ. *See, e.g., SEC v. Todd*, 642 F.3d 1207, 1220–21 (9th Cir. 2011).

3

**a.    Defendants Claimed That the Company Had Achieved 645% Growth with "No Spending on Marketing Promotion," and That the Company Could Maintain the Growth Rate by Increasing Spending on Marketing, Without Disclosing That Its Marketing Expenses Would Have to Be Booked as Reductions to Revenue**

On December 15, 2020, the first day of the Class Period, Defendants made statements during an Investor Day presentation that Tattooed Chef had achieved 645% growth with "no spending on marketing promotion."  ¶ 46. The statements were reduced to written form in the attached chart that was disseminated to analysts:



*Id*.  Defendants Sam and Sarah Galletti, Dieckmann, and Cargile told the analysts that the Company would launch its first advertising and marketing campaign in 2021, which would drive significant continued growth.  ¶¶ 38, 45, 50.  These statements were false and misleading because they failed to disclose

the fact that, far from being premised on "no spending on marketing promotion," Tattooed Chef's aggressive growth strategy was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that those expenses were required by GAAP to be booked as reductions to revenue and thus would decrease rather than increase the growth rate.   ¶ 47.  As a result, the Individual Defendants' statements about revenue growth were materially misleading. *Id.*[5]

The Gallettis and Dieckmann, who collectively owned 51% of the Company's stock, also told investors that the Company planned to raise capital needed to fund its growth through investors' exercise of warrants.  ¶¶ 49–51.  The investors would receive stock and the Company would receive cash.  ¶ 49.

¶ 48.

However, for the Company to be able to raise this cash, which would be

---

[5] The misrepresentations about the Company's current plan to maintain and increase its growth rate were not "forward-looking statements" and thus not protected by the PSLRA's safe-harbor provision.

up to $230 million, its stock needed to trade above $18 per share for 20 out of 30 trading days, as reflected by the following graph that the Gallettis and Dieckmann provided to analysts:

## Capital Structure

| Name | Shares O/S | % |
|---|---|---|
| Sam Galletti (and Family) | 32,786,538 | 50% |
| Public Shareholders | 20,093,584 | 31% |
| Fourm II Management | 5,555,000 | 9% |
| UMB Capital Corporation | 4,683,791 | 7% |
| Pizzo Food, SRL | 1,500,000 | 2% |
| Stephanie Dieckmann | 500,000 | 1% |
| | 65,118,913 | 100% |

| | | |
|---|---|---|
| Warrants (TTCFW) | 20,000,000 | |
| Exercisable @ $11.50 | | |

Callable by the company if share price trades > $18 for 20 of 30 trading days.
Could generate $230 million cash --- or Company can choose a cashless exercise.

¶ 49.

Prior to the Investor Day presentation, the Company's stock was well below the price necessary to allow the Company to raise the needed cash through exercise of the warrants. ¶ 50. On December 2, 2020, the stock closed at $15.42. *Id.* After the Investor Day presentation was filed with the SEC on Form 8-K, however, the stock's price rose dramatically, increasing to $19.35 on December 15, 2020 on unusually heavy trading volume of 6.8 million shares, approximately ten times the normal volume. *Id.* The stock continued to increase in the ensuing days, reaching $24.69 by December 23, 2020 on unusually heavy trading volume, as reflected in the following chart:



*Id.*

The Individual Defendants' motion to dismiss all but ignores these detailed allegations about the false December 15, 2020 statements.  Indeed, all the motion to dismiss says about these specific statements is the conclusory (and incorrect) missive that "[t]here are no facts alleged that contradict this statement."  Defs.' Mem. at 8.  But this is patently incorrect.

The FAC alleges that the statements were all false *because the undisclosed "slotting fees" were marketing expenses, which the Individual Defendants had falsely stated were zero*. ¶ 47.  In addition, when Defendants were forced to restate their financial results, "they were forced to admit the true adverse extent of these significant additional expenses."  ¶ 54.  With respect to 2020, the Company admitted that "the Company's gross profits for 2020 were only $22.358 million, not $23.7 million, and gross margins for 2020 were only 15.1%, not 15.9%."  ¶ 60.  Thus, significant additional, previously undisclosed expenses existed in 2020, increasing the Company's expenses and reducing both reported EBITDA[6] and gross margins.  ¶¶ 54, 60.  In addition, the statements about the Company's ability to maintain its growth rate through increasing market expenses were

---

[6] Earnings before interest, taxes, depreciation, and amortization.

false because, as noted *supra*, the Individual Defendants concealed the fact that such expenses would have to be booked as reduction to revenue and thus would lower the growth rate.

These facts are more than sufficient to plead falsity. In *In re Zoran Corp. Derivative Litigation*, for example, plaintiffs alleged that the company's financial statements falsely stated that it was in compliance with GAAP while certain executive compensation expenses were misstated and required restatement. 511 F. Supp. 2d 986, 1011 (N.D. Cal. 2007). The court held that the requirement of restatement supported a finding of falsity and materiality for purposes of stating a Section 10(b) claim. *Id.*; *see also, e.g.*, *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486–87 (S.D.N.Y. 2004) ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made"); *Police Ret. Sys. of St. Louis v. Constr. Inc.*, 2021 U.S. Dist. LEXIS 257297, at *47 (N.D. Cal. Sept. 16, 2021) (same) (collecting cases). Where, as here, a complaint specifies each statement alleged to be misleading, and the reasons why the statement was misleading, falsity is sufficiently alleged. *See, e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1179–80 (9th Cir. 2009) (reversing dismissal); *Saeger v. Pac. Life Ins. Co.*, 94 F. App'x 544, 546 (9th Cir. 2009) (same).

