BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
   fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
   achang@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:   (858) 914-2002

*Counsel for Lead Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| DINKO MIHAYLOV, JOHN HANCOCK, SHASHANK BAGUL, JOHN SPADARO, MUSTAPHA HOTAIT, and MARCO STARACE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TATTOOED CHEF, INC., SALVATORE GALLETTI, STEPHANIE DIECKMANN, CHARLES F. CARGILE, EDWARD GELFAND, PAULA CIARAMITARO, MARIE QUINTERO-JOHNSON, SARAH GALLETTI, and BDO USA, LLP,<br><br>Defendants. | Case No. 2:22-cv-9311-GW-E<br><br>Class Action<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned counsel, allege the following, based upon personal knowledge as to themselves and their own acts, and based upon information and belief as to all other matters, relying on the investigation conducted by their counsel, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Tattooed Chef, Inc. ("Tattooed Chef", "TTCF" or the "Company"), information obtained from Confidential Witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for their allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Tattooed Chef securities between December 15, 2020 and November 28, 2022, inclusive (the "Class Period"). Plaintiffs seek to recover damages caused by Defendants' (defined below) violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.    During the Class Period, Defendants made false and misleading statements about Tattooed Chef's revenue growth and expenses and filed false financial statements and press releases which caused the Company's stock price to increase to over $26 per share, causing Plaintiffs and other stockholders to purchase the stock at inflated prices.  When the truth was revealed, the stock declined substantially, and currently trades at approximately $0.54 per share.

3.    The chart below represents the performance of Tattooed Chef's stock (blue line) compared to the Nasdaq index (green line) during the Class Period:

1



## II.  JURISDICTION AND VENUE

4.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

6.  Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company's head office is located at 6305 Alondra Boulevard, Paramount, California 90723.

7.  In connection with the acts, conduct and other wrongs alleged in

2

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiffs

8.    Lead Plaintiffs, as set forth in the accompanying certifications, incorporated by reference herein, purchased Tattooed Chef securities during the Class Period and were economically damaged thereby.

### B.    Defendants

#### (1)    The Company

9.    Defendant Tattooed Chef, Inc. is a food company that offers sourced plant-based food. Its products are available in the frozen food sections of national retail food stores across the United States, as well as on e-commerce sites. The Company also provides chef-created products to the group of plant-based consumers, as well as the mainstream marketplace. Tattooed Chef was founded by Salvatore Galletti and his daughter, Sarah Galletti, in 2017 and is headquartered in Paramount, California.

10.    Defendant Tattooed Chef is incorporated in Delaware and its headquarters are located at 6305 Alondra Boulevard, Paramount, California 90723. Tattooed Chef, Inc. securities trade on NASDAQ under the ticker symbol "TTCF."

#### (2)    The Individual Defendants

11.    Defendant Salvatore ("Sam") Galletti ("Sam Galletti") has served as the Company's Chief Executive Officer ("CEO") and President since 2017. Galletti had a motive and incentive to commit fraud because he stood to gain significantly from the Company's inflated stock price since he was the single

3

largest stockholder of Tattooed Chef during the Class Period, owning 50% of the Company's stock at the beginning of the Class Period and owning no less than 38.7% of the Company's stock at all times during the Class Period. Sam Galletti engaged in illegal insider selling during the Class Period.

12. Defendant Stephanie Dieckmann ("Dieckmann") served as the Company's Chief Operating Officer and then as Chief Financial Officer ("CFO") during the Class Period. In its SEC filings, Tattooed Chef represented that Dieckmann has extensive experience with finance and accounting issues. The Company's 2022 Proxy Statement represented that:

> [Ms. Dieckmann] has over 12 years of combined food industry experience. In her role as CFO, she oversees all of our accounting, business support, financial planning and analysis, treasury, real estate and tax functions. Ms. Dieckmann was appointed as our CFO on April 15, 2021. In her role as COO, Ms. Dieckmann is primarily responsible for all operations in the U.S. and helped spearheaded growth from approximately $32.5 million in sales in 2017 to approximately $148.5 million in 2020. Prior to joining us, Ms. Dieckmann was CFO at APPA Fine Foods, a private label food manufacturer of fresh ready to eat, frozen meals, and grilled chicken products, where she worked for over seven years. She also held a financial controller position with The Perfect Bite Co., a gourmet frozen appetizer company.

Dieckmann also had a motive to engage in fraud since she owned 500,000 shares of the Company's stock and thus stood to benefit from the inflated stock price. Shortly before the beginning of the Class Period, Dieckmann received a one-time bonus of $1,000,000 in cash and stock valued at approximately $12,040,000. By issuing false statements, Dieckmann benefitted through the

4

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

significant increase in the value of her stock.

13.    Defendant Charles F. Cargile served as the Company's CFO during the Class Period.

14.    Defendant Edward Gelfand served as a member of Tattooed Chef's Board of Directors during the Class Period and was the Chair of the Company's Audit Committee.  In its SEC filings, Tattooed Chef represented that Gelfand has extensive experience with securities regulation and public companies.  The Company's 2022 Proxy Statement represented that:

> Edward Gelfand has over four decades of combined legal experience involving business and securities regulation. Mr. Gelfand specializes in public and private securities offerings and syndications, securities compliance and transactions, public company filings, merger and acquisitions, as well as other related practices, including SEC and FINRA defense representation. Mr. Gelfand is an active member of the State Bar of California, and is a partner in the law firm of Gartenberg Gelfand Hayton LLP and also serves as of counsel to the law firm of Gundzik Heeger LLP. Mr. Gelfand has served and continues to serve as corporate securities counsel for several SEC-reporting public companies, including QS Energy, Inc., Rightscorp Inc., Iroquois Valley Farmland REIT, PBC (Regulation A+), Massroots, Inc. and PPOL, Inc. He also serves as corporate counsel to numerous private companies and individuals. Mr. Gelfand has experience across a wide range of industries, including broker-dealers, investment advisers, restaurants, film distribution pro boxing, renewable energies, aeronautics, auto racing, and real estate. Mr. Gelfand has been engaged in private and government practice since 1976. He has previously served as a

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

staff attorney, special counsel, and as a Chief, Branch of Enforcement, in the Los Angeles Regional Office of the SEC. He has also served as an arbitrator for the NASD, now Financial Industry Regulatory Authority (FINRA), and been appointed as a receiver by numerous federal courts. Mr. Gelfand received a B.S. from Roosevelt University in 1970, and a J.D. from the University of San Fernando Valley College of Law in 1976.

15. Defendant Paula Ciaramitaro served as a member of Tattooed Chef's Board of Directors during the Class Period and was a member of the Company's Audit Committee. In its SEC filings, Tattooed Chef represented that Ciaramitaro has extensive experience with accounting issues such as handling accounts receivable and accounts payable. The Company's 2022 Proxy Statement represented that:

[Ciaramitaro] is a seasoned financial executive with more than 25 years of experience in the food industry. She has served as the Controller for J&D Seafoods, Inc. since 1994 and has extensive experience managing accounts receivable, accounts payable, inventory and trading, product sourcing and creation, developing trading strategies in a very competitive seafood market, and much more. Prior to her position with J&D Seafoods, she founded her own travel agency, M.A.P. Travel, Inc., which she operated from 1982 to 1987.

16. Defendant Marie Quintero-Johnson served as a member of Tattooed Chef's Board of Directors during the Class Period and was a member of the Company's Audit Committee and is a CPA. In its SEC filings, Tattooed Chef represented that Quintero-Johnson is an accounting expert. The Company's 2022 Proxy Statement represented that:

6

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

Prior to joining the Coca-Cola Company in 1992, Ms. Quintero-Johnson began her career at Coopers & Lybrand (n.k.a PricewaterhouseCoopers). Ms. Quintero-Johnson currently sits on the Board of Coca-Cola Beverages Africa, Coca-Cola Bottling of Egypt, Atlanta Downtown Improvement District, and Cristo Rey Atlanta High School. She received her M.B.A. from the Darden Graduate School of Business Administration, University of Virginia, and her B.S. in Accounting and International Business from Georgetown University. Ms. Quintero-Johnson is a Certified Public Accountant.

17. Defendant Sarah Galletti is a co-founder of the Company and has served as its Chief Marketing Officer at all relevant times, responsible for all sales and marketing decisions. Together with her father Sam Galletti, Sarah Galletti owns over 50% of the Company's stock and thus is a control person.

18. Defendants Sam Galletti, Dieckmann, Cargile, Gelfand, Ciaramitaro, Sarah Galletti, and Quintero-Johnson are collectively referred to herein as the "Individual Defendants."

19. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or

7

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

20.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

21.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Tattooed Chef under *respondeat superior* and agency principles.

**(3)    BDO**

22.    Defendant BDO USA, LLP ("BDO") was the external auditor responsible for auditing Tattooed Chef's financial statements during the Class Period. BDO willfully ignored accounting errors that existed in plain sight and improperly represented that Tattooed Chef's financial statements fully complied with GAAP.

23.    Tattooed Chef, the Individual Defendants, and BDO are collectively referred to as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**A.    Defendant Sam Galletti Forms a SPAC and Then Orchestrates a Merger**

24.    The endemic fraud associated with Special Purpose Acquisition Companies ("SPACs") has by now been well documented. Of course, everything is clear in hindsight. But this case concerns conduct that took place

8

during the heyday of the SPACs, when the fraud was not yet known. SPACs were once the darling of Wall Street, accounting for about half of all new IPOs by volume from January 2019 until early 2021, according to a February 2021 JP Morgan report.[1]

25.     Here, Defendant Sam Galletti was the sponsor and ringleader of the SPAC. The sponsors of a SPAC—the people running it—get highly discounted rates on upwards of a fifth of company stock. Combined with redemptions, the result can be heavy dilution.

26.     A recent analysis by Stanford Law School professor Michael Klausner, NYU School of Law assistant professor Michael Ohlrogge, and Emily Ruan of Stanford University shows that the ultimate dilution means that, while SPACs raise $10 per share at the outset, by the time they merge with a target, the median SPAC only has $6.67 in cash for each outstanding share.[2]

27.     SPACs are nick-named blank-check companies because, until the target is identified, no one knows what the business will ultimately be.

28.     Tattooed Chef was originally incorporated in Delaware on May 4, 2018 under the name of Forum Merger II Corporation ("Forum"), as a SPAC for the purpose of effecting a merger, capital stock exchange, asset acquisitions, stock purchase, reorganization or similar business combination with one or more business.

29.     On October 15, 2020 (the "Closing Date"), Forum consummated the transactions contemplated within the Agreement and Plan of Merger dated June 11, 2020 as amended on August 10, 2020, (the "Merger Agreement"), by

---

[1] *See* Erik Sherman, *5 Lessons from the Rise and Fall of SPACs*, FORTUNE, Apr. 27, 2021, *available at* https://www.forbes.com/sites/zengernews/2021/04/27/5-lessons-from-the-rise-and-fall-of-spacs/?sh=2c159a967cb0 (last visited Jan. 28, 2025).

[2] *Id.*

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

and among Forum, Myjojo, Inc., a Delaware corporation ("Myjojo (Delaware)"),[3] Sprout Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Forum ("Merger Sub"), and Sam Galletti, in his capacity as the holder representative (the "Holder Representative"). The transactions contemplated by the Merger Agreement are referred to herein as the "Transaction" or "Merger."

30.   Upon the consummation of the Merger, Merger Sub merged with and into Myjojo (Delaware) (the "Merger"), with Myjojo (Delaware) surviving the Merger in accordance with the Delaware General Corporation Law. Immediately upon the completion of the Merger, Myjojo (Delaware) became a direct wholly owned subsidiary of Forum.

31.   In connection with the Closing of the Merger (the "Closing"), Forum changed its name to Tattooed Chef, Inc. Tattooed Chef's common stock began trading on the Nasdaq under the symbol "TTCF" on October 16, 2020.

**B.   Tattooed Chef and Its Marketing and Sales Strategies**

32.   According to Tattooed Chef's November 19, 2022 Prospectus:

> [Tattoed Chef is] a rapidly-growing plant-based food company with operations in the United States and Italy, offering a broad portfolio of frozen, plant-based food products in private label and under the 'Tattooed Chef' brand. We provide plant-based meals and snacks including, but not limited to, acai and smoothie bowls, zucchini spirals, riced cauliflower, vegetable bowls and cauliflower crust pizza to leading club store and food retailers in

---

[3] Sam Galletti had originally formed Myjojo as a California S-corporation. On May 21, 2020, Myjojo (Delaware) was formed with Sam Galletti owning all of the shares of common stock. On May 27, 2020, Myjojo, Inc. (California) merged into Myjojo, Inc. (Delaware) with Myjojo, Inc. (Delaware) issuing shares of common stock to the sole stockholder (Galletti) of Myjojo (California).

10

the United States.[4]

33.    Tattooed Chef was a very small company prior to the beginning of the Class Period. Tattooed Chef represented that Defendant Galletti was the Company's chief decision-maker and the one person who made all major decisions affecting the Company: "We have one operating segment and one reportable segment, as our chief decision maker, our Chief Executive Officer, reviews financial information on an aggregate basis for purposes of allocating resources and evaluating financial performance."[5]   Until July 2020, the only other executive officer of the Company was Defendant Dieckmann.  Tattooed Chef later added a Chief Growth Officer in July 2020 and a CFO in August 2020.  Thus, at the start of the Class Period, the Company only had five people in its leadership team.

34.    Moreover, Galletti's daughter, Defendant Sarah Galletti, handled all the Company's marketing efforts: "*Ms. Galletti* [ ] *currently oversees all "Tattooed Chef" marketing efforts*.[6]  The father/daughter duo, who founded the Company, also own 50% of the Company's stock, and thus dominate and control all aspects of the Company.

35.    The Company was, prior to the start of the Class Period, experiencing growth but constrained by the fact that it only had one line of business, a limited number of products, and a concentration of most of its sales in just five customers:

Our revenue in the twelve month period ended December 31, 2019 ("Fiscal 2019") was approximately $84.9 million, which represents a 79.5% increase from the twelve month period ended December

---

[4] *See* Prospectus filed with the SEC on Nov. 19, 2020, at 23.
[5] *Id.* at 24.
[6] *Id.*

11

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

31, 2018 ("Fiscal 2018") revenue of $47.3 million and for the nine months ended September 30, 2020 was approximately $108.9 million, which represents a 87.4% increase from revenue for the nine months ended September 30, 2019 of $58.1 million. As of September 30, 2020, our products were sold in approximately 7,200 club and grocery outlets in the United States. Our innovative plant-based products offer consumers a diverse portfolio of wholesome, clean label items that are convenient, without sacrificing on quality, nutritional value or freshness and that are great tasting.

*During Fiscal 2019, we sold a substantial portion of our products to five customers, which accounted for approximately 95% of Fiscal 2019 revenue. Three of those customers accounted for approximately 87% of revenue for the nine months ended September 30, 2020.* Management believes our relationships with these customers are strong, and none have indicated any intent to cease or reduce the volume of business they do with us. As we grow "Tattooed Chef," we expect to expand our sales and marketing team by adding more dedicated personnel to service additional retail customers. We are also contemplating adding outside sales representatives and/or brokers to extend our sales efforts. These efforts to add retail customers could partially mitigate customer concentration risk.

36. As the Class Period began, Tattooed Chef's stock price and prospects were dependent on increasing sales and revenues. Because Tattooed Chef was not profitable, the Company's revenue growth rate was the main metric emphasized by Tattooed Chef to analysts and the stock market. Further, its main strategy for growing revenues was to try to increase distribution of its

12

products to more retailers and to grocery stores, to increase the number of its products sold through its club channel (Walmart and Sam's Club), and to increase sales of its branded products instead of its private label products, which historically had accounted for most of its sales.  With respect to its goal of increasing sales of its branded products, the Company stated:

> Revenue Strategy — Historical growth has been predominately driven by sales of private label products. However, *our current strategy is to grow sales of "Tattooed Chef" branded products, which have increased from approximately 4% of revenue in Fiscal 2018 to approximately 22% of revenue in Fiscal 2019 to approximately 55% of revenue in the nine months ended September 30, 2020*.  We expect growth of "Tattooed Chef" sales to continue to outpace that of private label, *which will require us to plan, develop and execute a detailed marketing strategy*.[7]

37.    In order to increase sales of its branded products, however, Tattooed Chef needed to hire more people and also pay higher "slotting fees" and incur promotional expenses.   Tattooed Chef's products are frozen products that are sold in stores' highly competitive freezer department.  These products are subject to much higher competition because retailers and grocery stores have a much more limited space available for frozen products.

**C.    Materially False and Misleading Statements Issued During the Class Period**

38.    On December 15, 2020, Tattooed Chef filed a Form 8-K signed by its CEO Charles Cargile.  The filing attached slides from an "Analyst Day" presentation that Defendants Sam Galletti, Dieckmann, Sarah Galletti, and

---

[7] *Id.* at 24.

13

Cargile had presented to stock analysts. The presentation contained the following graph depicting the history of the Company:



39.  The Investor Day presentation also told analysts that Tattooed Chef was growing rapidly and had a "massive opportunity to disrupt the $55bn U.S. frozen food category" and that "Tattooed Chef's near-term opportunity [was] $12.6 bn":

[The remainder of this page is deliberately left blank.]

14

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws



40.    At the beginning of the Class Period, almost all the Company's products were sold through big box retailers such as Wal-Mart and Costco, as reflected in the chart below:

[The remainder of this page is deliberately left blank.]