**b.    Defendants Made False Statements in the Annual and Quarterly Reports**

The FAC also alleges in great detail the falsity of Tattooed Chef's 2020 and 2021 Annual Reports on Form 10-K, which were signed by the Individual Defendants. On March 19, 2021, after market hours, Tattooed Chef filed with the SEC its 2020 Annual Report on Form 10K for the year ended December 31, 2020 (the "2020 Annual Report"). ¶ 56. The Annual Report was signed by

8

Defendants Galletti, Cargile, Gelfand, Ciaramitaro, and Quintero-Johnson. *Id.*[7] The 2020 Annual Report falsely reported the Company's financial results and falsely stated that "*our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.*"  ¶ 58.  The figures reported in the 2020 Annual Report were later admitted to be false, as noted *supra*, "the Company's gross profits for 2020 were only $22.358 million, not $23.7 million, and gross margins for 2020 were only 15.1%, not 15.9%."  ¶ 60.

When it came time to report financial results for 2021, the amount of slotting fees, marketing expenses, and promotional discounts had become so large that they interfered with the Company's ability to report the "supercharg[ed] … growth" in revenues that it hoped would convince the market that it was a high-growth company.  ¶ 44.  The stock market places a premium on significant increases in revenues, even if profits suffer, and thus will assign a higher multiple (and thus stock price) to high-growth companies. ¶ 104.  The rationale is that if revenues increase fast enough, a company will eventually be able to achieve economies of scale and reduce expenses, thus becoming more profitable. *See id.*; *see also* ¶ 36.

But during 2021 the Individual Defendants faced a problem: they had promised very large promotions, slotting fees, and discounts to customers to convince them to buy Tattooed Chef's products.  And because GAAP required such expenses to be accounted for as reductions to revenue, correctly accounting for the costs would torpedo Defendants' high-growth narrative. *See* ¶ 104.  Thus, Defendants embarked on a scheme to book more amounts of

---

[7] In addition, attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Galletti and Cargile attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud.  ¶ 56.

revenue than warranted and misclassify the slotting and promotional fees as operational expenses instead of reductions to revenue:

> Tattooed Chef's aggressive growth strategy was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that the Individual Defendants intended to mischaracterize those expenses as "operating expenses" instead of reductions to revenue, as required by GAAP.

¶ 47.

As a result, the Defendants' statements about revenue growth were false; had the slotting fees and in-store promotion fees been deducted from the revenue figures, the revenue growth would have been materially lower, the market would have assigned a lower multiple to the stock, and the stock price would have been much lower.   ¶¶ 47, 104; *see also* ¶ 71 ("The Company incorrectly recorded certain payments to customers as promotional and bad debt expenses within operating expenses rather than a reduction of revenue. As a result, both revenue and operating expenses were overstated by $0.1 million for the three months ended March 31, 2021.").

The FAC specifically alleges the falsity of each quarterly and annual statement issued by Defendants in 2021, and includes graphs highlighting in yellow the changes between the original reported financial information and the correct information which was only disclosed after the end of the Class Period, when the Company restated its financial results.  For example, for Q1 2021, the complaint contains the following chart:

> The table below sets forth the condensed consolidated financial statements, including as reported, and the impacts resulting from the restatement and the as restated balances for the

quarterly period ended March 31, 2021 (in thousands):

| ($ in thousands, except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income | | |
|---|---|---|---|
| For the three months ended March 31, 2021 | As Reported | Adjustments | As Restated |
| REVENUE | 52,469 | (2,054) | 50,415 |
| COST OF GOODS SOLD | 45,289 | 119 | 45,408 |
| GROSS PROFIT | 7,180 | (2,173) | 5,007 |
| OPERATING EXPENSES | 14,196 | (3,025) | 11,171 |
| LOSS FROM OPERATIONS | (7,016) | 852 | (6,164) |
| LOSS BEFORE PROVISION FOR INCOME TAXES | (9,717) | 852 | (8,865) |
| INCOME TAX BENEFIT (EXPENSE) | 1,475 | (239) | 1,236 |
| NET LOSS | (8,242) | 613 | (7,629) |
| NET LOSS PER SHARE | | | |
| Basic | (0.10) | — | (0.10) |
| Diluted | (0.11) | 0.01 | (0.10) |
| COMPREHENSIVE LOSS | (8,133) | 613 | (7,520) |

¶ 71.  The FAC provides similar particularized details regarding the falsity of the Q2 2021 Form 10-Q by including a graph showing the originally filed (false) information and the correct information provided when the results were restated:

The table below sets forth the condensed consolidated financial statements, including as reported, and the impacts resulting from the restatement, and the as restated balances for the quarterly period ended June 30, 2021 (in thousands):

| ($ in thousands except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) | | |
|---|---|---|---|
| For the three months ended June 30, 2021 | As Reported | Adjustment | As Restated |
| REVENUE | 50,270 | (3,010) | 47,260 |
| COST OF GOODS SOLD | 41,953 | (822) | 41,131 |
| GROSS PROFIT | 8,317 | (2,188) | 6,129 |

| | | | |
|---|---|---|---|
| OPERATING EXPENSES | 16,419 | 427 | 16,846 |
| LOSS FROM OPERATIONS | (8,102) | (2,615) | (10,717) |
| LOSS BEFORE PROVISION FOR INCOME TAXES | (7,463) | (2,615) | (10,078) |
| INCOME TAX EXPENSE | (50,009) | 724 | (49,285) |
| NET LOSS | (57,472) | (1,891) | (59,363) |
| | | | |
| NET LOSS PER SHARE | | | |
| Basic | (0.70) | (0.02) | (0.72) |
| Diluted | (0.70) | (0.02) | (0.72) |
| | | | |
| COMPREHENSIVE LOSS | (57,682) | (1,891) | (59,573) |

| ($ in thousands except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) | | |
|---|---|---|---|
| For the six months ended June 30, 2021 | As Reported | Adjustment | As Restated |
| REVENUE | 102,739 | (5,064) | 97,675 |
| COST OF GOODS SOLD | 87,242 | (703) | 86,539 |
| GROSS PROFIT | 15,497 | (4,361) | 11,136 |
| OPERATING EXPENSES | 30,615 | (2,598) | 28,017 |
| LOSS FROM OPERATIONS | (15,118) | (1,763) | (16,881) |
| LOSS INCOME BEFORE PROVISION FOR INCOME TAXES | (17,180) | (1,763) | (18,943) |
| INCOME TAX EXPENSE | (48,534) | 485 | (48,049) |
| NET LOSS | (65,714) | (1,278) | (66,992) |
| | | | |
| NET LOSS PER SHARE | | | |
| Basic | (0.81) | (0.02) | (0.83) |
| Diluted | (0.81) | (0.02) | (0.83) |
| | | | |
| COMPREHENSIVE LOSS | (65,815) | (1,278) | (67,093) |

¶ 89.

In complete disregard of these well-pleaded allegations, however, the Individual Defendants claim that Plaintiffs "have not alleged any facts" to

support the fact that they were "classifying them [slotting fees and promotional discounts] as operating expenses rather than reductions to revenue." Defs.' Mem. at 9. This claim is meritless as the FAC contains numerous particularized allegations demonstrating that this happened. In addition, the Company's restated financial results *admit* that "[t]he Company incorrectly recorded certain payments to customers as promotional and bad debt expenses within operating expenses rather than a reduction of revenue." ¶ 71; *see also* ¶ 104. Thus, the Individual Defendants' claim to the contrary lacks a factual basis.[8]

The FAC also particularly alleges that "[t]he 2020 Annual Report and the Q1 2021 Form 10-Q were … false and misleading because they failed to disclose the risk to the Company's liquidity from higher-than-disclosed promotional fees and discounts, slotting fees, and other marketing costs for the Company's products." ¶ 72. Moreover, "[b]ecause the Company's line of credit was tied to the net amount of the Company's accounts receivables, slotting and promotional fees and/or discounting of the Company's products reduced the amount of liquidity available under the Company's line of credit." *Id*. "Defendants knew that the Company would need additional liquidity due to ongoing problems with the Company's business." *Id*. "[T]he Company was paying high promotional and slotting fees for its products, which was causing it to receive less net revenue/accounts receivable for the sale of its products,

---

[8] The Individual Defendants do not argue that the statements were immaterial, and thus have waived any such argument. Even if they had not waived the argument, materiality is not subject to any heightened pleadings standard and merely requires an allegation that the false statement or omission "would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A company is only required to restate financial results if the amounts are material, and thus materiality is clearly alleged here. *See, e.g.*, *Hemmer Grp. v. Sw. Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013) ("allegations [of corrected financial statements] especially when combined with the fact that the [company] restated its financials, are sufficient to plead materiality").

13

since such fees were required to be deducted from both revenues and accounts receivable under GAAP." *Id*. "As a result, Defendants knew the Company would need to raise additional capital to fund its growth." *Id.*

Indeed, these undisclosed risks to the Company's liquidity came to fruition when the Company was forced to restate its financial results: revenues and accounts receivable were materially reduced, thus reducing the credit available to Tattooed Chef. ¶ 122. According to Confidential Witness #3 ("CW#3"), the Company was failing to pay its suppliers. ¶ 138. The situation was so dire that Defendant Sam Galletti was forced to provide a personal $5 million loan to the company to keep it afloat. ¶ 76. These facts support a finding of the Individual Defendants' scienter regarding the liquidity problem.

The 2021 Annual Report on Form 10-K, signed by the Individual Defendants, was false because it "overstated revenue by $5,436,000 and overstated gross profit by $4,975,000." ¶ 100. "The Individual Defendants violated GAAP and knowingly inflated the Company's revenues and gross profit, which were the two key metrics emphasized by the Company to the stock market and securities analysts that followed the Company." *Id*. The motive of the Individual Defendants to falsely portray Tattooed Chef as a "high-growth" company was revealed in the 10-K, in which Defendants hyped false growth figures that were later reduced:

> *We continue to experience strong revenue growth over prior periods. Revenue increased to $213.4 million in the twelve-month period ended December 31, 2021 ("Fiscal 2021") as compared to $148.5 million in the twelve-month period ended December 31, 2020 ("Fiscal 2020") and $84.9 million in the twelve-month period ended December 31, 2019 ("Fiscal 2019"), representing a year over year growth rate of 43.7% and 74.9%, respectively.*

14

¶ 101 (emphases in original).  This statement was false because "the Company's revenues had not increased to $213.4 million and the growth rate was not 43.7%.  In reality, revenues had only increased to $207.994 million and the growth rate was only 40%."  ¶ 102.  The filing of the 2021 Annual Report caused the Company's stock price to increase from $11.06 on March 15, 2022 to $12.23 on March 17, 2022 — a 10.6% increase on heavy trading volume.  ¶ 103.