15

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws



41.     During the Class Period, however, in an effort to expand its growth, Tattooed Chef embarked on a plan to try to sell its products in grocery stores:

> Tattooed Chef products are sold in the frozen food section of retail stores and club stores. We initially approached club stores to carry Tattooed Chef products recognizing the demanding volume requirements associated with these customers. ***We believe our success with club stores across an array of Tattooed Chef branded products indicates that the Tattooed Chef brand resonates with our target consumer and would be attractive to conventional retail grocery customers***.[8]

42.     Tattooed Chef represented that the Merger with Forum Merger II Corporation in the Fall of 2020 would allow the Company to achieve this goal of expanding beyond Walmart, Costco and Sam's Club.  Tattooed Chef's December 15, 2020 Investor Day presentation supplied the following graph

---

[8] *See* 2020 Annual Report at 4.

16

depicting additional distribution partners and brokers that it gained access to as a result of the Merger:

43.     Tattooed Chef's December 15, 2020 Investor Day presentation stated that it had gained access to the following grocery stores for the purpose of selling its products in the prior two months:

[The remainder of this page is deliberately left blank.]

17

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws



**LAST 60 DAYS: WE INTRODUCED TATTOOED CHEF TO THE FOLLOWING NATIONAL RETAILERS**

    

    

    

    

**WE EXPECT SIGNIFCANT OFFICIAL NEW BUSINESS AWARDS THAT WILL GO INTO EFFECT IN 2021**

44.    Two key factors made it more difficult for upstarts like Tattooed Chef to convince retailers to give them space in the frozen section:  (1) there is a much more limited amount of space available for frozen products in grocery stores compared to big box retailers such as Costco and Sam's Club;  and (2) the limited amount of space available, as well as the increased costs to retailers and grocery stores of maintaining frozen sections, including the cost of the freezers and higher electricity costs, causes retailers and grocery stores to successfully demand higher "slotting fees" and other payments and/or discounts from manufacturers for the frozen shelf space.  These factors made it difficult for smaller companies like Tattooed Chef to maintain desired margins after paying the increased promotional costs and slotting fees. Nonetheless, Tattooed Chef represented to the market as the Class Period began that it was well-positioned to supercharge its growth through increased sales of its branded frozen products.

18

45.     Despite these problems, Defendants Galletti, Cargile, and Dieckmann provided the following earnings guidance in the December 15, 2020 Investor Day presentation, telling investors the Company expected to realize revenue of $222 million the following year and then more than double revenue to $500 million by 2023:[9]

**2021 GUIDANCE AND BEYOND**

| Year | Revenue | Gross Margin | Adjusted EBITDA |
|---|---|---|---|
| 2021 | $222 million | 20% - 25% | $8-10 million |
| 2022 | $300 million | 25% - 30% | mid-teens as % of sales |
| 2023 | $500 million | 30% - 35% | high-teens as % of sales |
| 2026 | $1 billion | 35%+ | 20%+ as % of sales |

46.     Defendants also highlighted the 645% growth of the Company's branded products, which growth they represented had been achieved "with no spending on marketing promotion":

---

[9] The revenue, gross margin, and EBITDA guidance was not accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the guidance. Moreover, the guidance was false and misleading and was made by Defendants Sam and Sarah Galletti, Dieckmann, and Cargile with actual knowledge by them that the statements were false or misleading. Among other things, as alleged herein, the Individual Defendants knew at the time that Tattooed Chef's growth plan and projected revenues and gross profits/margins were predicated on an accounting scam pursuant by which the Company was improperly classifying the slotting fees and in-store promotion costs that were essential to the growth plan as "operational expenses" instead of reductions to revenue.

19



47.    The statements in paragraphs 38, 39, 45, and 46, made at the December 15, 2020 Investor Day presentation and incorporated in the Form 8-K, were false and misleading because they failed to disclose the fact that, far from being premised on "no spending on marketing promotion," Tattooed Chef's aggressive growth strategy was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that Defendants Sam and Sarah Galletti, Cargile, and Dieckmann intended to mischaracterize those expenses as "operating expenses" instead of reductions to revenue, as required by GAAP. As a result, the statements about revenue growth were materially inflated; had the slotting fees and in-store promotion fees been deducted from the revenue figures, the revenue growth would have been materially lower.

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

48.    Defendants Sam and Sarah Galletti, Dieckmann, and Cargile told the analysts that the Company would launch its first advertising and marketing campaign in 2021, which would drive significant continued growth:

49.    The Gallettis and Dieckmann, who collectively owned 51% of the Company's stock, also told investors that the Company planned to raise capital needed to fund its growth through investors' exercise of warrants. The investors would receive stock and the Company would receive cash. However, for the Company to be able to raise this cash, which would be up to $230 million, its stock needed to trade above $18 per share for 20 out of 30 trading days, as reflected by the following graph that the Gallettis and Dieckmann provided to analysts:

21

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws



## Capital Structure

| Name | Shares O/S | % |
|---|---|---|
| Sam Galletti (and Family) | 32,786,538 | 50% |
| Public Shareholders | 20,093,584 | 31% |
| Fourm II Management | 5,555,000 | 9% |
| UMB Capital Corporation | 4,683,791 | 7% |
| Pizzo Food, SRL | 1,500,000 | 2% |
| Stephanie Dieckmann | 500,000 | 1% |
| | 65,118,913 | 100% |

Warrants (TTCFW)　　　　　　　　　　　　　　　20,000,000
　　Exercisable @ $11.50
　　Callable by the company if share price trades > $18 for 20 of 30 trading days.
　　Could generate $230 million cash --- or Company can choose a cashless exercise.

50.    Prior to the Investor Day presentation, the Company's stock was well below the price necessary to allow the Company to raise the needed cash through exercise of the warrants.  On December 2, 2020, the stock closed at $15.42.  After the Investor Day presentation was filed with the SEC on Form 8-K, however, the stock's price rose dramatically, increasing to $19.35 on December 15, 2020 on unusually heavy trading volume of 6.8 million shares, approximately ten times the normal volume.  The stock continued to increase in the ensuing days, reaching $24.69 by December 23, 2020 on unusually heavy trading volume, as reflected in the following chart:

22

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

51.     On February 22, 2021, Tattooed Chef issued a press release which disclosed that the Company had been able to raise cash from the exercise of the warrants due to its stock having exceeded the necessary price:

PARAMOUNT, Calif., Feb. 22, 2021 (GLOBE NEWSWIRE) -- Tattooed Chef, Inc. (Nasdaq: TTCF) ("Tattooed Chef" or the "Company"), a leader in plant-based foods, today announced that 9,108,935 publicly held warrants (the "Public Warrants") were exercised on a cashless basis as of 5:00 p.m. Eastern Time on February 16, 2021, the date for redemption fixed by the Company. As a result of the cashless exercise mechanism, 4,447,892 of the 9,108,935 shares underlying the Public Warrants were surrendered in payment of the warrant exercise price, and 4,661,043 shares were issued. The warrants have ceased to trade on Nasdaq and the Company now has a total of 81,448,726 shares of common stock issued and outstanding.

*As announced on January 14, 2021, 10,758,215 Public Warrants were previously exercised for cash, resulting in the Company receiving cash exercise price proceeds of $123,719,473, in the aggregate. The Company's total cash balance is now approximately $200 million.*

*Sam Galletti, Tattooed Chef's Chief Executive Officer said, "We are pleased to have further strengthened our balance sheet* while simplifying our capital structure and limiting dilution by invoking the cashless exercise provision for a portion of the Public Warrants. With $200 million of cash on-hand, we have the ability to invest in strategic growth initiatives to accelerate our growth and enhance long-term stockholder value."

23

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

**Preliminary Revenue Results**

*Tattooed Chef today announced preliminary revenue of approximately $39.5 million for the fourth quarter of 2020 and $149 million for fiscal year 2020, representing 47% growth and 76% growth compared to the respective prior year periods. In addition, revenue of Tattooed Chef branded product was approximately $24 million for the fourth quarter of 2020 representing the highest quarterly branded revenue in Company history and reflects an increase of 253% compared to $9.5 million in the prior year period. For fiscal year 2020, revenue of Tattooed Chef branded product was approximately $85 million, an increase of 448% compared to $18.9 million in fiscal year 2019.*

The Company expects to report fourth quarter and fiscal 2020 financial results after market close on Wednesday, March 10, 2021.

52.   On March 10, 2021, Tattooed Chef issued a press release pre-announcing its Q4 2020 and full year 2020 financial results. Approved by Sarah and Sam Galletti, the press release stated:

Paramount, California—March 10, 2021 (GLOBE NEWSWIRE) – Tattooed Chef, Inc. (Nasdaq: TTCF) ("Tattooed Chef" or the "Company"), a leader in plant-based foods, today announced financial results for the three and twelve months ended December 31, 2020.

*"We are pleased with our solid financial results for the fourth quarter and full year 2020 driven by record sales of our Tattooed Chef branded products,"* said Sam Galletti, President and CEO of Tattooed Chef. "We are successfully executing on our growth

24

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

strategy and have kept the momentum going with a strong start to 2021. Based on current retailer commitments, *we will increase store count by 41% and points of distribution of Tattooed Chef branded products by 35% by the end of the first quarter. We have a long runway for growth, particularly in conventional food retailers and are thrilled with our early success*."

*Sarah Galletti, Chief Creative Officer and "The Tattooed Chef", added,* "The success of our brand is attributable to our ability to connect with consumers through our food. We are revolutionizing the way people think about plant-based food and disrupting the frozen aisle with a differentiated offering. *We ended 2020 with 38 branded SKUs and have a pipeline of 150 more plant-based ideas we can't wait to share with the world*."

**Financial Highlights for the Fourth Quarter of 2020 Compared to the Fourth Quarter of 2019**

● *Revenue was $39.6 million, a 48% increase compared to $26.8 million in the prior year period; Tattooed Chef branded product revenue was a record $23.9 million, an increase of 172% compared to $8.8 million in the prior year period*.

● Net income was $41.5 million compared to net income of $2.2 million in the prior year period. The current period net income included a one-time tax benefit resulting from the Company's change from an S-corporation to a C-corporation at the time of the reverse merger in October 2020. The restructuring in anticipation of the merger caused a step-up in the tax basis of intangible assets creating a deferred tax asset and a tax benefit of $39.3 million.

● Adjusted EBITDA was $3.7 million, or 9% of revenue,

25

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

compared to $2.2 million, or 8% of revenue, in the prior year period.

53.     The March 10, 2021 press release also reported the following financial results for the full year 2020 period:

**Full Year 2020 Results**

Revenue increased by $63.6 million, or 75%, to $148.5 million for the year ended December 31, 2020 compared to $84.9 million in the year ended December 31, 2019. The revenue increase was primarily driven by a $66.3 million increase in sales of Tattooed Chef branded products, partially offset by a $0.9 million decrease in sales of private label products and a $1.8 million decrease in sales of legacy products for select private label retailers resulting from our shift in focus to branded product sales. The increase in Tattooed Chef branded products resulted from expansion in the number of U.S. distribution points, as well as increased volume at existing club channel customers of our current portfolio of products and new product introductions including smoothie bowls, vegetable blends, buffalo cauliflower, and other value-added riced cauliflower meals.

*Gross profit increased $10.0 million to $23.7 million in the year ended December 31, 2020* compared to $13.7 million in the year ended December 31, 2019. *Gross margin in the year ended December 31, 2020 was 15.9%*, slightly lower than 16.1% in the year ended December 31, 2019. The gross profit increase was primarily due to the higher revenue levels for the year ended December 31, 2020 compared to the prior year. Gross margin declined slightly due to higher costs for raw materials and other variable

26

manufacturing costs in the year ended December 31, 2020 as compared to the prior year.

*Operating expenses increased $12.0 million to $19.5 million in the year ended December 31, 2020* compared to $7.5 million in the year ended December 31, 2019.

54.     The statements in the March 10, 2021 press release by Sarah and Sam Galletti, as alleged in paragraphs 52 and 53, were false and misleading because they misrepresented the Company's financial results.  In reality, the Company's gross profits for 2020 were only $22.358 million, not $23.7 million, and gross margins for 2020 were only 15.1%, not 15.9%.[10]  The statement that the Company's operating expenses were only $19.5 million in 2020 was also false.  When the Company subsequently filed its 2020 Annual Report nine days later, it listed operating expenses of $32.541 million for 2020.[11]  The statements also touted the Company's strong growth but omitted to disclose the fact that a significant increase in spending on sales and marketing expenses to support the growth in revenue and brand recognition for Tattooed Chef was occurring, thereby providing a materially misleading picture of the Company's financial condition and growth.   Indeed, when the Individual Defendants finally came clean with the Company's actual, restated financial results in the fall of 2022, they were forced to admit the true adverse extent of these significant additional expenses: Adjusted EBITDA decreased by $35.8 million to a loss of $26.1

---

[10] As later admitted and disclosed by the Company in its Amended Form 10-K/A filed with the SEC on Nov. 17, 2022, at 38.  The Amended Form 10-K/A was for the reporting period ending Dec. 31, 2021 but contained revised/restated numbers for 2020.

[11] *See* 2020 Annual Report on Form 10-K, filed Mar. 19, 2021, at F-3. The Annual Report also stated: "Operating expenses increased $25.0 million, or 336.6%, to $32.5 million for Fiscal 2020 as compared to $7.5 million for Fiscal 2019." *Id.* at 31.

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

million for Fiscal 2021 as compared to positive $9.7 million for Fiscal 2020.[12]

55.    The March 10, 2021 false statements had their desired effect, as the Company's stock price rose substantially.  On March 5, 2021, the stock had closed at $19.12 per share.  After the disclosure of the false financial results, the stock increased from $20.46 on March 9, 2021 to $22.34 on March 15, 2021, with heavy trading volume of almost 3 million shares on March 11, 2021, as reflected in the following chart:



56.    On March 19, 2021, after market hours, Tattooed Chef filed with the SEC its 2020 Annual report on Form 10K for the year ended December 31, 2020 (the "2020 Annual Report"). The 2020 Annual Report was signed by Defendants Galletti, Cargile, Gelfand, Ciaramitaro, and Quintero-Johnson.  In

---

[12] *See* Amended 10-K/A, filed Nov. 17, 2022, at 40.

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

addition, attached to the Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Galletti and Cargile attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of any fraud. Cargile was identified as the Company's CFO and Principal Financial and Accounting Officer.

57. The 2020 Annual Report stated that Sam and Sarah Galletti, along with Stephanie Dieckmann, were key executives at the Company responsible for all the key decisions regarding sales and marketing, as well as the Company's growth strategy:

*Our success is substantially dependent on the continued service of certain members of senior management, including Salvatore "Sam" Galletti, our founder, President and Chief Executive Officer, Stephanie Dieckmann, our Chief Operating Officer, Sarah Galletti, the "Tattooed Chef" and our Creative Director*, and Giuseppe Bardari, President of Ittella Italy. *These executives have been primarily responsible for determining the strategic direction of our business and for executing our growth strategy* and are integral to our brand, culture, product development and the reputation we enjoy with suppliers, co-manufacturers, distributors, customers and consumers. In particular, Ms. Galletti is responsible for leading our branding initiatives, creative strategy, and product development, and there is no other current employee who can lead these functions if Ms. Galletti is unable to provide these services to us. In addition, Mr. Galletti and Ms. Galletti have historically been the primary sales and marketing contacts for our customers. The loss of the services of any of these executives could adversely affect

29

our business, relationship with key customers and suppliers, branding, creative strategies, and prospects, as we may not be able to find suitable individuals to replace them on a timely basis, if at all.  In addition, any such departure could be viewed in a negative light by investors and analysts, which may cause the price of any of our publicly traded securities to decline.  We do not currently carry key-person life insurance for any of our management team.[13]

58.    The 2020 Annual Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding the Company's internal controls and remediation efforts:

***Controls and Procedures***

We have begun the process of, and we are focused on, designing and implementing effective internal controls measures to improve our internal control over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:

- We hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting; and

- We developed internal controls documentation, including comprehensive accounting policies and procedures and designed, implemented, and tested new controls over key financial processes

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a

---

[13] *See* 2020 Annual Report at 13.

30

sustained period of financial reporting cycles, *we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting.*

*Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our chief executive officer and chief financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this Quarterly Report. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of March 31, 2021, our disclosure controls and procedures were not effective due to the material weaknesses in our internal control over financial reporting described above.

*However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.*

*Changes in Internal Control Over Financial Reporting*

*Other than described above in this Item 4, there has been no change*

31

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

*in our internal control over financial reporting during the fiscal quarter ended March 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*.

59.     The statements in paragraph 58 were false and misleading because the Annual Report misrepresented that the Company's financial statements complied with GAAP, misrepresented the extent of the material deficiencies in the Company's internal controls, and falsely stated that there had been no change in internal controls over financing reporting during the quarter ended March 31, 2021 that were reasonably likely to have any additional material effect on the controls over financial reporting.

60.     The 2020 Annual Report was also false and misleading because it misrepresented the Company's financial results.  In reality, the Company's gross profits for 2020 were only $22.358 million, not $23.7 million, and gross margins for 2020 were only 15.1%, not 15.9%.[14]

61.     The 2020 Annual Report also stated:

**Indebtedness**

*We have a line of credit that provides for borrowings up to (a) 90% of the net amount of eligible accounts receivables*; plus, (b) the least of (i) the sum of: (A) 50% of the net amount of eligible inventory; plus (B) 45% of the net amount of eligible in-transit inventory; (ii) $10.0 million; or (iii) 50% of the aggregate amount of revolving loans outstanding, minus (C) the sum of all reserves.