### c.   The Statements About the Company's Internal Controls Were False and Misleading

The 2021 Annual Report was also false and misleading because it concealed additional *known, then-existing material deficiencies in the Company's internal controls*.[9]  Most importantly, the 2021 Annual Report failed to disclose that, in addition to the lack of adequate internal controls  over the tracking and accounting of promotional allowances granted to customers, including applicable adjustments to revenue for related variable consideration, that *management (specifically including the Gallettis and Dieckmann) were intentionally overriding the controls that existed in order to misclassify slotting fees and promotional allowances as "operating expenses" so as to artificially inflate the Company's reported Net Revenues and Gross Profits*.  ¶ 107.  The Individual Defendants' claim that these allegations are not supported by particularized facts (Defs.' Mem. at 12–13) is baseless.  The FAC contains detailed allegations from numerous "confidential witnesses."  For example, according to Confidential Witness #1 ("CW#1"), who served as Tattooed Chef's Director of SOX Compliance during the Class Period and reported directly to Defendant Dieckmann, who, along with Defendant Cargile (Dieckmann's predecessor), bore primary

---

[9] The misrepresentations about the current status of the Company's internal controls were not "forward-looking statements" and thus not protected by the PSLRA's safe-harbor provision. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts").

15

responsibility for addressing the material weaknesses in the Company's internal controls, at least nine material weaknesses had been identified by BDO at year end in 2020.  ¶ 73.  According to CW#1, the need to hire additional personnel in certain positions was a large component in addressing the material weaknesses identified by BDO, but CEO Galletti did not want to or was unwilling to spend the money necessary to hire enough people.  *Id.* According to CW#1, as part of a review of the revenue recognition practices, a review was conducted of some of the Company's larger contracts.  That review determined that the Company was not adhering to GAAP with respect to some of the Company's more complex contracts due to the manner in which it was accounting for expenses. ¶ 74.  CW#1 worked with BDO on the relevant issues, with BDO ultimately determining that the problems were material and would require a restatement of the Company's financial results.  ¶ 75.

Confidential Witness #2 ("CW#2") was employed by Tattooed Chef during the Class Period as an A/R (Accounts Receivable) Specialist beginning in December 2021, reporting directly to Controller Mary Chesley, who in turn reported directly to Defendant CFO Dieckmann.  ¶ 77.  CW#2 was responsible for the receipt of and posting of payments from vendors that sold the Company products, including, but not limited to Wal-Mart, Trader Joe's, Albertson's and KeHE.  ¶ 78.   CW#2 provided specific examples of customers such as KeHE where more than half of the invoiced amount represented promotions or slotting fees that the customer was not required to pay, thus inflating the reported revenues figures because the Company had applied incorrect accounting treatment.  ¶ 79.  According to CW#2, the Individual Defendants were recognizing the full amount of revenue and then booking the promotions and discounts as "operational expenses," contrary to GAAP.  ¶ 80.

These detailed allegations, which Defendants all but ignore, are more

than sufficient to demonstrate both the falsity of Defendants' statements and their scienter. *See Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) ("[t]he PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance"). In *Glazer*, as here, the complaint's allegations regarding the company's financial results were supported by particularized "confidential witness" allegations.

Moreover, none of the FAC's allegations represent mere "statements of optimism," "opinion," or "puffery." All the statements referred or were related to specific metrics of the Company's financial results. In rejecting a similar claim of "optimism" and "puffery," the Ninth Circuit reasoned that even a vague statement, such as "everything [was] going fine," could be misleading and thus actionable if the speaker knew that the contrary was true:

> "When valuing corporations, … investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. … [P]rofessional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." … Examples of "mere corporate puffery" include statements such as "the opportunity for system placement at hospitals 'is still very, very large,'" and that a company "'will come out stronger' and 'is in a pretty good position' despite the economic crisis." … But even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim" when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly. … For example, reassuring investors that "everything [was] going fine" with FDA approval when the company knew FDA approval would never come was materially misleading. … Similarly, a statement that the

17

company "anticipates a continuation of its accelerated expansion schedule" when the expansion had already failed was materially misleading. …

*Quality Sys.*, 865 F.3d at 1143–1144.  Here, the Individual Defendants' statements regarding the Company's aggressive growth strategy and compliance with GAAP are neither statements of optimism or puffery because, viewed in context, these statements are materially false.  *See id*.; *see also Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (finding actionable a statement that the company "anticipates a continuation of its accelerated expansion schedule" because "the Company had not been too happy with the earlier sales," and as such, the statement "could reasonably be interpreted as conveying a level of confidence in the continued viability of the expansion program not borne out by the adverse facts allegedly known to the defendants").[10]