62.     The 2020 Annual Report also represented that the Company had been successful in increasing sales of its branded products compared to sales

---

[14] As later admitted and disclosed by the Company in its Amended Form 10-K/A filed with the SEC on Nov. 17, 2022, at 38.  The Amended Form 10-K/A was for the reporting period ending Dec. 31, 2021 but contained revised/restated numbers for 2020.

32

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

of its private label products, which traditionally had constituted most of its sales. While that continued to remain true, the Company reported that the sales of its branded products had significantly increased, growing from approximately 22% of total revenue in Fiscal 2019 ($18.3 million) to approximately 57% of total revenue in Fiscal 2020 ($84.6 million):

| Revenue Streams (in thousands) | December 31, 2020 | | December 31, 2019 | |
| --- | --- | --- | --- | --- |
| | Revenue | % Total | Revenue | % Total |
| Private Label | $    62,906 | 42% | $   63,820 | 75% |
| Tattooed Chef | 84,592 | 57% | 18,280 | 22% |
| Other revenues | 994 | 1% | 2,819 | 3% |
| Total | $   148,492 | | $   84,919 | |

In addition, the 2020 Annual Report touted the Company's ability to increase sales and revenue in retail stores:

*Proven and Experienced Management Team*

Our executive management team, led by Salvatore "Sam" Galletti, includes individuals who possess substantial industry experience. Cumulatively, our management team has over 160 years of industry experience, with an average of 25 years' experience in the food industry, and an average tenure with us of seven years. We believe that the depth of experience of our management team demonstrates our capability to continue growing our business.

…

*Continue to Grow the Tattooed Chef Brand*
…

Tattooed Chef products are sold in the frozen food section of retail stores and club stores. We initially approached club stores to carry Tattooed Chef products recognizing the demanding volume requirements associated with these customers. *We believe our*

33

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

*success with club stores across an array of Tattooed Chef branded products indicates that the Tattooed Chef brand resonates with our target consumer and would be attractive to conventional retail grocery customers.*

…

***Expand Product Offerings***

We believe that there is significant consumer demand for plant-based products as evidenced by the successful launch of a variety of our products.  In addition, we believe that we have been successful in identifying meaningful consumer trends and translating these preferences into products that meet our customers' requirements.  *We intend to leverage this knowledge and experience to continue to build our new concept library and expand our existing portfolio of products by creating new products and line extensions.*[15]

63.    The foregoing statements in paragraph 62 about the increased sales of the Company's branded products were false and misleading because they failed to disclose the extent of the slotting and promotional fees/discounts that the Company was paying to get retailers to carry their branded products, and that such expenses were being misclassified as operational expenses instead of reductions to revenue.  They also misrepresented the Company's ability to increase sales and revenue in retail stores.

64.    On April 16, 2021, Tattooed Chef filed a Form 8-K announcing that its CFO, Mr. Cargile, had resigned "effective immediately."  The Company appointed Defendant Dieckmann to replace Cargile.  The Form 8-K

---

[15] 2020 Annual Report at 4.

34

represented that "Mr. Cargile's resignation is not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or procedures."

65.    Just one month later, on May 18, 2021, Tattooed Chef filed a "Notification of Late Filing" on Form 12b-25 in which it stated that "Tattooed Chef, Inc. (the "Company") has determined that it is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2021."  The form was signed by Defendant Dieckmann.

66.    The May 18, 2021 Form 12b-25 stated:

On April 12, 2021, the Acting Director of the Division of Corporation Finance and Acting Chief Accountant of the Securities and Exchange Commission together issued a public statement (the "SEC Warrant Accounting Statement") on accounting and reporting considerations for warrants issued by special purpose acquisition companies ("SPACs").  The SEC Warrant Accounting Statement discussed "certain features of warrants issued in SPAC transactions" that "may be common across many entities." The SEC Warrant Accounting Statement indicated that when one or more of such features is included in a warrant, the warrant "should be classified as a liability measured at fair value, with changes in fair value each period reported in earnings."  The Company classified its private placement warrants issued concurrently with the Company's initial public offering (the "Warrants") as equity instruments. As a result of the SEC Warrant Accounting Statement, the Company's management spent considerable time and effort evaluating accounting treatment of the Warrants, taking time and

35

resources that would otherwise have been devoted to other Form 10-Q matters requiring attention and rendering the Company unable to complete its accounting procedures by the filing deadline.

67.     The Form 12b-25 was false and misleading because it represented that the entire basis for the delay in filing the Company's Form 10-Q was the additional work it had been required to do in order to reclassify its SPAC-related warrants from equity to debt.  In reality, a significant reason for the delay in filing the Form 10-Q was a result of the issues surrounding revenue recognition and the classification and timing of expenses.

68.     On May 18, 2021, Tattooed Chef filed its Form 10-Q for the quarter ending March 31, 2021.  The Quarterly Report was signed by Defendants Sam Galletti and Dieckmann.  The Form 10-Q reported the following revenue and other financial information for Q1 2021:

**TATTOOED CHEF, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND COMPREHENSIVE INCOME (LOSS) (unaudited)**
**(in thousands, except for share and per share information)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| **REVENUE** | $    52,682 | $    33,170 |
| **COST OF GOODS SOLD** | 45,905 | 23,927 |
| **GROSS PROFIT** | 6,777 | 9,243 |
| **OPERATING EXPENSES** | 13,795 | 2,390 |
| **INCOME (LOSS) FROM OPERATIONS** | (7,018) | 6,853 |
| Interest expense | (20) | (224) |
| Other income (expense) | (2,589) | - |
| **INCOME (LOSS) BEFORE PROVISION FOR INCOME TAXES** | (9,627) | 6,629 |
| **INCOME TAX BENEFIT (EXPENSE)** | 1,475 | (730) |

36

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

| | | |
|---|---:|---:|
| **NET INCOME (LOSS)** | (8,152) | 5,899 |
| **LESS: INCOME ATTRIBUTABLE TO NONCONTROLLING INTERESTS** | - | 1,022 |
| **NET INCOME (LOSS) ATTRIBUTABLE TO TATTOOED CHEF, INC.** | $ (8,152) $ | 4,877 |
| **NET INCOME (LOSS) PER SHARE** | | |
| Basic | $ (0.10) $ | 0.17 |
| Diluted | $ (0.11) $ | 0.17 |
| **WEIGHTED AVERAGE COMMON SHARES** | | |
| Basic | 79,415,105 | 28,324,038 |
| Diluted | 79,719,129 | 28,324,038 |
| **OTHER COMPREHENSIVE INCOME (LOSS), NET OF TAX** | | |
| Foreign currency translation adjustments | 109 | (352) |
| Total other comprehensive income (loss), net of tax | 109 | (352) |
| Comprehensive income | (8,043) | 5,547 |
| Less: comprehensive income attributable to the noncontrolling interest | - | 1,011 |
| Comprehensive income attributable to Tattooed Chef, Inc. stockholders | $ (8,043) $ | 4,536 |

69.    The Q1 2021 Form 10-Q was false and misleading because it *overstated revenue by $2.054 million, overstated gross profit by $2.173 million, and overstated operating expenses by $3.025 million*.

70.    In response to the Company's filing of these financial results, the Company's stock price rose substantially.  The stock had closed at $16.85 on May 13, 2021.  In response to the filing of the Q1 2021, though, the stock increased substantially, rising from a close of $18.01 on May 17, 2021 to close at $19.84 on May 18, 2021, on heavy volume of over two million shares.  The Company's stock price continued to increase in the ensuing days based on the improved reported results and increased revenues, rising to $23.29 per share by June 2, 2021, as reflected in the chart below:

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

71.     Tattooed Chef later admitted that the Q1 2021 Form 10-Q was false and misleading and did not comply with GAAP.  On November 17, 2022, Tattooed Chef filed an Amended Form 10-Q/A for its March 31, 2022 quarter in which it provided the true facts regarding its prior Q1 2021 financial results. That filing noted the following:[16]

> Subsequent to the issuance of the condensed consolidated financial statements as of and for the quarter ended March 31, 2021 included in the Form 10-Q/A filed with the SEC on May 2, 2022, the following errors were identified:
>
> – The Company incorrectly recorded expenses for advertising placement by a marketing services firm on a straight-line basis over the life of the contract rather than when the services were actually rendered. As a result, marketing expenses were overstated by $1.0 million for the three months ended March 31, 2021.
> – The Company incorrectly recorded expenses related to a multi-vendor mailer program with a customer as operating expenses rather than as a reduction of revenue. As a result, both operating expenses and revenue were overstated by $1.9 million for the three months ended March 31, 2021.
> – The Company incorrectly recorded certain payments to customers as promotional and bad debt expenses within operating expenses rather than a reduction of revenue. As a result, both revenue and operating expenses were overstated by $0.1 million for the three months ended March 31, 2021.

[16] *See* Amended Form 10-Q/A filed on Nov. 17, 2022 at 7.

38

    – The Company identified errors related to the underlying data used in the inventory capitalization and inventory net realizable value assessment. As a result, cost of goods sold was understated by $0.1 million from net realizable value write-downs for the three months ended March 31, 2021.

    – The income tax impact of the errors identified above resulted in an increase of income tax expense of $0.2 million for the three months ended March 31, 2021.

    – The Company identified 15,216 shares of RSAs granted to non-employee directors was incorrectly included in the number of shares from warrants exercised on the condensed consolidated statements of changes in stockholders' equity for the three months ended March 31, 2021. This presentation error has no impact on other condensed consolidated financial statements as of and for the three months ended March 31, 2021.

The table below sets forth the condensed consolidated financial statements, including as reported, and the impacts resulting from the restatement and the as restated balances for the quarterly period ended March 31, 2021 (in thousands):

| ($ in thousands, except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income | | |
|---|---|---|---|
| For the three months ended March 31, 2021 | As Reported | Adjustments | As Restated |
| REVENUE | 52,469 | (2,054) | 50,415 |
| COST OF GOODS SOLD | 45,289 | 119 | 45,408 |
| GROSS PROFIT | 7,180 | (2,173) | 5,007 |
| OPERATING EXPENSES | 14,196 | (3,025) | 11,171 |
| LOSS FROM OPERATIONS | (7,016) | 852 | (6,164) |
| LOSS BEFORE PROVISION FOR INCOME TAXES | (9,717) | 852 | (8,865) |
| INCOME TAX BENEFIT (EXPENSE) | 1,475 | (239) | 1,236 |
| NET LOSS | (8,242) | 613 | (7,629) |
| NET LOSS PER SHARE | | | |
| Basic | (0.10) | — | (0.10) |
| Diluted | (0.11) | 0.01 | (0.10) |
| COMPREHENSIVE LOSS | (8,133) | 613 | (7,520) |

72.    The 2020 Annual Report and the Q1 2021 Form 10-Q were also false and misleading because they failed to disclose the risk to the Company's liquidity from higher-than-disclosed promotional fees and discounts, slotting fees, and other marketing costs for the Company's products. Because the Company's line of credit was tied to the net amount of the Company's accounts receivables, slotting and promotional fees and/or discounting of the

39

Company's products reduced the amount of liquidity available under the Company's line of credit. Defendants knew that the Company would need additional liquidity due to ongoing problems with the Company's business. Among other things, the Company was paying high promotional and slotting fees for its products, which was causing it to receive less net revenue/accounts receivable for the sale of its products, since such fees were required to be deducted from both revenues and accounts receivable under GAAP. As a result, Defendants knew the Company would need to raise additional capital to fund its growth.

73. According to Confidential Witness #1 ("CW#1"), who served as Tattooed Chef's Director of SOX Compliance during the Class Period and reported directly to Defendant Dieckmann (who, along with Defendant Cargile who was the CFO prior to Dieckmann, bore primary responsibility for addressing the material weaknesses in the Company's internal controls), at least nine material weaknesses had been identified by BDO at year end in 2020. According to CW#1, the need to hire additional personnel in certain positions was a large component in addressing the material weaknesses identified by BDO, but CEO Galletti did not want to or was unwilling to spend the money necessary to hire enough people. As part of this overall process, the Company was looking at the revenue recognition process.

74. In addition, according to CW#1, as part of a review of the revenue recognition practices, a review was conducted of some of the Company's larger contracts. That review determined that the Company was not adhering to GAAP with respect to some of the Company's more complex contracts due to the manner in which it was accounting for expenses.

75. CW#1 worked with BDO on the relevant issues, with BDO ultimately determining that the problems were material and would require a

40

restatement of the Company's financial results. CW#1 also updated the Audit Committee on a quarterly basis and was the person who informed the Audit Committee when it was determined that a restatement was necessary. The members of Tattooed Chef's Audit Committee at the time were Edward Gelfand (Chair), Paula Ciaramitaro, and Marie Quintero-Johnson.  BDO worked directly with Defendant Cargile, the Company's CFOs (Cargile, and then Dieckmann), and with the members of the Audit Committee.  Thus, Defendants Cargile, Dieckmann, Gelfand, Ciaramitaro and Quintero-Johnson had actual knowledge of the improper accounting and the fact that the Company's financial statements were materially false and misleading because they did not comply with GAAP.

76.     At the time the 2020 Annual Report and the Q1 2021 Form 10-Q were filed, Defendants also knew but failed to disclose that lenders would be unwilling to lend the Company more money without remediation of the Company's deficient controls.  But due to reduced revenues and cash flows as a result of the higher slotting and in-store promotional fees and/or discounting of the Company's products, the Company did not have enough money to hire additional personnel that were needed to remediate the internal controls.  Most of the defects in the Company's deficient internal controls identified by the Company's auditor at the time — BDO — were the result of a lack of personnel necessary to carry out the internal controls.  Defendants intentionally failed to hire the full extent of the additional personnel recommended by BDO because of the cost of doing so, and since the additional payroll costs would further reduce the Company's dwindling cash.  As a result, the Defendants knew about and approved a cycle which inevitably would lead to continuing deficiencies in internal controls due to the lack of enough personnel, which then would cause lenders to refuse to loan additional money to the Company.

These problems were later manifested when Tattooed Chef was unable to procure additional liquidity from lenders in the fall of 2022, resulting in Galletti having to make a $5 million loan to the Company to fund its ongoing operations.

77.     Confidential Witness #2 ("CW#2") was employed by TTCF during the Class Period as an A/R (Accounts Receivable) Specialist beginning in December 2021, reporting directly to Controller Mary Chesley, who in turn reported directly to Defendant CFO Dieckmann.  During CW#2's time at TTCF, CW#2 was the only person in A/R and CW#2 started at the Company two weeks before year-end in 2021.  CW#2 said there was a person in A/R previously who was supposed to train CW#2 but that person quit the Friday before CW#2 started working at the Company.  CW#2 said there were no established Standard Operating Procedures ("SOPs") when CW#2 started working.

78.     CW#2 was responsible for the receipt of and posting of payments from vendors that sold TTCF products, including, but not limited to Wal-Mart, Trader Joe's, Albertson's and KeHE.  According to CW#2, during the Class Period there were often many discrepancies between the amount billed on TTCF's invoices and the amount received.  CW#2 noted that a lot of the time it had to do with discounts offered by the Company.

79.     During the Class Period, Tattooed Chef offered many promotions to vendors for marketing its products, according to CW#2.  CW#2 said that there could be several different discounts associated with one invoice or one payment. CW#2 explained that for a $100,000 payment there could be as much as $25,000 in deductions.  CW#2 noted that sometimes with customer KeHE more than half of the payment received could be deducted.  CW#2 said KeHE is not a retail store but a distributor with agreements with a number of retail

42

stores, and that KeHE delivered the TTCF product to the various retailers and negotiated various discounts or promotions for product placements. CW#2 recalled once receiving only approximately $50,000 from KeHE for invoices that were worth approximately $1 million before discounts were applied.

80.    These discounts and promotions were much higher than Tattooed Chef had disclosed and were so large that they should have materially reduced Tattooed Chef's revenues, had the proper accounting treatment been applied. Instead of doing so, though, the Individual Defendants were recognizing the full amount of revenue and then booking the promotions and discounts as "operational expenses."

81.    On April 15, 2021, Defendant Sam Galletti sold 800,000 shares of Tattooed Chef stock at $10 per share. The Form 4 filed by Sam Galletti indicated that the sale was not pursuant to a Rule 10b5-1 plan but instead was a sale that Sam Galletti orchestrated the timing of in order to satisfy an obligation of "personal indebtedness" to a lender. This demonstrates scienter because the Company's written policies regarding insider sales prohibited Sam Galletti from selling stock outside of a Rule 10b5-1 plan.[17]   Sam Galletti benefitted from the sale by extinguishing a debt obligation he owed; he received a higher value for the shares than he would have, if he had not sold the stock based on material non-public information, and thus was able through his insider selling to extinguish a larger amount of his personal indebtedness. The same day, Sam Galletti gifted 500,000 shares of stock to an unidentified

[17] *See* Tattooed Chef's 2022 Proxy Statement at 27: "Our insider trading policy prohibits directors, officers, employees, and consultants (including each of our NEOs), as well as certain family members, others living in the covered person's household, and entities whose transactions in our securities are subject to his or her influence or control, from trading in our securities (or securities of any other company with which we do business) while in possession of material nonpublic information, other than in connection with a Rule 10b5-1 plan adopted in compliance with the policy."

43

individual.  Sam Galletti benefitted from the gift by receiving an income tax deduction for the full value of the stock price on the date of sale times the number of shares gifted (500,000).  Thus, in all, Sam Galletti disposed of 1.3 million shares on April 15, 2021 at inflated prices and based on material non-public information.