Nor can the Individual Defendants avoid a finding of falsity by latching on the phrases like "[w]e believe" and casting their statements as "opinions." *See* Defs.' Mem. at 11–12.  In light of the facts pleaded showing the Individual Defendants' knowledge that it was impossible for Tattooed Chef to maintain high revenue growth and, at the same time, comply with GAAP (*see* ¶ 104), their alleged false statements, whether or not preceded by the phrase "[w]e believe," are actionable. *In re Intuitive Surgical Sec. Litig.*, 2017 U.S. Dist. LEXIS 161098, at *17 (N.D. Cal. Sept. 29, 2017); *see also*, *e.g.*, *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48 (1st Cir. 2005) ("if a plaintiff adequately pleads that

---

[10] By the same token, *Oregon Public Employees Retirement Fund v. Apollo Group Inc.* is distinguishable because that case involved only "vague" statements of "inherently subjective 'puffing'" that did "not set out with specificity the reasons for … revenue growth." 774 F.3d 598, 606 (9th Cir. 2014). In contrast, Tattooed Chef's statements here specified an "aggressive growth strategy [that] was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that the Individual Defendants intended to mischaracterize those expenses as 'operating expenses' instead of reductions to revenue, as required by GAAP." ¶ 47. *Apollo* is thus inapposite.

18

a statement of opinion was subjectively false when made, the complaint will … satisfy the pleading requirements"); *Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170 (D. Mass. 2006) (defendant's false statements about patent litigation were made actionable because the complaint alleged facts showing defendant did not believe statements).

### d. Plaintiffs Have Alleged False Statements About the Line of Credit

Defendants' contention that Plaintiffs have not adequately alleged the falsity of the statements about the line of credit (¶¶ 61, 121, 132–133) is unavailing.  As to these statements, it is true that the statements are "forward looking" because they state that Defendants "believe that our cash will be sufficient to support our planned operations for at least the next 12 months." ¶ 121.  The statements, however, are not protected by the PSLRA's safe-harbor provision because (1) they were not accompanied by meaningful cautionary language; and (2) the FAC alleges that the Individual Defendants had actual knowledge of the falsity of the statements at the time.  First, no meaningful cautionary language accompanied this statement.  To be "meaningful," the cautionary language must "identify[] important factors that could cause actual results to differ."  15 U.S.C. § 78u-5(c)(1)(A)(i).  Here, Defendants do not cite to any cautionary language that accompanied paragraphs 61, 121, and 132–133 of the FAC, and instead only refer to generic statements that accompanied other false statements which were unrelated to the statements about the line of credit. *See* Defs.' Mem. at 10–11, 14.  Thus, the statements are not protected by the safe-harbor provision. *See Glazer Capital*, 63 F.4th at 769 ("[d]efendants cannot rely on boilerplate language describing *hypothetical* risks to avoid liability for the failure to disclose that the company *already* had information suggesting the merger might not ensue") (emphases in original).

19

Even if they had been accompanied by specific cautionary language, the statements are actionable because the complaint alleges that the defendants knew the statements were false when made.  Specifically, the FAC alleges:

The Individual Defendants knew that the Company's existing liquidity was not in fact sufficient to fund the Company's operations for the next twelve months.  The Individual Defendants were well aware of this fact because, as the Annual Report admitted, "Our management regularly reviews certain liquidity measures to monitor performance."  The Individual Defendants knew, but failed to disclose, that the Company's accounts receivables (similar to its reported revenues) had been materially inflated by up to $5,436,000.  The reason that this undisclosed fact was highly material to the Company's liquidity was that the Company's credit line allowed the Company to borrow up to 90% of the amount of the accounts receivable.  …  But because the slotting fees and in-store promotional costs were also required to be deducted from accounts receivables (but had not been), the Company's accounts receivables were inflated during the Class Period and thus the Company was borrowing more than it was entitled to under its line of credit.  When the Company was forced to restate its financial results, this would reduce or eliminate its available credit, imperiling its liquidity.  In fact, the Company lost its ability to obtain credit from lenders within six months, forcing Defendant Galletti to lend the Company $5 million before the end of the year.  As noted herein by CW#2 and CW#3, the Individual Defendants also knew that the Company was not paying its suppliers and other bills on time, and thus had actual knowledge

20

of material problems with the Company's cash flow and liquidity.

¶ 122.  Thus, the FAC adequately alleges the falsity of the statements about the line of credit.  *See Glazer Capital*, 63 F.4th at 781 ("[d]efendants cannot invoke safe-harbor protection on the basis that they lacked 'actual knowledge of falsity'").

### 2.    Plaintiffs Have Adequately Alleged Scienter

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "A defendant is liable under Section 10(b) and Rule 10b-5 when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)).  "Deliberate recklessness is 'an extreme departure from the standards of ordinary care … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'"  *Schueneman*, 840 F.3d at 705 (italics in original). In ruling on a motion to dismiss, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) (italics in original). "A securities fraud complaint will survive a motion to dismiss under Rule 12(b)(6) 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting *Tellabs*, 551 U.S. at 324).

Here, the Individual Defendants' scienter is alleged with great

particularity. The FAC contains detailed allegations derived from three separate confidential witnesses demonstrating that Defendants intentionally overrode the Company's internal controls and recognized inflated revenue during the Class Period despite knowing that GAAP required the substantial promotional and slotting fees that the Company had offered to customers to be booked as reductions to revenue rather than operating expenses. *See* ¶¶ 73–80. Defendants' challenge to the sufficiency of the "CW" allegations is unwarranted because they argue for a standard for confidential witness allegations that has been specifically rejected by the Ninth Circuit. *See Glazer Capital*, 63 F.4th at 771 ("the adequacy of the [complaint] does not depend on each CW possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made."); *id.* at 769 ("[r]equiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one"). Plaintiffs' CW allegations are more than sufficient because the FAC specifically alleges the CWs' roles, to whom they reported, and why they were in a position to know the facts about the fraud.