82.    Sam Galletti's disposal of 1.3 million shares on April 15, 2021 is indicative of his scienter because the sales were unusual in timing and amount. Galletti had not sold any Tattooed Chef stock at any point previously and did not sell any shares after this date.

83.    On August 12, 2021, Defendants Sam and Sarah Galletti and Defendant Dieckmann disseminated a press release pre-announcing the Company's Q2 2021 financial results.  The press release touted the following alleged financial results realized by the Company:

**Financial Highlights for the Second Quarter of 2021 Compared to the Second Quarter of 2020**

- Revenue was $50.7 million, a 45.9% increase compared to $34.8 million in the prior year period; Tattooed Chef branded product revenue was $33.1 million, an increase of 62.3% compared to $20.4 million in the prior year period.

- Gross profit was $8.0 million, or 15.7% gross margin, compared to $3.7 million, or 10.8% gross margin, in the prior year period.

- Net loss was $53.2 million compared to net income of $1.3 million in the prior year period. This loss includes a one-time, non-cash expense of $46.0 million resulting from a valuation allowance on a deferred tax asset due to additional investments.

- Adjusted EBITDA was negative $5.9 million compared to Adjusted EBITDA of positive $2.0 million in the prior year

44

period. Adjusted EBITDA is a non-GAAP financial measure defined under "Non-GAAP Measures." Please see "Adjusted EBITDA Reconciliation" at the end of this press release.

84.    The press release also contained the following quotes from Defendants Sam and Sarah Galletti:

"The growth we have experienced in the first half of 2021 is a testament to the strength of the Tattooed Chef brand and the ability of our team to execute," *said Sam Galletti, President and CEO of Tattooed Chef. "We are firing on all cylinders, winning distribution in leading national retailers like Kroger, Publix, and Albertsons, and our velocities are outperforming the competition. By the end of the third quarter, we expect our branded Tattooed Chef products will be in over 12,000 retail stores, exceeding our previous goal of 10,000 stores*. Furthermore, with the acquisition of Foods of New Mexico in May, we have ample production capacity to achieve over $500 million in revenue, and a strong innovation pipeline to stay ahead of the curve. I have never been more excited about the future of Tattooed Chef."

Sarah Galletti, Chief Creative Officer and "The Tattooed Chef", added, "We are still in the early innings of growth as we prepare to expand Tattooed Chef beyond the frozen aisle and into refrigerated and ambient products later this year or early next year. With our new manufacturing capabilities for Mexican food products, meat alternatives and alternative tortillas, I am confident our innovation ideas will really resonate with consumers and I am excited about all the future opportunities for growth."

45

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

85.    The press release also stated:

***Outlook***

For full year 2021, the Company now expects:

- Revenue in the range of $235 million to $242 million, an increase of 58% to 63% compared to 2020. This guidance implies 49% year-over-year growth on the base business to $222 million, and a $13 million to $20 million contribution from one of the two facilities included in the Foods of New Mexico acquisition. The Company does not expect the second facility, Karsten, to have a material impact on 2021 revenue because of the timing of equipment being installed during the fourth quarter.

- Gross margin in the range of 16% to 22%.

- Adjusted EBITDA of negative $14 million to $17 million. The Company is committed to an aggressive plan of growing its brand through extensive marketing and promotional spending that has already produced significant revenue growth in both grocery and mass retail. To augment the revenue growth, the Company has invested in its staff and infrastructure, equipment, brand visibility, and customer acquisition costs to meet the marketplace demands and the Company's current and future goals. The Company also continues to be impacted by increases in logistic costs, storage fees, legal and accounting fees, and marketplace shortages in packaging products.

- Capital expenditures in the range of $15 million to $20 million.

///

*The Company is in a high growth phase.[18]*

86. The statements in the August 12, 2021 press release were false and misleading because the cited financial results, including the alleged growth in revenues and gross profits, were false and because the reported financial results did not comply with GAAP, as disclosed below with respect to the Form 10-Q filed four days later to report the same financial results.

87. On August 16, 2021, the Company filed with the SEC its second quarter report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report were certifications pursuant to SOX signed by Defendants Sam Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

88. The 2Q21 Report revealed the Company reported a net revenue of $50,716,000 for the three months ended June 30, 2021 and $103,398,000 for the six months ended June 30, 2021, and a net loss of $53,196,000 for the three months ended June 30, 2021 and $61,348,000 for the six months ended June 30, 2021.

---

[18] The revenue, gross margin, and EBITDA guidance was not accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the guidance. Moreover, the guidance was false and misleading and was made by Defendants Sam and Sarah Galletti and Dieckmann, with actual knowledge by them that the statements were false or misleading. Among other things, as alleged herein, the Individual Defendants knew at the time that Tattooed Chef's projected revenues and gross profits/margins were predicated on an accounting scam pursuant to which the Company was improperly classifying the slotting fees and in-store promotion costs that were essential to the growth plan as "operational expenses" instead of reductions to revenue. As a result, the Individual Defendants knew that the projected numbers could not be achieved once the correct GAAP accounting treatment was applied since such correct treatment required the significant slotting and promotional fees to be applied as a reduction of revenue. The correct accounting treatment would thus significantly reduce the bogus projections for both revenues and gross profits.

47

89.     The Q2 2021 Form 10-Q was false and misleading, as the Company later admitted.  In an Amended Form 10-Q filed with the SEC on November 17, 2022, the Company provided a narrative explanation and tables summarizing the original and restated financial results for Q2 2021, as follows:

Subsequent to the issuance of the condensed consolidated financial statements as of and for the quarter ended June 30, 2021, included in the Form 10-Q/A filed with the SEC on May 2, 2022, the following errors were identified:

–The Company incorrectly recorded expenses for advertising placement by a marketing services firm on a straight-line basis over the life of the contract rather than when the services were actually rendered. As a result, marketing expenses were understated by $3.4 million and $2.5 million for the three months and six months ended June 30, 2021, respectively.

–The Company incorrectly recorded expenses related to a multi-vendor mailer program with a customer as operating expenses rather than as a reduction of revenue. As a result, revenue was overstated by $2.8 million and $4.8 million for the three and six months ended June 30, 2021, respectively. Operating expenses were overstated by $2.8 million and $4.8 million for the three and six months ended June 30, 2021, respectively.

–The Company incorrectly recorded certain payments to customers as promotional and bad debt expenses within operating expenses rather than a reduction of revenue. As a result, both revenue and operating expenses were overstated by $0.2 million

48

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

and $0.3 million for the three and six months ended June 30, 2021, respectively.

–The Company identified errors related to the underlying data used in the inventory capitalization and inventory net realizable value assessment. As a result, cost of goods sold was overstated by $0.8 million and $0.7 million for the three and six months ended June 30, 2021, respectively.

–The income tax impact of the errors identified above resulted in a decrease of deferred tax assets by $0.7 million as of June 30, 2021 and the $0.7 million was fully reserved during the three months ended June 30, 2021 due to the Company established a full valuation allowance starting the second quarter of 2021. As a result, the income tax expense was decreased by $0.7 million and $0.5 million for the three months and six months ended June 30, 2021, respectively.

The table below sets forth the condensed consolidated financial statements, including as reported, and the impacts resulting from the restatement, and the as restated balances for the quarterly period ended June 30, 2021 (in thousands):

| ($ in thousands except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) | | |
|---|---|---|---|
| **For the three months ended June 30, 2021** | **As Reported** | Adjustment | **As Restated** |
| REVENUE | 50,270 | (3,010) | 47,260 |
| COST OF GOODS SOLD | 41,953 | (822) | 41,131 |
| GROSS PROFIT | 8,317 | (2,188) | 6,129 |
| OPERATING EXPENSES | 16,419 | 427 | 16,846 |

49

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

| | | | |
|---|---|---|---|
| LOSS FROM OPERATIONS | (8,102) | (2,615) | (10,717) |
| LOSS BEFORE PROVISION FOR INCOME TAXES | (7,463) | (2,615) | (10,078) |
| INCOME TAX EXPENSE | (50,009) | 724 | (49,285) |
| NET LOSS | (57,472) | (1,891) | (59,363) |
| | | | |
| NET LOSS PER SHARE | | | |
| Basic | (0.70) | (0.02) | (0.72) |
| Diluted | (0.70) | (0.02) | (0.72) |
| | | | |
| COMPREHENSIVE LOSS | (57,682) | (1,891) | (59,573) |

**Condensed Consolidated Statements of Operations and Comprehensive Income (Loss)**

| ($ in thousands except per share amounts) | | | |
|---|---|---|---|
| For the six months ended June 30, 2021 | As Reported | Adjustment | As Restated |
| REVENUE | 102,739 | (5,064) | 97,675 |
| COST OF GOODS SOLD | 87,242 | (703) | 86,539 |
| GROSS PROFIT | 15,497 | (4,361) | 11,136 |
| OPERATING EXPENSES | 30,615 | (2,598) | 28,017 |
| LOSS FROM OPERATIONS | (15,118) | (1,763) | (16,881) |
| LOSS INCOME BEFORE PROVISION FOR INCOME TAXES | (17,180) | (1,763) | (18,943) |
| INCOME TAX EXPENSE | (48,534) | 485 | (48,049) |
| NET LOSS | (65,714) | (1,278) | (66,992) |
| | | | |
| NET LOSS PER SHARE | | | |
| Basic | (0.81) | (0.02) | (0.83) |
| Diluted | (0.81) | (0.02) | (0.83) |
| | | | |
| COMPREHENSIVE LOSS | (65,815) | (1,278) | (67,093) |

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

| ($ in thousands) | Condensed Consolidated Statements of Stockholders' Equity | | |
|---|---|---|---|
| **For the three months ended June 30, 2021** | **As Reported** | **Adjustment** | **As Restated** |
| Net loss in accumulated deficit for the three months ended June 30, 2021 | (57,472) | (1,891) | (59,363) |
| Retained earnings (Deficit) ending balance | (2,424) | (30) | (2,454) |
| Total Stockholders' equity ending balance | 232,867 | (30) | 232,837 |

90.    On November 22, 2021, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Sam Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

91.    The 3Q21 Report disclosed a net revenue of $58,780,000 three months ended September 30, 2021 and $161,972,000 nine months ended September 30, 2021, and a net loss of $8,174,000 three months ended September 30, 2021 and $70,095,000 nine months ended September 30, 2021.

92.    The 3Q21 Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding Tattooed Chef's internal controls and remediation efforts:

However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Quarterly Report were prepared in accordance with U.S. GAAP, *our management has concluded that our*

51

*consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.*

…

**Changes in Internal Control Over Financial Reporting**

**Other than described above in this Item 4**, *there has been no change in our internal control over financial reporting during the fiscal quarter ended September 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.*

93.    On March 11, 2022, Tattooed Chef issued a press release stating that it would have to restate its quarterly results for March 31, 2021, June 30, 2021 and September 30, 2021 "because the Company did not properly record the tax effects associated with the Company's issuance of 825,000 shares of its common stock to Harrison Co. in June 2021 as partial consideration for services rendered in connection with the Company's de-SPAC transaction that occurred in October 2020. The $4 million deferred tax asset that should have been recorded as of December 31, 2020 (with a corresponding offset to additional paid-in-capital) was determined to have an immaterial impact on the Company's consolidated financial statements as of and for the year ended December 31, 2020."

94.    The March 11, 2022 press release further stated that:

The Company expects that the restatements to properly recognize the deferred tax asset and the related valuation allowance will have no effect on its previously reported:

- revenues for any period;

- cash flows for any period;

- (loss) earnings before tax for any period;

52

- Adjusted EBITDA for any period; and

- liquidity position for any period.

The Company further expects that the restatements will have no effect on its future operations.

95.     The statements in the March 11, 2022 press release were false and misleading because they affirmatively stated that the accounting issues would have no effect on the Company's revenues, cash flows, or future operations. This was false and misleading because Defendants Sam Galletti, Dieckmann, Gelfand, Ciaramitaro, Quintero-Johnson, and Sarah Galletti knew there were other material accounting errors that existed at the time at the Company and which would have a material adverse effect on revenues, cash flows, and future operations. The failure to disclose the other existing, known accounting errors, namely the failure to reduce reported revenues by the slotting fees, in-store promotional fees, and discounts/rebates, represented an intentional concealment of material information and an intentional effort to further mislead stockholders and the market.

96.     On March 16, 2022, the Company filed with the SEC its annual report and fourth quarter and annual results on Form 10-K for the period ended December 31, 2021 (the "2021 Annual Report"). The 2021 Annual Report was signed by Defendants Sam Galletti, Dieckmann, Ciaramitaro, Gelfand, and Quintero-Johnson. Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Sam Galletti and Dieckmann attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

97.     In the 2021 Annual Report, the Company reported a net revenue of $213,430,000 and a net loss of $87,404,000.

53

98.    The 2021 Annual Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part, regarding its internal controls and remediation efforts:

However, after giving full consideration to these material weaknesses, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements included in this Annual Report on Form 10-K were prepared in accordance with U.S. GAAP, our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.

**Remediation of Material Weaknesses**

We have begun the process of, and *we are focused on, designing and implementing effective measures to improve our internal controls over financial reporting and remediate the material weaknesses. Our efforts include a number of actions:*

- Hired qualified staff and outside resources to segregate key functions within our financial and information technology processes supporting our internal controls over financial reporting;

- Hired several qualified accounting professionals with appropriate level of expense and training to design, maintain and improve our accounting policies, procedures and controls to prevent and detect material misstatements related to the presentation and

54

disclosures of the consolidated financial statements;

- Developed internal controls documentation, including comprehensive accounting policies and procedures over certain key financial processes and related disclosures; and

- Drafted position papers for all complex, non-recurring transactions.

While these actions and planned actions are subject to ongoing management evaluation and will require validation and testing of the design and operating effectiveness of internal controls over a sustained period of financial reporting cycles, *we are committed to the continuous improvement of our internal control over financial reporting and will continue to diligently review our internal control over financial reporting.*

**Changes in Internal Control Over Financial Reporting**

Other than described above in this Item 9A, *there has been no change in our internal control over financial reporting during the fiscal year ended December 31, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.*

99. The 2021 Annual Report disclosed the following financial results:

55

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

**TATTOOED CHEF, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**AND COMPREHENSIVE INCOME (LOSS)**
**(in thousands, except for share and per share information)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| **NET REVENUE** | $    213,430 | $    148,498 | $    84,918 |
| **COST OF GOODS SOLD** | 191,318 | 126,818 | 71,733 |
| **GROSS PROFIT** | 22,112 | 21,680 | 13,185 |
| **OPERATING EXPENSES** | 59,109 | 31,633 | 7,127 |
| **(LOSS) INCOME FROM OPERATIONS** | (36,997) | (9,953) | 6,058 |
| Interest expense | (261) | (735) | (494) |
| Other (expense) income | (2,222) | 39,434 | - |
| **(LOSS) INCOME BEFORE PROVISION FOR INCOME TAXES** | (39,480) | 28,746 | 5,564 |
| **INCOME TAX (EXPENSE) BENEFIT** | (47,924) | 40,278 | (154) |
| **NET (LOSS) INCOME** | (87,404) | 69,024 | 5,410 |
| **LESS: INCOME ATTRIBUTABLE TO NONCONTROLLING INTERESTS** | - | 1,422 | 1,057 |
| **NET (LOSS) INCOME ATTRIBUTABLE TO TATTOOED CHEF, INC.** | $    (87,404) | $    67,602 | $    4,353 |
| **NET (LOSS) INCOME PER COMMON SHARE** | | | |
| Basic | $    (1.07) | $    1.85 | $    0.15 |
| Diluted | $    (1.08) | $    1.68 | $    0.15 |
| **WEIGHTED AVERAGE COMMON SHARES** | | | |
| Basic | 81,532,234 | 36,487,862 | 28,324,038 |
| Diluted | 81,671,129 | 40,077,188 | 28,324,038 |
| **OTHER COMPREHENSIVE INCOME (LOSS), NET OF TAX** | | | |
| Foreign currency translation adjustments | $    (954) | $    777 | $    (174) |
| Total other comprehensive (loss) income, net of tax | (954) | 777 | (174) |
| Comprehensive (loss) income | $    (88,358) | $    69,801 | $    5,236 |
| Less: comprehensive income attributable to the noncontrolling interest | - | 1,506 | 1,064 |
| Comprehensive (loss) income attributable to Tattooed Chef, Inc. stockholders | $    (88,358) | $    68,295 | $    4,172 |

In addition, the 2021 Annual Report touted the Company's ability to increase

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

sales and revenue in retail stores:

*Proven and Experienced Management Team*

Our executive management team, led by Salvatore "Sam" Galletti, includes individuals who possess substantial industry experience. Cumulatively, our management team has over 160 years of industry experience, with an average of 25 years' experience in the food industry, and an average tenure with us of seven years. We believe that the depth of experience of our management team demonstrates our capability to continue growing our business.

…

*Continue to Grow the Tattooed Chef Brand*

…

Tattooed Chef products are sold in the frozen food section of retail stores and club stores. We initially approached club stores to carry Tattooed Chef products recognizing the demanding volume requirements associated with these customers. *We believe our success with club stores across an array of Tattooed Chef branded products indicates that the Tattooed Chef brand resonates with our target consumer and is attractive to conventional retail grocery customers*.