The Individual Defendants' cited cases are inapposite. For example, in *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014), the complaint only alleged "a single statement by a lone witness, a clinical sales representative in Florida who worked for Intuitive for three months and said, '100% that hospitals were cutting back.'" *Id.*, 759 F.3d at 1063. Further, the sole witness was a "low-level employee." *Id.* Here, in contrast, the complaint contains three separate CWs, all of whom worked in the relevant areas affected by the fraud and reported either directly to defendants or to high-level executives. For example, CW#3 "worked at Tattooed Chef's headquarters during the Class Period from March 2021 to December 2022 and had frequent

22

interactions with Defendants Galletti and Dieckmann." ¶ 136.  CW#3 also "worked at the Company's headquarters in Paramount, California and reported to Cosmo Briguglio, who reported directly to his cousin, CEO Sam Galletti."  ¶ 138.  Thus, CW#3 experienced Tattooed Chef's internal-control problem first-hand — stating that "*the Company was routinely not paying its bills and creditors.*"  ¶ 136 (emphasis in original).  In addition, CW#3 had direct discussions of these payment problems with "Defendant Sam Galletti[, who] was aware of these problems … [and] was not at all surprised to hear suppliers were not being paid."  ¶ 138.  As one example, CW#3 told Galletti that the corrugated cardboard supplier Neway had refused to supply any more product until a payment was made. *Id.*  CW#3 indicated Defendant Dieckmann was also aware of the problem because Galletti told CW#3 that Galletti indicated he had spoken with CFO and Defendant "Stephanie Dieckmann about the problems after the conversation between CW#3 and Galletti."  *Id.*

The allegations regarding CW#1 are likewise particularized and cogent. CW#1 "served as Tattooed Chef's Director of SOX Compliance during the Class Period and reported directly to Defendant Dieckmann (who, along with Defendant Cargile who was the CFO prior to Dieckmann, bore primary responsibility for addressing the material weaknesses in the Company's internal controls), at least nine material weaknesses had been identified by BDO at year end in 2020."  ¶ 73.  "CW1 also updated the Audit Committee on a quarterly basis and was the person who informed the Audit Committee when it was determined that a restatement was necessary."  ¶ 75.  The members of Tattooed Chef's Audit Committee at the time were Edward Gelfand (Chair), Paula Ciaramitaro, and Marie Quintero-Johnson.  *Id.*  BDO worked directly with Defendant Cargile, the Company's CFOs (Cargile, and then Dieckmann),

and with the members of the Audit Committee.[11]   *Id*.   Thus, "Defendants Cargile, Dieckmann, Gelfand, Ciaramitaro and Quintero-Johnson had actual knowledge of the improper accounting and the fact that the Company's financial statements were materially false and misleading because they did not comply with GAAP."   ¶ 75.   They also knew about the Company's lack of liquidity during the Class Period.   ¶ 138.

In addition, CW#2 was employed by Tattooed Chef during the Class Period as an A/R (Accounts Receivable) Specialist beginning in December 2021, reporting directly to Controller Mary Chesley, who in turn reported directly to Defendant CFO Dieckmann.   ¶ 77.   CW#2 was responsible for the receipt of and posting of payments from vendors that sold the Company products, including, but not limited to Wal-Mart, Trader Joe's, Albertson's and KeHE.   ¶ 78.   CW#2 recalled once receiving only approximately $50,000 from KeHE for invoices that were worth approximately $1 million before discounts were applied.   ¶ 79.   CW#2 indicated that the Individual Defendants were recognizing the full amount of revenue and then booking the promotions and discounts as "operational expenses."   ¶ 80.

Galletti's scienter is also indicated by his insider selling.   On April 15, 2021, Galletti sold 800,000 shares of Tattooed Chef stock at $10 per share.   ¶ 81. The sale was not pursuant to a Rule 10b5-1 plan but instead was a sale that Galletti orchestrated the timing of in order to satisfy an obligation of "personal indebtedness" to a lender.   *Id*.   This demonstrates scienter because the

---

[11] The Individual Defendants are not entitled to a favorable inference based on the allegation that "Tattooed Chef did not hide the expenses from BDO" (¶ 112).   *See SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938, at *113 (C.D. Cal. Mar. 16, 2006) (refusing to negate scienter based on reliance-on-auditor defense).   To the contrary, this allegation gives rise to an inference of scienter on the part of BDO.   On this point, the Individual Defendants' reliance on *In re Taleo Corp. Securities Litigation* is misplaced because the inference of defendants' "innocent" intent there was drawn not from transparency to the auditor, but from the public disclosure of their accounting error. 2010 U.S. Dist. LEXIS 13696, at *29 (N.D. Cal. Feb. 17, 2010).

24

Company's written policies regarding insider sales prohibited Galletti from selling stock outside of a Rule 10b5-1 plan. *Id.* The same day, Galletti gifted 500,000 shares of stock to an unidentified individual. *Id.* Galletti benefitted from the gift by receiving an income tax deduction for the full value of the stock price on the date of sale times the number of shares gifted (500,000). Thus, in all, Galletti disposed of 1.3 million shares on April 15, 2021 at inflated prices and based on material non-public information. *Id.* Galletti's disposal of 1.3 million shares was unusual in timing and amount. *Id.* Galletti had not sold any Tattooed Chef stock at any point previously and did not sell any shares after this date. ¶ 82. These facts are sufficient to show scienter. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).