…

*Expand Product Offerings*

We believe that there is significant consumer demand for plant-based products as evidenced by the successful launch of a variety of our products. In addition, we believe that we have been successful in identifying meaningful consumer trends and translating these preferences into products that meet our

57

customers' requirements. *We intend to leverage this knowledge and experience to continue to build our new concept library and expand our existing portfolio of products by creating new products and line extensions*.[19]

100. These financial results and statements in paragraphs 97, 98, and 99 were materially false and misleading and did not comply with GAAP. They were false because they overstated revenue by $5,436,000 and overstated gross profit by $4,975,000. Defendants Sam Galletti, Dieckmann, Ciaramitaro, Gelfand, Quintero-Johnson, and Sarah Galletti violated GAAP and knowingly inflated the Company's revenues and gross profit, which were the two key metrics emphasized by the Company to the stock market and securities analysts that followed the Company. The foregoing statements in paragraph 99 about the increased sales of the Company's branded products were false and misleading because they failed to disclose the extent of the slotting and promotional fees/discounts that the Company was paying to get retailers to carry their branded products, and that such expenses were being misclassified as operational expenses instead of reductions to revenue. They also misrepresented the Company's ability to increase sales and revenue in retail stores.

101. The 2021 Annual Report also falsely stated that:

We continue to experience strong revenue growth over prior periods. Revenue increased to $213.4 million in the twelve-month period ended December 31, 2021 ("Fiscal 2021") as compared to $148.5 million in the twelve-month period ended December 31, 2020 ("Fiscal 2020") and $84.9 million in the twelve-month period

---

[19] 2021 Annual Report at 4.

58

ended December 31, 2019 ("Fiscal 2019"), representing a year over year growth rate of 43.7% and 74.9%, respectively.

102.   This statement was false because the Company's revenues had not increased to $213.4 million and the growth rate was not 43.7%.  In reality, revenues had only increased to $207.994 million and the growth rate was only 40%.

103.   The filing of the 2021 Annual Report caused the Company's stock price to increase from $11.06 on March 15, 2022 to $12.23 on March 17, 2022 — a 10.6% increase on heavy trading volume.

104.   The Individual Defendants wanted to portray the Company as a "high growth" entity[20] because the stock market affords higher multipliers and thus stock prices to companies that are growing faster, even if they are unprofitable.   As the 2021 Annual Report recognized, the Individual Defendants were required under GAAP to deduct various expenses related to the Company's revenues, such as slotting fees, product demonstration allowances, and in-store marketing costs from reported revenues: "Some contracts also include some form of variable consideration. The most common forms of variable consideration include discounts, slotting fees, trade discounts, promotional programs, and demonstration costs. Variable consideration is treated as a reduction in revenue when product revenue is recognized."[21]      Instead    of    doing    so,    the    Individual    Defendants

---

[20] The 2021 Annual Report, in addition to providing false revenue and growth statistics, stated that "We are a rapidly growing plant-based food company."  *See* 2021 Annual Report at 2.

[21] *See* 2021 Annual Report at 40. The 2021 Annual Report also stated: "We anticipate that marketing expenditures will primarily be on product demonstration allowances, slotting fees (as we expand into conventional retail grocery stores), and other similar in-store marketing costs, which we believe will be effective. Some of these expenses will be categorized as deductions to revenue under GAAP as opposed to marketing expense.  Sarah Galletti

59

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

mischaracterized such expenses as operating expenses so they would not reduce the Company's reported Net Revenues and Gross Profit. The Company admitted this when it restated the Annual Report on November 16, 2022, stating: "Marketing expenditures are expected to be primarily on product demonstration allowances, slotting fees (as we expand to additional retail grocery stores) and other similar in-store marketing costs. *Some of these expenses will be categorized as net deductions to revenue under GAAP as opposed to marketing expense*." *See* 2021 Annual Report on Form 10-K/A, filed 11/16/22. The Annual Report also stated that Sarah Galletti continued to be in charge of all marketing efforts: "As we expand and grow revenue, we started and continue to build out a brand management team (to support Ms. Galletti, who currently oversees all "Tattooed Chef" marketing efforts) to focus on digital marketing, social media and other marketing functions." *See* 2021 Annual Report at p. 31.

105. The 2021 Annual Report also indicated that:

Our management's discussion and analysis of financial condition and results of operations is based on *our consolidated financial statements which have been prepared in accordance with U.S. GAAP*.[22]

106. This statement was false because the financial statements in the 2021 Annual Report had not been prepared in accordance with U.S. GAAP, as the Company later admitted when it restated the Annual Report.

107. The 2021 Annual Report was also false and misleading because it concealed additional known, then-existing material deficiencies in the

continues to lead our marketing efforts with respect to the Tattooed Chef brand." *See* 2021 Annual Report at 9.

[22] *See* 2021 Annual Report at 40.

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

Company's internal controls. Most importantly, the 2021 Annual Report failed to disclose that, in addition to the lack of adequate internal controls over the tracking and accounting of promotional allowances granted to customers, including applicable adjustments to revenue for related variable consideration, that management (specifically including the Gallettis and Dieckmann) were intentionally overriding the controls that existed in order to misclassify slotting fees and promotional allowances as "operating expenses" so as to artificially inflate the Company's reported Net Revenues and Gross Profits.

108. During the Class Period (and still currently), Tattooed Chef was a small company with a very limited executive C-suite. All top-level decisions were made by the Gallettis, Dieckmann, and Cargile. Dieckmann and Cargile ran the accounting department and directly made the decisions regarding the improper accounting treatment involved in this case. The Gallettis ran the sales and marketing operations and had actual knowledge that the relevant expenses were required under GAAP to be booked as reductions of revenues. Sam Galletti was also the boss and person to whom Dieckmann and Cargile directly reported to. CW#2, the sole person working in Accounts Receivable, directly work with the controller and Dieckmann. Sam Galletti also signed the SEC filings which mentioned the required proper accounting treatment, which he intentionally disregarded.

109. The 2021 Annual Report also falsely stated that, notwithstanding the partial, incomplete control deficiencies identified in the report, that the Company's financial results "present[ed] fairly, in all material respects, our financial position, results of operations and cash flows":

> *However, after giving full consideration to these material weaknesses*, and the additional analyses and other procedures that we performed to ensure that our consolidated financial statements

included in this Annual Report on Form 10-K were prepared in accordance with U.S. GAAP, *our management has concluded that our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.*[23]

110. This misrepresentation was later admitted to be false by the Company when it filed its Amended 2021 Annual Report on Form 10-K/A on November 17, 2022. That Amended 2021 Annual Report stated:

[A]s a result of the material weaknesses described below, management has concluded that, as of December 31, 2021, *the Company's internal control over financial reporting was not effective to provide reasonable assurance of the reliability of financial reporting and the preparation of consolidated financial statements for external purposes in accordance with U.S. GAAP.*[24]

111. The 2021 Annual Report also contained a certification by Defendant BDO USA LLP, which stated:

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors

Tattooed Chef, Inc.

Paramount, California

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Tattooed Chef, Inc. (the "Company") as of December 31, 2021 and 2020, the related consolidated statements of operations and

---

[23] *See* 2021 Annual Report at 43.
[24] *See* Amended 2021 Annual Report at 48.

62

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

comprehensive income (loss), stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2021, and the related notes (collectively referred to as the "consolidated financial statements"). *In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2021, in conformity with accounting principles generally accepted in the United States of America.*

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 16, 2022 expressed an adverse opinion thereon.

112.   The auditor opinion signed by Defendant BDO USA LLP was false and misleading because it falsely represented that the Company's financial statements presented fairly, in all material respects, the financial position of the Company and that the financial statements had been prepared in conformity with GAAP.  BDO acted with scienter because it knew that its certification was false.  BDO knew, as it acknowledged in the 10-K, that the Company's internal controls were materially deficient.  Further, BDO knew, because it was disclosed in the 10-K, that Tattooed Chef was engaged in an aggressive growth campaign and was paying significant slotting fees and in-store promotional

63

costs to retailers in order to convince them to carry the Company's frozen products.  Further, BDO knew, as the 10-K disclosed, that "[The Company] continue[s] to add outside sales representatives and/or brokers to extend our sales efforts. *Marketing expenditures are expected to be primarily on product demonstration allowances, slotting fees (as we expand to additional retail grocery stores) and other similar in-store marketing costs. Some of these expenses will be categorized as net deductions to revenue under GAAP as opposed to marketing expense.*"[25]  Thus, BDO knew that the slotting fees and promotional expenses were required by GAAP to be classified as reductions to revenue, not as operational expenses.  Notwithstanding this knowledge, BDO certified the 2021 Annual Report despite its actual knowledge that millions of dollars of slotting fees and promotional expenses had been misclassified as operational expenses, thus inflating the Company's reported revenues and gross profits.  Tattooed Chef did not hide the expenses from BDO and BDO's entire job was to ensure that the expenses reported to it by Tattooed Chef were properly classified under GAAP.

113.   BDO's scienter is also demonstrated by the Confidential Witness allegations contained herein.  For example, CW#2, as the sole person working in Accounts Receivable, worked with BDO both directly and through the controller.   CW#2 provided specific invoices and explanations to BDO regarding payments.  It is reasonable to infer that BDO knew that during the Class Period, there were often many discrepancies between the amount billed on Tattooed Chef's invoices and the amount received, that Tattooed Chef offered many promotions to vendors for marketing its products, and that sometimes more than half of the payment received could be deducted.

---

[25] *See* 2021 Annual Report at 31.

114.   In addition, Confidential Witness #4 ("CW#4") worked at Tattooed Chef's San Pedro, CA office, which was a property owned by the Galletti family and operated above one of their restaurants.   CW#4 worked as the Vice President of Sales Support from June 2021 until May 2022, reporting initially to Chief Growth Officer Matt Williams and then to Gaspare Guarrasi when he was hired as COO in approximately September 2021.  Williams and Guarrasi reported to CEO and defendant Sam Galletti. The R&D kitchen where Co-Founder & Chief Creative Officer Sarah Galletti created the food items was also in San Pedro.

115.   CW#4 was responsible for overseeing the customer service team, which handled order entry and logistics (scheduling shipments).  CW#4 also was involved in the ERP implementation and training for the ERP system. CW#4 was also responsible for preparing Tattooed Chef's forecasts.  CW#4 said the sales team entered their forecasts into a formula-based Excel spreadsheet, which contained four tabs (one for each sales person) in the spreadsheet in which sales people entered their expected sales and it was itemized by customer and SKU.  The sales team reported to Williams.  CW#4 used the sales forecasts to determine the production forecast.  CW#4 also pulled actualized forecasts from QuickBooks (used like an ERP system before the ERP system was implemented in January 2022) which were the actual sales for the last three months.  CW#4 said the actualized forecasts were imported into an Excel spreadsheet and compared to the sales person's original forecast.   This comparison was shown to the sales reps and used as a tool to help them improve and optimize their forecasting (if there were discrepancies).

116.  While BDO was auditing the Company's financials for the Company's 2021 Annual Report, it discovered red flags regarding the Company's accounting fraud.  According to CW#4, during such time there was

65

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

an incident with one of the Company's top two customers (Wal-Mart) in which there was a discrepancy regarding less revenue received by Tattooed Chef from Wal-Mart than there should have been based on the invoices/purchase orders. The auditors inquired with Dieckmann about it and Dieckmann told the auditors that TTCF had failed to invoice the orders, thus attempting to explain the missing revenue. CW#4 said it was $40,000 worth of orders, and did not know why Dieckmann would say that to the auditor without checking with CW#4 or anyone to try to better understand the discrepancy.

117.   CW#4 looked further into it and discovered that it was not true that the Company had failed to invoice the full amount of the orders to Wal-Mart and that instead the discrepancy was due to the fact that Wal-Mart was claiming that TTCF owed a rebate that was much higher than what TTCF had calculated based on existing orders. CW#4 then ran a report, which came up with the same figure as Wal-Mart. CW#4 determined that the report Dieckmann ran did not include private-label products. CW#4 explained that typically rebates are not offered on private-label products but only those products appearing with the Tattooed Chef name. CW#4 inquired with Sam Galletti about whether he agreed to pay Wal-Mart rebates on private-label and Galletti responded that he had agreed to that. As such, the figure Wal-Mart submitted was correct. The rebates/discounts being provided to Wal-Mart should have been recorded as a reduction of revenues but instead were being improperly recorded as other operational expenses — exactly the type of wrongful conduct that eventually led to the restatement. Thus, Dieckmann's false statements to BDO raised or should have raised red flags to BDO about the improper accounting the Company was using for its revenues. CW#4 said this occurred in the end of February 2022 or beginning of March 2022, during the time BDO was working on the Company's 2021 Annual Report, which was

66

filed on March 16, 2022.  The accounting errors thus existed in plain sight and BDO willfully ignored them and improperly represented in the 2021 Annual Report that Tattooed Chef's financial statements fully complied with GAAP.[26]

118.  These facts demonstrate that Tattooed Chef willfully failed to follow its own internal policies and guidelines regarding revenue recognition and the booking of expenses related to its revenues.  Both GAAP and the Company's policies, as admitted in the Company's annual reports, required the Company to reduce revenue by the amounts of the slotting fees, in-store promotions, and other expenses related to the sale of its frozen products.  The Individual Defendants willfully disregarded these policies by failing to reduce its reported revenues by the amount of these expenses and instead booking them as operating expenses.  This was not a complicated accounting issue and the Individual Defendants and BDO were well aware they were causing the Company to violate GAAP.

119.  In addition, CW#4's team filled orders and, in the course of trying to fulfill orders, CW#4 learned that TTCF was not paying its truckers.  In addition, when ordering supplies, CW#4 learned that suppliers were also not being paid.  CW#4 explained that when ordering, certain ingredients had to be ordered well in advance of customer specified shipment dates.  However, CW#4 was finding out that suppliers had not been paid and were not shipping ingredients that typically could take months to receive only weeks before

---

[26] Defendant Dieckmann explained the material impact of the mischaracterized expenses as a reduction of revenue when she spoke to analyst JP Wollam of Roth MKM Capital Partners during a May 16, 2023 conference call, explaining:  "what I want to take the time to remind everyone, JP, is, when we do these promotions with Costco[,] [a]nd we've talked about it openly before in which we participate in two MBMs, for one is for the Organic Riced Cauliflower Stir-Fry and other is for Organic Acai Bowl.  *We have a large contra revenue item that comes with this. And when we restated our financials for 2022, we stated that it was over $5 million.*"

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

customers were expecting their orders.  CW#4 explained that Albertson's and other large retailers charged TTCF if orders were not filled in the time promised.  CW#4 explained that because TTCF was a vegan and organic brand, the ingredients could not be acquired just anywhere.

120.  CW#4 provided Guarrasi in March 2022 with a report indicating that TTCF shorted approximately $500,000 from orders (just for that month).  The shortages were caused by a lack of ingredients and supplies due to the problems with the Company failing to pay vendors and suppliers.  CW#4 also discussed the order shortages with Dieckmann, who therefore also had knowledge of the problems.

121.  In addition, according to Confidential Witness #3 ("CW#3"), Tattooed Chef was not paying its suppliers across the board, which was impacting revenues as suppliers who had not been paid refused to provide necessary ingredients and supplies for the Company's frozen products.  BDO was auditing the Company's books at the time and part of its audit involved reviewing the paperwork for the Company's accounts payable.  As a result of reviewing these files, BDO necessarily would have discovered the non-payments and late payments and increasing accounts payable balances.

122.  The 2021 Annual Report also represented that the Company had enough liquidity to fund its operations for at least the next twelve months:

**Liquidity and Capital Resources**

As of December 31, 2021, we had $92.4 million of cash. We believe that our cash will be sufficient to support our planned operations for at least the next 12 months.

123.  This statement was false and misleading because the Individual Defendants knew that the Company's existing liquidity was not in fact sufficient to fund the Company's operations for the next twelve months.  The

68

Individual Defendants were well aware of this fact because, as the 2021 Annual Report admitted, "Our management regularly reviews certain liquidity measures to monitor performance." The Individual Defendants knew, but failed to disclose, that the Company's accounts receivables (similar to its reported revenues) had been materially inflated by up to $5,436,000. The reason that this undisclosed fact was highly material to the Company's liquidity was that the Company's credit line allowed the Company to borrow up to 90% of the amount of the accounts receivable. *See* 2021 Annual Report at p. 37. But because the slotting fees and in-store promotional costs were also required to be deducted from accounts receivables (but had not been), the Company's accounts receivables were inflated during the Class Period and thus the Company was borrowing more than it was entitled to under its line of credit.[27] When the Company was forced to restate its financial results, this would reduce or eliminate its available credit, imperiling its liquidity. In fact, the Company lost its ability to obtain credit from lenders within six months, forcing Defendant Galletti to lend the Company $5 million before the end of the year. As noted herein by CW#2 and CW#3, the Individual Defendants also knew that the Company was not paying its suppliers and other bills on time, and thus had actual knowledge of material problems with the Company's cash flow and liquidity.

124. The 2021 Annual Report was also false and misleading because it failed to disclose the full extent of the material deficiencies in the Company's

---

[27] As the Company would later disclose when it filed its restated 2021 Annual Report, "As described in Notes 1 and 5 to the consolidated financial statements, the Company recognizes revenue net of estimates for variable consideration related to *customer incentives in the form of slotting fees, trade discounts, promotional programs, and demonstration costs. The allowance for variable consideration for customer incentives is recorded as a reduction of accounts receivable* in the consolidated balance sheet and totaled $4.1 million as of December 31, 2021." *See* Amended 2021 Annual Report at F-3.

69

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

internal controls over financial reporting and that the additional undisclosed material deficiencies also posed a material risk to Tattooed Chef's ability to raise additional capital.