Arguing the contrary, the Individual Defendants cite no law to support their assertion, contrary to Plaintiffs' well-pleaded allegations, that Sam Galletti's stock sales were nothing "unusual" or "suspicious." *Zucco Partners, LLC v. Digimarc Corp.* is inapposite because plaintiffs there failed to provide any trading history of defendants. 552 F.3d 981, 1005–06 (9th Cir. 2009). Likewise inapposite is *Lipton v. Pathogenesis Corp.* because the insider stock sales there involved only "10,000 shares" — "a tiny percentage of [defendant's] holdings." 284 F.3d 1027, 1037 (9th Cir. 2002). In contrast, the FAC lays out the history, the unusual timing, and the significant amount of shares involved in Sam Galletti's stock sales. ¶ 81.

Finally, this case is atypical in that Tattooed Chef was very small, had only one operating segment, and Galletti and Dieckmann were the main decision makers. *See* ¶ 33 ("[w]e have one operating segment and one reportable segment, as our chief decision maker, our Chief Executive Officer, reviews financial information on an aggregate basis for purposes of allocating resources and evaluating financial performance"). Until July 2020, the only

25

other executive officer of the Company was Defendant Dieckmann.   ¶ 33. Galletti's daughter, Defendant Sarah Galletti, handled all the Company's marketing efforts and they collectively owned 50% of the stock, giving them a strong motive to commit fraud. ¶ 34.   The indisputable falsity of the defendants' statements, which mandated an accounting restatement, coupled with the small size of Tattooed Chef and the hands-on involvement of the defendants in the sales and accounting matters that required the restatement (¶¶ 19, 33–35) are strongly indicative of scienter.  *See*, *e.g.*, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601 (N.D. Cal. 2019) ("falsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter") (quoting *Zucco Partners*, 552 F.3d at 1000).

Based on similar allegations concerning a company's major product that was the driver of its growth (*see* ¶¶ 33 ("one operating segment"), 167 ("frozen food" as "core product")), the Ninth Circuit routinely inferred scienter based on the core-operations doctrine.  *E.g.*, *S. Ferry LP v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008); *see also*, *e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (scienter pled where security concerns were "highly material" to operations); *Okla. Police Pension and Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484–85 (9th Cir. 2019) (scienter pled where complaint "alleged overall importance of real-time Credit Check Alerts" to business model); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–88 (9th Cir. 2008) (reasonable inference executives knew about orders that would have a "devastating effect" on revenue).

26

### 3.    Plaintiffs Have Adequately Alleged Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the [economic] loss" faced by the plaintiff.  *Dura*, 544 U.S. at 342.  A complaint must give the defendant "notice" of this causal connection; in other words, "the complaint must allege that the defendant's share price fell significantly after the truth became known."  *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citations omitted).  The misrepresentation need not be the "sole" reason for the decline as long as it is a "substantial cause," and the allegations, "if assumed true, are sufficient" to indicate a causal relationship between the company's "financial misstatements" and "the drop in [its] stock price."  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1025–26 (9th Cir. 2005).

"At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," rather than other factors.  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  The ultimate question is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

Here, loss causation is more than adequately alleged by the FAC's allegations of four "corrective disclosures." First, on October 12, 2022, Tattooed Chef announced that it would have to restate its financial results.  ¶¶ 145–147. That announcement resulted in a 9.8% stock price decline.  ¶ 148.  Second, on November 10, 2022, Tattooed Chef filed its restated financial results, stating that its cash balance had decreased to just $14.2 million as of September 30, 2022, and had an accumulated deficit of $108.1 million.  ¶¶ 150–151.  That filing resulted in a 14.7% stock price decline.  ¶ 152.  Third, on November 16, 2022, Tattooed Chef disclosed that its "ability to continue as a going concern had

27

been materially impaired," and that "it was in violation of its lending covenants." ¶ 154. That disclosure resulted in a 12.4% stock price decline. ¶ 155. Finally, on November 28, 2022, Tattooed Chef announced that it had received a $5 million loan from Defendant Sam Galletti. ¶ 158. That announcement resulted in a 10.6% stock decline. ¶ 159.

These well-plead facts are sufficient to plead loss causation. *See Daou*, 411 F.3d at 1006. In *Daou*, the court held that the plaintiff had pled loss causation based on allegations that major losses reported in an August 1998 quarterly report were causally connected to the company's premature recognition of revenue. *Id.* at 1026; *accord Berson*, 527 F.3d at 989–90. Here, similarly, the corrective disclosures announced the need to restate financial results based on improper recognition of revenue, which is the basis of the fraud alleged in the complaint.[12]

Of the four corrective disclosures pled, the Individual Defendants only dispute one: the October 12, 2022 partial disclosure. In so doing, the Individual Defendants improperly dispute the complaint's allegations, claiming the stock went up, when the complaint alleges "Tattooed Chef's share price fell $0.44 per share, or 9.8%, from its close on October 12, 2022 to open on October 13, 2022 at $4.05 per share, damaging investors." ¶ 148. The Individual Defendants are wrong. The October 12, 2022 partial disclosure was made after-hours, and in fact did cause the stock to drop 9.8% when the market reopened the next morning. ¶ 148. Moreover, the Individual Defendants do not dispute the material stock drops in response to the November 10, 2022 disclosure, which

---

[12] For this reason, Defendants' cited cases involving a "mismatch" of a corrective disclosure and fraudulent statement are inapposite. *See* Defs.' Mem. at 25 (citing *Goldman Sachs Grp. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113 (2021), *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014), and *Metzler*, 540 F.3d at 1049). There is no "mismatch" here as all the disclosures related directly to the accounting fraud and need to restate financial results Plaintiffs allege were false.