125.  On May 9, 2022, Tattooed Chef issued a press release announcing its Q1 2022 financial results.  The press release stated:

**First Quarter 2022 Financial Overview Compared to 2021 First Quarter**

- Revenue rose 37.3% to $72.1 million

- Tattooed Chef branded product revenue increased 21.2% to $43.5 million, or 60% of total revenue

- Adjusted EBITDA [(1)] was negative $13.4 million

- Net loss was $17.6 million

**First Quarter 2022 Operational Highlights**

- Branded SKUs rose to 90 as of March 31, 2022 from 78 as of December 31, 2021

- Added more than 10,000 new points of distribution

- Commenced production of frozen, ready-to-eat Mexican food items

- Enterprise-wide automation initiative underway and expected to be completed by the end of 2022

126.  The press release contained statements from the Gallettis:

After a record 2021, *our growth continued during the 2022 first quarter and we reported our highest ever quarterly revenue of approximately $72 million*," said Sam Galletti, President and CEO. "We are continuing to scale our business, and during the first quarter we saw increased contributions from the facilities acquired as part of the New Mexico Food Distributors, Inc. and Karsten Tortilla Factory, LLC transactions."

70

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

Mr. Galletti continued, "*We are advancing initiatives designed to leverage our increased manufacturing capacity and demand profile to drive efficiencies, reduce costs, expand margins, and enhance our competitive profile*. These include increasing our retail footprint and product count in existing retailers; expanding our presence outside of the freezer aisle to include refrigerated and ambient products; and integrating automation across our operations. We commenced operations at our dedicated cold storage facility in April 2022 and expect to generate significant savings this year by bringing this capability in-house. I am extremely proud of our team as they continue to deliver growth and maintain the highest levels of quality and client service while navigating multiple macroeconomic challenges."

*Sarah Galletti*, the Tattooed Chef, Founder and Chief Creative Officer *added*, "We believe everybody has a plant-based side, and the introduction of a broad range new product SKUs during the 2022 first quarter reflects our ability to craft delicious plant-based food for a wide range of eating occasions, flavor profiles, and nutritional needs. Through our nostalgic innovation approach, we continue to create meals that people know and love, now made healthier. *We are particularly enthusiastic about our expansion into new frozen product categories: burritos, quesadillas and Mexican entrees* that include a variety of tasty plant-based meat alternatives and ingredient combinations, such as the Plant Based Chorizo and Egg Burrito, the Plant Based Al Pastor Quesadilla, and Plant Based Chicken Mole Enchiladas. In addition, we are

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

significantly expanding our vegan line by incorporating vegan eggs and proprietary meat alternatives, including plant-based pork into our meals. Finally, we are on plan to commence production of Tattooed Chef branded oat butter bars during the second quarter of 2022, expanding the brand out of the freezer aisle."

127. On May 10, 2022, Tattooed Chef filed its Form 10-Q Quarterly Report for the quarter ending March 31, 2022. The Form 10-Q was signed by Defendants Sam Galletti and Dieckmann and reported the following financial results:

| Results of Operations | Three months Ended March 31 | | | |
|---|---|---|---|---|
| | | % of | | % of |
| (in thousands) | 2022 | revenue | 2021 | revenue |
| Net revenue | $ 72,064 | 100.0% | $52,469 | 100.0% |
| Cost of goods sold | 63,914 | 88.7% | 45,289 | 86.3% |
| Gross profit | 8,150 | 11.3% | 7,180 | 13.7% |
| Net loss | (17,551) | -24.4% | (8,242) | -15.7% |
| | | | | |
| Major operating expenses: | | | | |
| Promotional expenses | 2,904 | 4.0% | 1,932 | 3.7% |
| Marketing expenses | 6,128 | 8.5% | 2,666 | 5.1% |
| Post-manufacture cold storage costs | 1,801 | 2.5% | 711 | 1.4% |
| Professional services | 2,726 | 3.8% | 919 | 1.8% |
| Stock compensation expenses | 1,287 | 1.8% | 3,297 | 6.3% |
| Payroll, benefits and recruiting expenses | 2,628 | 3.6% | 1,162 | 2.2% |
| Operating expenses of newly acquired entities NMFD and BCI | 2,365 | 3.3% | - | 0.0% |

128. The Q1 2022 Form 10-Q was false and misleading because Net Revenues for Q1 2022 were inflated by $4,376,000 and Gross Profit for Q1 2022 was overstated by $4,083,000.

129. The Q1 2022 Form 10-Q heavily touted the Company's increase in revenues, stating the following:

**Net revenue**

Net revenue increased by $19.6 million, or 37.3%, to $72.1 million for the three months ended March 31, 2022 as compared to $52.5

72

million for the comparable period in 2021. The revenue increase was due in part to an increase of $7.6 million for Tattooed Chef branded products. In addition, private label products revenue increased by $8.8 million, primarily driven by the sales generated from NMFD and BCI (see Note 9 Business Combination). Other revenue increased by $3.2 million, mainly driven by the sales of salsa, tamales, meats and other products by NMFD to its restaurant customers. Both NMFD and BCI currently primarily manufacture private label products. In the aggregate, NMFD and BCI contributed approximately $17.5 million to our net revenue during the three months ended March 31, 2022. NMFD is expected to be fully operational and manufacturing both private label and Tattooed Chef branded products during 2022. Our Mexican-style plant-based Tattooed Chef branded products, burritos and quesadillas, were introduced to the market during the three months ended March 31, 2022. The Karsten facility is not currently in operation and is expected to become active during the second quarter of 2022. The Karsten facility is expected to manufacture Tattooed Chef branded salty snacks and other alternative Tattooed Chef branded and private label products. Belmont is expected to start manufacturing Tattooed Chef branded products during the second quarter of 2022. We anticipate continued growth in Tattooed Chef branded products primarily due to new product introductions, further expansion with current customers and increased sales to new retail customers.[28]

---

[28] *See* Q1 2022 Form 10-Q at 28.

73

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

130.   These statements were false and misleading because the Company was not in fact growing revenues at the rates quoted.  As a result, the Company was materially misrepresenting its growth rate.  The true facts were that *Net Revenue had only increased by $17.3 million, or 34.3%, to $67.7 million for the three months ended March 31, 2022 as compared to $50.4 million for the comparable period in 2021*.

131.   On August 9, 2022, Tattooed Chef filed a Form 10-Q to report its financial results for its second quarter 2022 financial results ending June 30, 2022.  The Form 10-Q was signed by Defendants Galletti and Dieckmann and reported the following financial results:

The following table sets forth key statistics for the three and six months ended June 30, 2022 and 2021:

| (in thousands) | Three months Ended June 30, | | | | Six months Ended June 30, | | | |
| | 2022 | % of revenue | 2021 | % of revenue | 2022 | % of revenue | 2021 | % of revenue |
|---|---|---|---|---|---|---|---|---|
| Net revenue | $ 58,110 | 100.0% | $ 50,270 | 100.0% | $130,174 | 100.0% | $102,739 | 100.0% |
| Cost of goods sold | 57,370 | 98.7% | 41,953 | 83.5% | 121,284 | 93.2% | 87,242 | 84.9% |
| Gross profit | 740 | 1.3% | 8,317 | 16.5% | 8,890 | 6.8% | 15,497 | 15.1% |
| Operating expenses | 24,346 | 41.9% | 16,419 | 32.7% | 49,139 | 37.7% | 30,615 | 29.8% |
| Loss from operations | (23,606) | -40.6% | (8,102) | -16.1% | (40,249) | -30.9% | (15,118) | -14.7% |
| Interest expense | (42) | -0.1% | (94) | -0.2% | (83) | -0.1% | (114) | -0.1% |
| Other (expense) income | (2,334) | -4.0% | 733 | 1.5% | (2,945) | -2.3% | (1,948) | -1.9% |
| Loss before provision for income taxes | (25,982) | -44.7% | (7,463) | -14.8% | (43,277) | -33.2% | (17,180) | -16.7% |
| Income tax expense | (455) | -0.8% | (50,009) | -99.5% | (711) | -0.5% | (48,534) | -47.2% |
| Net loss | (26,437) | -45.5% | (57,472) | -114.3% | (43,988) | -33.8% | (65,714) | -64.0% |

132.   The Q2 2022 Form 10-Q was false and misleading because it overstated Q2 2022 Net Revenues by $377,000, overstated gross profit by $1,588,000, overstated net revenues for the six months ending June 30, 2022 by $4,753,000, and overstated gross profit for the six months ending June 30, 2022 by $5,671,000.

74

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

133.   The August 9, 2022 Form 10-Q stated the following with respect to the Company's line of credit and liquidity:

**Lines of Credit**

The Company is party to a revolving line of credit agreement, which has been amended from time to time, pursuant to which a credit facility has been extended to the Company until September 30, 2023 (the "Credit Facility"). The Credit Facility provides the Company with up to $25.0 million in revolving credit. *Under the Credit Facility, the Company may borrow up to (a) 90% of the net amount of eligible accounts receivable*; plus, (b) the lower of: (i) sum of: (1) 50% of the net amount of eligible inventory; plus (2) 45% of the net amount of eligible in-transit inventory; (ii) $10.0 million; or (iii) 50% of the aggregate amount of revolving loans outstanding, minus (c) the sum of all reserves. *Under the Credit Facility amended and effected on June 30, 2022, the fixed charge coverage ratio was replaced by liquidity requirement. The Company is required to maintain minimum liquidity of not less than $10.0 million. Not less often than monthly (or weekly during a trigger period), the Company shall furnish to lender a borrowing base certificate as of the close of business on the last business day of such week*. Trigger period means the period following any date on which (a) an event of default has occurred, or (b) the Company's liquidity is less than $20.0 million. As of June 30, 2022, the Company was in compliance with all of the financial covenants under the Credit Facility.

75

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

134.   The August 9, 2022 Form 10-Q also stated:

**Liquidity and Capital Resources**

As of June 30, 2022, we had $27.7 million in cash and cash equivalents. The cash outflow during the six months ended June 30, 2022 is primarily attributable to $23.8 million in marketing and promotional spend to raise our brand awareness, and $15.6 million capital expenditures. The capital expenditures are for automation and robotic machinery to improve our production efficiency and reduce labor cost. By evaluating our business projections and expenditure budgets for 2022 and 2023, *we believe our cash on hand plus availability under our credit facilities are sufficient to meet our current working capital and capital expenditure requirements for a period of at least twelve months from the date of this filing*.

135.   The statements in the August 9, 2022 Form 10-Q about the Company's line of credit and liquidity were false and misleading, and omitted material facts.  Tattooed Chef failed to disclose that its liquidity problems were worse than disclosed, and that it was at imminent risk of violating the covenants in the amended Credit Facility agreement it had entered into on June 30, 2022.  Because that amended agreement eliminated the ability of the Company to borrow up to 90% of its accounts receivable, and replaced that with a requirement that the Company maintain minimum liquidity of $10 million, with monthly reporting requirements (weekly if the Company's cash balance dropped below $20 million), the Company was at risk of defaulting under the amended credit facility.

136.    The Form 10-Q also failed to disclose that the Company had overstated its accounts receivable, revenues, and gross profits, and that when

76

the truth about these accounting/GAAP violations was finally disclosed banks would refuse to lend to the Company.  Instead of disclosing the true facts, Defendants Sam Galletti, Dieckmann, Ciaramitaro, Gelfand, Quintero-Johnson, and Sarah Galletti lied and represented that "we believe our cash on hand plus availability under our credit facilities are sufficient to meet our current working capital and capital expenditure requirements for a period of at least twelve months from the date of this filing."

137.    The Company represented in the 10-Q that it "was in compliance with all the financial covenants under the Credit Facility" but failed to disclose the known, existing risk to such compliance.  According to CW#3, who worked at Tattooed Chef's headquarters during the Class Period from March 2021 to December 2022 and had frequent interactions with Defendants Sam Galletti and Dieckmann, *the Company was routinely not paying its bills and creditors*, *which CW#3 witnessed first-hand* since she/he worked at the Company's headquarters in Paramount, California and reported to Cosmo Briguglio, who reported directly to his cousin, CEO Sam Galletti.  CW#3 worked within the Company's Purchasing Department and was responsible for purchasing raw materials (ingredients) and packaging needed to fulfill orders.  As a Demand Planner, CW#3 was responsible for scheduling production and managing materials to meet customer orders on schedule.  Through his/her position in Purchasing, CW#3 had interaction with the Company's Accounts Payable department, as a result of which CW#3 learned that *TTCF was not paying its suppliers "across the board*."  CW#3 said the non-payment was an issue in getting the supplies needed to fulfill orders for the entire time CW#3 was with the Company.  According to CW#3, many suppliers would not fulfill new orders because they had not been paid on past orders which made it difficult for CW#3 to order the supplies needed to run production and fill new orders.

CW#3 said the non-payment was for raw materials (ingredients used to make the products) and packaging (boxes) the products were put into to be sold. CW#3 indicated that trucking companies also were not paid and then the company had difficulty getting deliveries out when there was product.

138.   In addition, CW#3 said it was difficult to fill orders throughout CW#3's tenure and oftentimes, TTCF only filled partial orders.  CW#3 said most of the time, the Company could only run one shift in production and that some of the larger customers, such as Target and Albertson's, charged fees for late or unfulfilled orders.  According to CW#3, Tattooed Chef had accumulated at least a million dollars in these fees.

139.   According to CW#3, Defendant Sam Galletti was aware of these problems because CW#3 discussed them with Galletti, who was not at all surprised to hear suppliers were not being paid.  As one example, CW#3 told Sam Galletti that the corrugated cardboard supplier Neway had refused to supply any more product until a payment was made.  CW#3 indicated Defendant Dieckmann was also aware of the problem because Sam Galletti told CW#3 that Sam Galletti indicated he had spoken with CFO and Defendant Stephanie Dieckmann about the problems after the conversation between CW#3 and Sam Galletti.  In addition, according to CW#3 some suppliers refused payments plans and would no longer do business with TTCF, such as Superior (another packaging supplier).  CW#3 brought in another packaging supplier and TTCF did not pay the first invoice received, which caused problems.  CW#3 said there were even plumbing issues in the building and the Company failed to pay a $50 invoice from the plumber, as a result of which the plumbing issue was never fully resolved.

140.   The liquidity/cash flow problems were so bad that Defendant Sam Galletti once contributed some of his own money to meet payroll for corporate

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

employees, according to CW#3.  In addition, CW#3 indicated that at one point the Company's production workers staged a walk out because they had not been paid.

141.    None of these adverse, material facts were disclosed by Tattooed Chef in its SEC filings or financial statements during the Class Period.  In addition, prior to the amendment of the Company's credit facility on June 30, 2022, Tattooed Chef had been manipulating its ability to borrow cash under the credit facility by violating GAAP, mischaracterizing expenses related to its revenue as operating expenses rather than as reductions of revenue.  This maximized the Company's reported revenues, thus allowing it to borrow more money than it would have been allowed to under the credit facility if the Company had reported the actual, lower revenue numbers.

142.  When the credit facility was amended on June 30, 2022, Tattooed Chef could not get away with this accounting manipulation anymore since it was now subject to the requirement to maintain at least $10 million in cash at all times.  As of June 30, 2022, its cash position of $27.7 million was higher than the $20 million threshold that would trigger *weekly* reports to its lenders, but it was getting precariously close to triggering that threshold.  In order to try to avoid triggering that requirement, Tattooed Chef stopped paying some vendors, which began an undisclosed downward spiral in its liquidity since the Company was just putting off to another day increasingly mounting expenses.  Moreover, its conduct in stopping payments to vendors meant that vendors began to stop providing the Company with the ingredients it needed to make its products, which then began negatively affecting the Company's revenues.  When it eventually was forced to pay the vendors, its expenses increased substantially for the relevant period, thus triggering a default in the credit facility due to cash dropping below $10 million.  Eventually, the

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

Company's lenders stopped the spigot and Defendant Galletti was forced to make a $5 million personal loan to Tattooed Chef on November 23, 2022, as discussed *infra*.

143.   As indicated *infra*, on October 6, 2022 the Company disclosed that it had received a written notice from its auditor, BDO USA, LLP, that the Company's 2021 Annual Report and its quarterly reports for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021 were materially misstated and should no longer be relied upon and should be restated.

144.   A Form 8-K filed six days later on October 12, 2022, signed by Defendant Galletti, set forth the expected impact that the forthcoming restatement would have on the Company's quarterly financial results that had been filed just two months earlier on August 9, 2022:

> The estimated impact of these restatements on the Company's unaudited interim condensed consolidated financial statements for the three months ended June 30, 2022 is expected to be less than a $1 million decrease in revenue, decrease in gross profit, increase in operating expenses and increase in net loss. The estimated impact of these restatements for the six months ended June 30, 2022 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $1 million decrease in operating expenses, and a $4 million increase in net loss.

Thus, this filing admitted that the Form 10-Q filed on August 9, 2022, in addition to the Company's other financial statements, were false and misleading.  The only reason the expenses for the first six months of 2022 were reduced was that the Company had inflated its revenues by pushing expenses into "operating expenses" that should have been recorded as reductions to revenue.  The reduction to revenues and profits was $5 million.