28

resulted in a 14.7% stock decline, the November 16, 2022 disclosure, which resulted in a 12.4% stock decline, and the November 28, 2022 disclosure, which resulted in a 10.6% stock decline.   ¶¶ 153, 156, 159.   Each one of these disclosures provided additional incremental information about the Company's accounting restatement, causing the stock to tank from $4.49 on October 12, 2022 to $1.44 on November 29, 2022 — a combined drop of $3.05, or 68%.

The Individual Defendants' cited cases are inapposite.   In *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735 (D. Ariz. 2022), plaintiffs only alleged one stock drop, the decline was only 7%, the company never restated its financial results, and the single disclosure only referenced the company's receipt of a subpoena, while also "mention[ing] the COVID-19 pandemic more than seventy times, describing it as 'significantly impact[ing]' [the company's] business[.]" *Bajjuri*, 641 F. Supp. 3d at 770.  Similarly, in *Jedrzejczyk v. Skillz Inc.*, 2023 WL 2333891 (N.D. Cal. Mar. 1, 2023), only one corrective disclosure was alleged and it concerned a short seller report where the authors had "adverse financial incentives."   Here, in stark contrast, there were four corrective disclosures, all of which were made by the company itself and each of which not only disclosed the need for an accounting restatement but admitted that the specific reason requiring restatement was the same reason alleged by Plaintiffs here as the cause of the fraud.   *E.g.*, ¶ 145 (the Company had "incorrectly recorded expenses related to a multi-vendor mailer program with a large customer as operating expenses rather than as a reduction of revenue"). Also, there was not a temporary "dip followed by a rebound" in this case.  As noted *supra*, the Company's stock tanked 68% from the date of the first disclosure to the last disclosure.  The Company ultimately was forced to file for bankruptcy due to defendants' accounting fraud.  Absent legal support, the Individual Defendants' challenges to loss causation should be rejected.

**B.      Plaintiffs Have Stated a Section 20(a) Claim for Control-Person Liability**

To state a Section 20(a) claim, a plaintiff need only allege "(1) a primary violation of federal securities laws"; and "(2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Such allegations are subject to a notice-pleading standard. *See Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 966–67 (D. Ariz. 2010).

Here, as discussed above, Plaintiffs have stated a claim for primary violation. And Plaintiffs have alleged in detail that the Individual Defendants controlled Tattooed Chef and its financial reporting. *E.g.*, ¶¶ 19, 34, 108, 188, 198. Because the Individual Defendants do not challenge the sufficiency of the allegations of control, they have waived any argument on this point. Accordingly, the Court should deny the Individual Defendants' motion with respect to the Section 20(a) claim, if the Court finds that Plaintiffs have stated a claim under Section 10(b).

**C.      Should the Court Grant the Individual Defendants' Motion, the Court Should Grant Leave to Amend**

The Court should reject outright the Individual Defendants' request for dismissal with prejudice because it conflicts with the policy favoring resolution of cases "on the merits." *Foman v. Davis*, 371 U.S. 178, 181–82 (1962). Rule 15 provides that leave to amend "[shall be] freely give[n] … when justice so requires." FED. R. CIV. P. 15(a)(2). The Ninth Circuit requires that leave to amend be granted with "'extreme liberality.'" *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987).

30

Leave to amend is particularly appropriate because the motion to dismiss relies on a heightened pleading standard.  Any pleading deficiencies can be cured. *See United States ex rel. Tamanaha v. Furukawa Am., Inc.*, 445 F. App'x 992, 994 (9th Cir. 2011) (instructing the district court to grant leave to amend a complaint that failed to satisfy Rule 9(b)).  Moreover, no conceivable prejudice can result from amending the FAC because this case remains at the pleadings stage.  In fact, in securities-fraud class actions under a similar procedural posture, this Court has routinely granted plaintiffs leave to amend their complaints.  *E.g.*, *Jiangchen*, 2017 U.S. Dist. LEXIS 222743, at *21; *Black v. Snap, Inc.*, 2023 U.S. Dist. LEXIS 188695, at *48 (C.D. Cal. Sept. 26, 2023) (Wu, J.).

## III.   CONCLUSION

For the reasons set forth above, the Court should deny Defendants' motion in its entirety.

Dated:  October 25, 2024

Respectfully submitted,

BOTTINI & BOTTINI, INC.

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.
Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002
Email:         fbottini@bottinilaw.com
                   achang@bottinilaw.com

*Counsel for Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hofait, and Marco Starace*

31

**Certificate of Compliance**

The undersigned, counsel of record for John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace, certifies that this brief contains 8,705 words, which complies with the 10,000-word limit set by the Court's order of July 17, 2024 (Dkt. No. 95).

Dated:  October 25, 2024

<u>s/ Francis A. Bottini, Jr.</u>
Francis A. Bottini, Jr.

1