145.   The material misstatements and omissions alleged herein were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the statements and omissions were false because: (1) Tattooed Chef's annual and quarterly financial statements during the Class Period included "certain errors" such as overstating revenue and understating losses that were due to the Company (a) incorrectly recording expenses related to a multi-vendor mailer program with a large customer as operating expenses rather than as a reduction of revenue; and (b) incorrectly recording expenses for advertising placement by a marketing services firm on a straight-line basis over the life of the contract rather than when the services were actually rendered; (2) as a result, Tattooed Chef would need to restate its previously filed financial statements for certain periods; (3) Tattooed Chef failed to disclose the full extent of the material deficiencies in the Company's internal controls and misrepresented its alleged success in remediating those deficiencies; (4) Tattooed Chef's goodwill was materially impaired and would require an impairment charge of $25.6 million; (5) the Company was short of cash and had failed to pay vendors on time and Sam Galletti had been forced at one point to lend the Company money to meet payroll; (6) the Company's growth strategy was unachievable and materially impaired; and (7) as a result, Defendants' statements about the Company's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

81

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

## IV.        THE TRUTH GRADUALLY EMERGES

146.   On October 12, 2022, Tattooed Chef filed a Form 8-K which stated:

**Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On October 6, 2022, Tattooed Chef, Inc. (the "Company") received a written notice pursuant to Item 4.02(b) from the Company's former independent registered public accounting firm, BDO USA, LLP, that the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021, and its audited annual consolidated financial statements for the year ended December 31, 2021, and accompanying audit report, each as previously filed with the Securities and Exchange Commission ("SEC"), *were materially misstated and should no longer be relied upon and should be restated, because the Company (a) incorrectly recorded expenses related to a multi-vendor mailer program with a large customer as operating expenses rather than as a reduction of revenue; and (b) incorrectly recorded expenses for advertising placement by a marketing services firm on a straight-line basis over the life of the contract rather than when the services were actually rendered.* For these reasons, pursuant to Item 4.02(a) the Board, after consultation with the Audit Committee, has also determined that *the Company's unaudited interim condensed consolidated financial statements for the quarters ended March 31, 2022 and June 30, 2022 should no longer be relied upon*.

147. The Company's October 12, 2022 filing admitted that the Company's 2021 Annual Report and the Company's Quarterly Reports for Q1,

82

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

Q2, and Q3 2022 were *false statements* because the Company's financial statements were "materially misstated."

148. Tattooed Chef's October 12, 2022 Form 8-K revealed that the Company's financial results were false for the following reasons and in the following estimated amounts:

The estimated impact of these restatements on the Company's unaudited interim condensed consolidated financial statements for the three months ended March 31, 2021 is expected to be a $2 million decrease in revenue, a $2 million decrease in gross profit, a $3 million decrease in operating expenses, and a $1 million decrease in net loss.

The estimated impact of these restatements on the Company's unaudited interim condensed consolidated financial statements for the three months ended June 30, 2021 is expected to be a $3 million decrease in revenue, a $3 million decrease in gross profit, a $1 million increase in operating expenses, and a $4 million increase in net loss. The estimated impact of these restatements for the six months ended June 30, 2021 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $2 million decrease in operating expenses, and a $3 million increase in net loss.

The estimated impact of these restatements on the Company's unaudited interim condensed consolidated financial statements for the three months ended September 30, 2021 is expected to be a $0.6 million decrease in operating expenses and a $0.5 million decrease in net loss. The estimated impact of these restatements for the nine months ended September 30, 2021 is expected to be a $5 million

83

decrease in revenue, a $5 million decrease in gross profit, a $3 million decrease in operating expenses, and a $2 million increase in net loss.

The estimated impact of the restatements on the Company's annual consolidated financial statements for the twelve months ended December 31, 2021 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $4 million decrease in operating expenses, and a $1 million increase in net loss.

The estimated impact of these restatements on the Company's unaudited interim condensed consolidated financial statements for the three months ended March 31, 2022 is expected to be a $4 million decrease in revenue, a $4 million decrease in gross profit, a $1 million decrease in operating expenses, and a $3 million increase in net loss.

The estimated impact of these restatements on the Company's unaudited interim condensed consolidated financial statements for the three months ended June 30, 2022 is expected to be less than a $1 million decrease in revenue, decrease in gross profit, increase in operating expenses and increase in net loss. The estimated impact of these restatements for the six months ended June 30, 2022 is expected to be a $5 million decrease in revenue, a $5 million decrease in gross profit, a $1 million decrease in operating expenses, and a $4 million increase in net loss.

149.   On this news, Tattooed Chef's share price fell $0.44 per share, or 9.8%, from its close on October 12, 2022 to open on October 13, 2022 at $4.05 per share, damaging investors.

84

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

150. The October 12, 2022 Form 8-K, however, was only a partial disclosure of the truth. The Company's filing concealed the fact that the Company's goodwill was materially impaired. Defendants Sam Galletti, Dieckmann, Ciaramitaro, Gelfand, Quintero-Johnson, and Sarah Galletti continued to conceal the fact that Tattooed Chef's goodwill had become materially impaired in 2022 and would therefore require a *$25.6 million charge*. That information was not disclosed to the market until the following year, when Tattooed Chef belatedly filed its Annual Report for 2022 on May 15, 2023.

151. On November 10, 2022, Tattooed Chef filed a Form 12b-25, Notification of Late Filing, in which it stated that it would be unable to timely file its Form 10-Q for Q3 2022. The filing indicated:

> Tattooed Chef, Inc. (the "Company") has determined that it is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2022 (the "Form 10-Q") by the prescribed due date for the reasons described below.

> The Company's accounting department has been fully occupied with restating its audited and unaudited condensed consolidated financial statements for the periods identified in the Company's Form 8-K dated October 12, 2022. As a result, the Company will be unable to provide complete financial results for the quarterly period ended September 30, 2022 and file the Form 10-Q by the required due date of November 9, 2022 without unreasonable effort and expense. The Company is working diligently and currently expects to file the Form 10-Q on or before November 14,

85

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

2022 (the extended deadline prescribed by Rule 12b-25).

152. The Form 12b-25 also stated:

Net revenue for the three months ended September 30, 2022 decreased approximately by $3.9 million, or 6.7%, to $54.1 million compared to the prior year period, and net loss for the three months ended September 30, 2022 was $38.3 million, compared to net loss of $8.3 million for the three months ended September 30, 2021. Net revenue for the nine months ended September 30, 2022 increased approximately by $23.9 million, or 15.3%, to $179.5 million over the prior year period, and net loss of $85.8 million for the nine months ended September 30, 2022, compared to a net loss of $75.3 million for the nine months ended September 30, 2021. As of September 30, 2022, the Company had total cash of $14.2 million and an accumulated deficit of $108.1 million. For the nine months ended September 30, 2022, the Company had net cash used in operating activities of $67.2 million.

153. In the filing, as noted above, the Company disclosed that its cash balance had decreased to just $14.2 million as of September 30, 2022 and an accumulated deficit of $108.1 million.

154. On this news, the Company's stock declined from $4.40 on November 10, 2022 to $3.75 on November 11, 2022, a 14.7% decline on extremely heavy trading volume of over 3.4 million shares. The stock continued to decline over the next three trading days, closing at $2.74 on November 16, 2022. Each of those three trading days experienced unusually heavy trading volume, with over 4.9 million shares traded on November 16, 2022.

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

155.   Then on November 16, 2022, after the market closed, Tattooed Chef finally filed its late Form 10-Q for Q3 2022.  The filing, signed by Galletti and Dieckmann, admitted that the Company's ability to continue as a going concern had been materially impaired and that it was in violation of its lending covenants, stating:

> The Company expanded its primary line of credit (the "Credit Facility") from $25.0 million to $40.0 million in August 2022. The Credit Facility contains a financial covenant that requires the Company to maintain a minimum negative $20.0 million of consolidated adjusted EBITDA for the trailing 1-quarter period ended September 30, 2022. The Company was not in compliance with the adjusted EBITDA minimum requirement as of the date these condensed consolidated financial statements were issued. Further, as disclosed in Note 14 Indebtedness, $2.7 million note payable under NMFD and $1.8 million note payable under Ittella Properties, were not in compliance with the financial covenant as of September 30, 2022.

> In order to alleviate these conditions and or events that may raise substantial doubt about the entities ability to continue as a going concern, management plans to continue to closely monitor its operating forecast and pursue additional sources of outside capital. If the Company is unable to (a) improve its operating results, (b) obtain additional outside capital on terms that are acceptable to the Company to fund the Company's operations, and/or (c) secure a waiver or avoid forbearance from the lender if the Company is continually unable to remain in compliance with the financial

87

covenants required by the Credit Facility, the Company will have to make significant changes to its operating plan, such as delay and reduce marketing expenditures, reduce investments in new products, reduce its capital expenditures, reduce its sale and distribution infrastructure, or otherwise significantly reduce the scope of its business. Moreover, if the Company fails to secure a waiver or avoid forbearance from the lender, the failure could accelerate the repayment of the outstanding borrowings under the Credit Facility or the exercise of other rights or remedies the lender may have under the loan documents and applicable law. While management believes the Company will be able to secure additional outside capital, no assurances can be provided that such capital will be obtained or on terms that are acceptable to the Company. Furthermore, given the inherent uncertainties associated with the Company's growth strategy and as the Company is currently not in compliance with the financial covenants required by the Credit Facility, these uncertainties raise substantial doubt about the Company's ability to continue as a going concern.

156. On November 16, 2022, Tattooed Chef also filed an Amended Annual Report on Form 10-K/A in order to restate the Company's financial results for the year ended December 31, 2021. Like the original Form 10-K, which had originally been filed on March 16, 2022, the Amended Annual Report stated that material deficiencies in the Company's internal controls over financial reporting existed. In that regard, the Amended Form 10-K/A stated:

Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of December 31, 2021, our

88

disclosure controls and procedures were not effective as a result of the material weaknesses described below.

157. These disclosures caused Tattooed Chef stock to decline another 12.4%, falling from a close of $2.74 on November 16, 2022 to close at $2.40 per share on November 17, 2022 on an all-time high trading volume of over 6 million shares.

158. On November 21, 2022, the Company filed a Form 8-K disclosing that it had received a delisting notice from Nasdaq on November 16, 2022:

> On November 16, 2022, Tattooed Chef, Inc. (the "Company") received notice from The Nasdaq Stock Market LLC ("Nasdaq") indicating that the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC, due to the Company's failure to timely file its Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2022 (the "Form 10-Q").

159. On November 28, 2022, the Company filed a Form 8-K disclosing that it had received a $5 million loan from Defendant Galletti.  The filing stated:

> On November 23, 2022, Tattooed Chef, Inc. (the "Company") received a $5,000,000 unsecured loan from the Company's CEO and Chairman of the Board, Salvatore Galletti. The Company, in turn, loaned that $5,000,000 on an unsecured basis to its operating subsidiary, Ittella International, LLC ("Ittella").
>
> The loan from Mr. Galletti to the Company is evidenced by a Promissory Note (the "Note") that bears interest at the same rate as that payable to UMB Bank, N.A. (the "Bank"), the Company's

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

lender under its principal line of credit (i.e., the daily adjusting term SOFR rate + 3.0% per annum), matures on September 30, 2025 (the "Maturity Date"), and is payable interest only, monthly, until the Maturity Date.

The loan from the Company to Ittella is evidenced by a Subordinated Note (the "Junior Note"), which is subordinated in right of payment to obligations to the Bank pursuant to the terms of a Subordination Agreement between the Company and the Bank and consented to by Ittella (the "Subordination Agreement"). Interest on, maturity date of, and repayment terms of the Junior Note are identical to those of the Note.

Under the terms of the Subordination Agreement, regularly scheduled payments on the Junior Note are permitted so long as there are no defaults (and the payment would not cause a default) under the Bank's loan documents. Both the Note and the Junior Note provide that if interest payments are at any time prohibited under the Subordination Agreement, the amount of interest that would have otherwise been paid will be added to principal.

160.   Tattooed Chef's stock declined materially on the news, falling from a close of $1.61 on Friday, November 25, 2022 to $1.44 on November 29, 2022 – a decline of 10.6% on unusually heavy trading volume of 2,341,600 shares on November 28, 2022.

161.   In 2023, the Company again was forced to delay the filing of its financial results.  On May 15, 2023, the Company finally filed its late financial statements.  In the press release announcing the Company's results, Defendant Galletti stated that "***Our focus has shifted from growth to profitability***, and

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

we are implementing the actions required to meet client and consumer demand and ensure our long-term success. We remain confident in our ability to achieve cost savings of up to $40 million or more in 2023. We now expect to reach breakeven Adjusted EBITDA** and become cash flow neutral during the third quarter of 2024 through a combination of continuing cost reductions, efficiency gains, inventory management, rationalization of underperforming products, new product introductions, and targeted retail expansion."

162. Galletti's May 15, 2023 statements were an admission that the Company's hyped "growth" strategy in 2021 and 2022 was doomed from the start and was infeasible and plagued by undisclosed material problems and accounting manipulations during the Class Period.

163. On May 15, 2023, Tattooed Chef filed its late 2022 Annual Report. In the report, Tattooed Chef disclosed for the first time that it had been forced to recognize a $25.6 million impairment charge to its goodwill. The Annual Report stated:

We have recently recognized impairment charges for goodwill and we may need to recognize further impairments for other assets in the future, which could materially adversely impact our financial condition and results of operations.

The carrying value of goodwill was $25.6 million, net of measurement period adjustment, before a triggering event occurred during the year ended December 31, 2022, which necessitated interim assessments for impairment. We regularly evaluate our assets for impairment in line with GAAP. Further impairments to other long-lived assets can arise due to negative industry or economic trends, business disruptions, changes in asset

91

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

usage, divestitures, and declines in market capitalization.

We recognized a full goodwill impairment charge of $25.6 million for the year ended December 31, 2022. (See Note 10 Intangible assets, net and goodwill in our consolidated financial statements that appear elsewhere in this Annual Report on Form 10-K). This impairment indicates that the fair value of the reporting unit is less than its carrying amount. The macroeconomic environment, such as inflationary pressures and supply chain disruptions, a sustained decline in share price, and the sales and profitability outlook for the affected reporting unit, primarily drove this impairment. *The impairment charge had an adverse impact on our results of operations for the year ended December 31, 2022*, and additional impairment charges for other assets in the future could have further adverse effects on our results of operations.

164. The 2022 Annual Report also disclosed that the Company's auditors had identified the goodwill issue as a "critical audit matter" and that the impairment charge represented the elimination of 100% of the Company's goodwill:

Prior to identification of the impairment indicators, the goodwill balance was $25.6 million. As a result of testing goodwill for impairment, *the Company fully impaired all recorded goodwill*.[29]

165. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

---

[29] *See* 2022 Annual Report at F-3.

92

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

## V.      DEFENDANTS' SCIENTER AND MOTIVE AND OPPORTUNITY TO COMMIT FRAUD

166. Defendants had actual knowledge of the falsity of all their statements because the Defendants were directly responsible for the conduct at issue in this litigation and were two of only four executive officers of the Company during the Class Period.

167. The information pled *supra* regarding the Confidential Witnesses demonstrates Defendants' knowledge of the falsity of their statements and omissions.  In addition, CW#3 was constantly "flagging" transactions and informing CEO Sam Galletti, CFO Stephanie Dieckmann and COO Gaspare Guarrasi about the problems with the Company's internal controls.  CW#3 rarely received any response but was often cut off from access to data when she/he questioned things by Chris Maxon, who was a Project Manager and ran the production facility at the Company's headquarters in Paramount, California.  Since CW#3 reported the problems directly to Sam Galletti and Dieckmann, not Maxon, a reasonable inference is that Galletti and Dieckmann instructed Maxon to cut off CW#3's access to the data in an attempt to conceal the problems.

168. In addition, according to Confidential Witness #5 ("CW#5"), who worked as a Data Analyst at the Company between November 2021 and December 2022, the internal controls at Tattooed Chef were the "worst she/he had ever seen."  During his tenure at the Company, CW#5 reported to COO Guarrasi and CFO Defendant Dieckmann.  CW#5 stated that during the Class Period, the Company made efforts to increase business in grocery stores, which demanded more discounting, and that the Company had difficulties paying bills due to cash flow issues and lack of internal controls.  CW#5 also stated that the Company's financial reporting system encountered substantial data

93

integrity issues.  Examples of these data integrity issues included double-counting of sales due to a lack of diligence in accounting.  CW#5 stated that on occasion invoices were entered twice because there were two transactions with the same number.

169.   CW#5 reported the data integrity issues to Dieckmann and others by email, with copies to Defendant Sam Galletti.  Thus, Defendants Dieckmann and Sam Galletti were well aware of the Company's data integrity issues and internal control deficiencies.

170.   Defendants' scienter is also inferred from the fact that the Company was extremely small and only had one business segment and line of business: the sale of its frozen food products.  The false statements and material omissions at issue in this case were thus all part of Tattooed Chef's "core product" such that Defendants' knowledge of the falsity of their statements is imputed to them based on their positions with the Company, the fact that the Company's SEC filings stated that Sam Galletti was the Chief Decision Maker at Tattooed Chef, that Dieckmann was the Chief Operating Officer and one of only four senior executives, and that all the false and undisclosed facts pertained to the Company's core (and only) product.   The Company's accounting operations were so small that, as CW#2 stated, she/he was the only person working in Accounts Receivable and directly worked with the controller and Dieckmann.  CW#2 also worked with BDO both directly and through the controller.  Under these circumstances, Defendants' scienter is established pursuant to the core product doctrine and the other specific facts alleged herein.

171.   Defendant Galletti owned 50% of the Company's stock at the beginning of the Class Period and thus had a strong motive to commit fraud since the fraud would benefit himself more than any other stockholder.  The

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

inflated stock price achieved through the fraud significantly increased the value of Galletti's stock during the Class Period.  Galletti's disposal of 1.3 million shares on April 15, 2021, as alleged *supra,* is indicative of his scienter and demonstrates how he took advantage of the inflated stock price to benefit himself.  The sales were also unusual in timing and amount because Galletti had never before sold any stock.  In addition, Galletti had a motive and incentive to commit fraud because he stood to gain significantly from the Company's inflated stock price since he was the single largest stockholder, owning 50% at the beginning of the Class Period and at least 38.7% of the Company's stock during the Class Period, as reflected in the chart below from the Company's 2021 Proxy Statement:

TATTOOED CHEF -- SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

| | Number of Shares Beneficially Owned as of April 16, 2021 | Percentage of Outstanding Shares |
|---|---|---|
| *Directors and Executive Officers of Tattooed Chef* | | |
| Salvatore Galletti(2)(4) | 31,420,522 | 38.7% |
| Stephanie Dieckmann(4) | 500,000 | 0.6% |

172.  Dieckmann also had a motive to engage in fraud since she owned 500,000 shares of the Company's stock and thus stood to benefit from the inflated stock price.  Shortly before the beginning of the Class Period, Dieckmann received a one-time bonus of $1,000,000 in cash and stock valued at approximately $12,040,000.  By issuing false statements, Dieckmann benefitted through the significant increase in the value of her stock.

173.  Defendants also had the motive and opportunity to commit the fraud.  The detailed allegations herein demonstrate the Company's need for

95

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

additional liquidity to fund its growth.  At the beginning of the Class Period, the Company primarily intended to generate that cash through its line of credit and through cash to be received from the exercise of outstanding warrants.

174.  The outstanding warrants, however, which would allow the Company to be able to raise up to $230 million in cash, would only be triggered if the Company's stock price traded above $18 per share for 20 out of 30 trading days.  Prior to the Investor Day presentation at the beginning of the Class Period, the Company's stock was well below the price necessary to allow the Company to raise the needed cash through exercise of the warrants.  On December 2, 2020, the stock closed at $15.42.  After the Investor Day presentation was filed with the SEC on Form 8-K, however, Tattooed Chef's stock price rose dramatically, increasing to $19.35 on December 15, 2020 on unusually heavy trading volume of 6.8 million shares, approximately ten times the normal volume.  The stock continued to increase in the ensuing days, reaching $24.69 by December 23, 2020 on unusually heavy trading volume.

175.  On February 22, 2021, Tattooed Chef issued a press release in which Sam Galletti was quoted as stating that the Company had been able to raise cash from the exercise of the warrants due to its stock having exceeded the necessary price.

176.  Sam Galletti and Dieckmann also had a motive to issue false statements to inflate Tattooed Chef's stock price due to the fact that some of their Tattooed Chef stock was subject to a Holdback agreement in the Merger that occurred shortly before the start of the Class Period.  As part of the Merger Agreement, an additional 5,000,000 shares of Forum's common stock (the "Holdback Shares"), most of which were owned by Galletti and Dieckmann, were placed into escrow, to be released after the Closing to Galletti and Dieckmann upon satisfaction, within the first three years after the Closing, of

96

the following conditions: (i) if the trading price of the Company's common stock equals or exceeds $12.00 on any 20 trading days in any 30-day trading period (the "$12.00 Share Price Trigger"), then 2,500,000 additional Holdback Shares would be released to Galletti and Dieckmann or (ii) if the trading price of the Company's common stock equaled or exceeded $14.00 on any 20 trading days in any 30-day trading period (each of such $14.00 trigger and the $12.00 Share Price Trigger, a "Share Price Trigger"), then 2,500,000 Holdback Shares would be released to Galletti and Dieckmann. If a change in control occurred within the first three years after the Closing, all Holdback Shares not previously released would be released to Galletti and Dieckmann. But, if the conditions to release of the Holdback Shares were not satisfied within the first three years of Closing, the Holdback Shares would be forfeited.

177.   By issuing the false statements during the Class Period, Galletti and Dieckmann inflated the Company's stock price, which resulted in satisfaction of the necessary conditions to receive the Holdback shares.  They thus received significant additional shares and avoided the forfeiture of such 5 million shares of Tattooed Chef stock.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

178.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

97

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

179. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

180. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

181. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

182. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

98

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

183. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

184. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

185. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

186. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT 1
### Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants

187. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

188. This Count is asserted against Defendants, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

189. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

190.  Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

191.  Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

192.  The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiffs and the Class.

193. Defendant BDO, as the Company's auditor, discovered or recklessly disregarded the accounting violations during its audit of the Company's financial statements, yet nonetheless issued a clean audit opinion which falsely stated that the Company's financial statements complied in all material respects with GAAP.

194. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

195. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

196. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

197. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which

102

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(A) of the Exchange Act
### Against the Individual Defendants

198.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

200.   As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

201.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the

103

Company's securities.

202. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)  declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)  awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)  awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  February 3, 2025

Respectfully submitted,

BOTTINI & BOTTINI, INC.

*s/ Francis A. Bottini, Jr.*

Francis A. Bottini, Jr.
Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:   (858) 914-2002

104

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

Email:      fbottini@bottinilaw.com
            achang@bottinilaw.com

*Counsel for Lead Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hofait, and Marco Starace and Lead Counsel for the Class*

105

Second Amended Class Action Complaint
for Violations of the Federal Securities Laws

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, John Hancock, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint on file with my counsel.

2.  I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.  My transactions during the Class Period in the securities of Tattooed Chef, Inc. are listed in the attached hereto as Exhibit A.

5.  I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____2/14/2023 | 9:29_ AM PST.

*John Hancock*

_____
JOHN HANCOCK

# EXHIBIT A

# EXHIBIT A

**John Hancock (Purchases)**

| Trade Date | Order Type | Security | Transaction Description | Quantity | Executed Price | Net Amount |
|---|---|---|---|---|---|---|
| 6/24/2021 | Buy | TTCF | TATTOOED CHEF INC | 200 | $20.18 | $4,035.20 |
| 6/24/2021 | Buy | TTCF | TATTOOED CHEF INC | 4800 | $20.18 | $96,864.00 |
| 6/24/2021 | Buy | TTCF | TATTOOED CHEF INC | 4910 | $20.16 | $98,985.60 |
| 7/1/2021 | Buy | TTCF | TATTOOED CHEF INC | 709 | $21.13 | $14,981.17 |
| 7/2/2021 | Buy | TTCF | TATTOOED CHEF INC | 237 | $21.03 | $4,984.11 |
| 7/2/2021 | Buy | TTCF | TATTOOED CHEF INC | 476 | $20.95 | $9,972.20 |
| 7/6/2021 | Buy | TTCF | TATTOOED CHEF INC | 410 | $20.74 | $8,503.40 |
| 7/7/2021 | Buy | TTCF | TATTOOED CHEF INC | 1510 | $19.88 | $30,018.80 |
| 7/7/2021 | Buy | TTCF | TATTOOED CHEF INC | 1712 | $19.88 | $34,034.56 |
| 7/8/2021 | Buy | TTCF | TATTOOED CHEF INC | 1007 | $19.91 | $20,049.37 |
| 7/9/2021 | Buy | TTCF | TATTOOED CHEF INC | 996 | $20.08 | $19,999.68 |
| 7/28/2021 | Buy | TTCF | TATTOOED CHEF INC | 3033 | $19.45 | $58,991.85 |
| 8/16/2021 | Buy | TTCF | TATTOOED CHEF INC | 1400 | $16.72 | $23,408.00 |
| 8/16/2021 | Buy | TTCF | TATTOOED CHEF INC | 600 | $16.48 | $9,888.00 |
| 8/16/2021 | Buy | TTCF | TATTOOED CHEF INC | 1000 | $16.71 | $16,710.00 |
| 8/16/2021 | Buy | TTCF | TATTOOED CHEF INC | 91 | $16.43 | $1,495.06 |
| 1/24/2022 | Buy | TTCF | TATTOOED CHEF INC | 925 | $11.89 | $10,998.25 |
| 2/7/2022 | Buy | TTCF | TATTOOED CHEF INC | 26 | $12.01 | $312.32 |
| 2/11/2022 | Buy | TTCF | TATTOOED CHEF INC | 209 | $12.01 | $2,510.09 |
| 3/15/2022 | Buy | TTCF | TATTOOED CHEF INC | 920 | $10.86 | $9,991.20 |
| 3/15/2022 | Buy | TTCF | TATTOOED CHEF INC | 829 | $10.86 | $9,002.94 |
| 4/18/2022 | Buy | TTCF | TATTOOED CHEF INC | 11 | $9.87 | $108.55 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 989 | $9.64 | $9,533.96 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.61 | $4,805.00 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.62 | $4,810.00 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.58 | $4,790.00 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.55 | $4,775.00 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.54 | $4,770.00 |
| 4/21/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.51 | $4,755.00 |
| 4/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $9.07 | $4,535.00 |
| 5/2/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $7.72 | $3,860.00 |
| 5/2/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $7.70 | $3,850.00 |
| 5/2/2022 | Buy | TTCF | TATTOOED CHEF INC | 37 | $7.68 | $284.16 |
| 5/2/2022 | Buy | TTCF | TATTOOED CHEF INC | 220 | $7.71 | $1,696.07 |
| 5/2/2022 | Buy | TTCF | TATTOOED CHEF INC | 43 | $7.71 | $331.32 |
| 5/9/2022 | Buy | TTCF | TATTOOED CHEF INC | 200 | $7.55 | $1,510.00 |
| 5/9/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $7.61 | $3,805.00 |
| 5/9/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $7.63 | $3,812.60 |
| 5/11/2022 | Buy | TTCF | TATTOOED CHEF INC | 250 | $6.64 | $1,660.00 |
| 5/11/2022 | Buy | TTCF | TATTOOED CHEF INC | 250 | $6.62 | $1,655.00 |
| 5/11/2022 | Buy | TTCF | TATTOOED CHEF INC | 250 | $6.64 | $1,660.00 |
| 5/11/2022 | Buy | TTCF | TATTOOED CHEF INC | 250 | $6.37 | $1,591.35 |
| 5/16/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $7.08 | $3,540.00 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 400 | $6.40 | $2,559.40 |

DocuSign Envelope ID: 12CB323F-7AA6-4E69-A8GA-C8BDD4AE7FDD

| Date | | Symbol | Name | Qty | Price | Amount |
|---|---|---|---|---|---|---|
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 100 | $6.40 | $640.00 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.40 | $3,200.00 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.38 | $3,187.85 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.38 | $3,189.35 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.38 | $3,187.55 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 11 | $6.40 | $70.35 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 489 | $6.40 | $3,129.60 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.39 | $3,197.15 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.38 | $3,189.25 |
| 8/22/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.40 | $3,199.60 |
| 9/1/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.35 | $3,172.50 |
| 9/1/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.35 | $3,175.00 |
| 9/6/2022 | Buy | TTCF | TATTOOED CHEF INC | 500 | $6.12 | $3,059.95 |
| 9/6/2022 | Buy | TTCF | TATTOOED CHEF INC | 100 | $6.19 | $618.50 |
| 9/6/2022 | Buy | TTCF | TATTOOED CHEF INC | 399 | $6.19 | $2,468.01 |
| 9/6/2022 | Buy | TTCF | TATTOOED CHEF INC | 1 | $6.18 | $6.18 |
| 9/27/2022 | Buy | TTCF | TATTOOED CHEF INC | 1000 | $5.02 | $5,018.50 |
| Total | | | | | | $604,142.54 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Shashank Bagul, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint on file with my counsel.

2.    I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.    My transactions during the Class Period in the securities of Tattooed Chef, Inc. are listed in the attached hereto as Exhibit A.

5.    I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___2/14/2023 | 4:43 PM PST___.

_Shashank Bagul_

SHASHANK BAGUL

**Exhibit A**

| Name | Date | Shares Purchased | Share Price | Total Cost |
|---|---|---|---|---|
| **Shashank Bagul** | 3/31/2021 | 600 | $19.16 | $11,493.00 |
| | 4/22/2021 | 500 | $17.42 | $8,708.30 |
| | 4/22/2021 | 100 | $17.41 | $1,741.50 |
| | 4/22/2021 | 100 | $17.41 | $1,741.50 |
| | 4/22/2021 | 100 | $17.41 | $1,741.50 |
| | 4/22/2021 | 100 | $17.41 | $1,741.50 |
| | 4/22/2021 | 100 | $17.41 | $1,741.50 |
| | 5/19/2021 | 800 | $19.26 | $15,408.00 |
| | 8/13/2021 | 1,168 | $17.13 | $20,007.02 |
| | 8/16/2021 | 1,000 | $17.11 | $17,106.20 |
| | 8/16/2021 | 500 | $17.14 | $8,570.00 |
| | 8/16/2021 | 200 | $17.13 | $3,426.00 |
| | 8/16/2021 | 100 | $17.13 | $1,713.00 |
| | 8/16/2021 | 100 | $17.13 | $1,713.00 |
| | 8/16/2021 | 100 | $17.13 | $1,713.00 |
| | 8/16/2021 | 100 | $16.75 | $1,675.00 |
| | 8/17/2021 | 3,000 | $16.29 | $48,870.00 |
| | 9/29/2021 | 500 | $18.63 | $9,314.15 |
| | 11/11/2021 | 637 | $16.32 | $10,395.84 |
| | 11/11/2021 | 190 | $16.35 | $3,106.50 |
| | 11/11/2021 | 163 | $16.35 | $2,665.05 |
| | 11/11/2021 | 10 | $16.35 | $163.50 |
| | 11/15/2021 | 1,000 | $16.34 | $16,340.00 |
| | 11/15/2021 | 500 | $16.39 | $8,195.00 |
| | 11/18/2021 | 500 | $17.41 | $8,705.00 |
| | 12/2/2021 | 600 | $15.89 | $9,534.00 |
| | 12/6/2021 | 400 | $14.98 | $5,994.00 |
| | 12/6/2021 | 100 | $14.99 | $1,498.99 |
| | 12/10/2021 | 1,000 | $16.00 | $16,000.00 |
| | 12/14/2021 | 500 | $15.78 | $7,888.95 |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Mustapha Hotait, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint on file with my counsel.

2.      I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      My transactions during the Class Period in the securities of Tattooed Chef, Inc. are listed in the attached hereto as Exhibit A.

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____2/16/2023 | 11:08 AM PST_____.

_____

MUSTAPHA HOTAIT

## EXHIBIT A

TRANSACTIONS IN THE STOCK OF TATTOEED CHEF DURING THE CLASS PERIOD

**Purchases:**

| Date | No. of Shares | Price | Total Cost |
|---|---|---|---|
| 11/08/2021 | 2,000 | $18.46 | $36,920 |
| 11/08/2021 | 2,500 | $18.56 | $46,400 |
| 11/09/2021 | 1,200 | $18.13 | $21,756 |
| 12/21/2021 | 2,300 | $16.83 | $38,709 |
| 02/08/2022 | 2,000 | $11.94 | $23,880 |
|  |  |  |  |

***Post* Class Period Sales:**

| Date | No. of Shares | Price | Total Proceeds |
|---|---|---|---|
| 02/09/2023 | 10,000 | $1.46 | $14,600 |
|  |  |  |  |

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, John Spadaro, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint on file with my counsel.

2.    I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.    My transactions during the Class Period in the securities of Tattooed Chef, Inc. are listed in the chart attached hereto as Exhibit A.

6.    I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses — such as lost wages and travel expenses — directly related to the class representation, as ordered or approved by the Court pursuant to law.

7.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 21, 2023.



JOHN SPADARO

**EXHIBIT A**

| Date | Shares Purchased | Share Price | Total Cost | Date | Shares Sold | Share Price | Total Proceeds |
|---|---|---|---|---|---|---|---|
| 3/30/2021 | 300 | $18.68 | $5,604.00 | 5/23/2022 | 184 | $6.53 | $1,201.52 |
| 4/14/2021 | 100 | $18.55 | $1,855.00 | 5/23/2022 | 16 | $6.53 | $104.48 |
| 4/16/2021 | 1,000 | $18.10 | $18,100.00 | 5/23/2022 | 300 | $6.53 | $1,959.00 |
| 4/19/2021 | 1,000 | $16.98 | $16,980.21 | 5/23/2022 | 1,000 | $6.53 | $6,530.00 |
| 4/20/2021 | 1,000 | $15.80 | $15,800.10 | | | | |
| 5/4/2021 | 600 | $17.34 | $10,402.32 | | | | |
| 8/17/2021 | 1,500 | $16.01 | $24,015.00 | | | | |
| 12/3/2021 | 88 | $15.19 | $1,336.72 | | | | |
| 12/3/2021 | 13 | $15.18 | $197.34 | | | | |
| 12/3/2021 | 557 | $15.19 | $8,460.83 | | | | |
| 1/27/2022 | 500 | $11.66 | $5,830.00 | | | | |

DocuSign Envelope ID: B29B1897-86D2-4E85-823A-2B93B2F39EC8

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Marco Starace, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint on file with my counsel.

2.      I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      My transactions during the Class Period in the securities of Tattooed Chef, Inc. are listed in the chart attached hereto as Exhibit A.

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___2/19/2023 | 12:04_ PM PST.

*Marco Starace*
_____
MARCO STARACE

DocuSign Envelope ID: B29B1897-86D2-4E85-823A-2B93B2F39EC8

# EXHIBIT A

# EXHIBIT A

DocuSign Envelope ID: B29B1897-86D2-4E85-823A-2B93B2F39EC8

**Marco Starace (Purchases)**

| Trade Date | Buy/Sell | Quantity | Trade Price |
|---|---|---|---|
| 11/17/2021 | BUY | 5,000 | $16.00 |
| 12/1/2021 | BUY | 5,000 | $16.00 |
| 12/30/2021 | BUY | 23,500 | $15.30 |
| 2/8/2022 | BUY | 380 | $11.90 |