BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
  fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
  achang@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

*Counsel for Plaintiffs John Hancock, Shashank Bagul, John Spadaro,*
*Dr. Mustapha Hotait, and Marco Starace*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| DINKO MIHAYLOV, JOHN HANCOCK, SHASHANK BAGUL, JOHN SPADARO, MUSTAPHA HOTAIT, and MARCO STARACE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>TATTOOED CHEF, INC., SALVATORE GALLETTI, STEPHANIE DIECKMANN, CHARLES F. CARGILE, EDWARD GELFAND, PAULA CIARAMITARO, MARIE QUINTERO-JOHNSON, SARAH GALLETTI, and BDO USA, LLP,<br><br>Defendants. | Case No. 2:22-cv-9311-GW-E<br><br>Class Action<br><br>**Plaintiffs' Memorandum of Points and Authorities in Opposition to the Individual Defendants' Motion to Dismiss the Second Amended Class Action Complaint**<br><br>Judge:       Hon. George H. Wu<br>Date:        June 9, 2025<br>Time:        8:30 a.m.<br>Courtroom: 9D, 9th Floor |

**Table of Contents**

I.      INTRODUCTION ...........................................................................................1

II.     ARGUMENT ................................................................................................3

        A.      Plaintiffs Have Sufficiently Stated a §10(b) Claim for
                Securities Fraud ...........................................................................3

                1.      Defendants' Statements Were Materially False
                        and Misleading...............................................................3

                        a.      Defendants Falsely Claimed That TCI Had
                                Achieved 645% Growth with "No Spending
                                on Marketing Promotion," and That TCI
                                Could Maintain the Growth Rate, But
                                Failed to Disclose That Its Marketing
                                Expenses Would Have to Be Booked
                                as Reductions to Revenue.............................................3

                        b.      Defendants Made False Statements in the
                                Annual and Quarterly Reports....................................8

                        c.      The Statements About TCI's Internal Controls
                                Were False and Misleading.........................................13

                        d.      Plaintiffs Have Alleged False Statements
                                About the Line of Credit.............................................16

                2.      Plaintiffs Have Adequately Alleged Scienter ....................17

                3.      Plaintiffs Have Adequately Alleged Loss Causation .......23

        B.      Plaintiffs Have Stated a §20(a) Claim............................................25

III.    CONCLUSION..............................................................................................25

# Table of Authorities

**Cases**

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ...........................................................................................3

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008) .......................................................................22, 24

*Brody v. Transitional Hosps. Corp.,*
  280 F.3d 997 (9th Cir. 2002) ...............................................................................3

*Brown v. Ambow Educ. Holding Ltd.,*
  2014 WL 523166 (C.D. Cal. Feb. 6, 2014) .........................................................24

*City of Dearborn Heights Act 345 Police &*
  *Fire Ret. Sys. v. Align Tech., Inc.,*
  856 F.3d 605 (9th Cir. 2017) .............................................................................17

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) ......................................................................................3, 23

*Evanston Police Pension Fund v. McKesson Corp.,*
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ...............................................................22

*Fecht v. Price Co.,*
  70 F.3d 1078 (9th Cir. 1995) .............................................................................15

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.,*
  63 F.4th 747 (9th Cir. 2023) ..................................................................15, 17, 18

*Hemmer Grp. v. Sw. Water Co.,*
  527 F. App'x 623 (9th Cir. 2013) .......................................................................11

*Hoang v. ContextLogic, Inc.,*
  527 F. Supp. 2d 938 (D. Ariz. 2007) ..................................................................25

*Howard v. Everex Sys., Inc.,*
  2024 WL 4471316 (N.D. Cal. Aug. 22, 2024) ....................................................25

*In re Alphabet, Inc. Sec. Litig.,*
  1 F.4th 687 (9th Cir. 2021) ................................................................................22

*In re Apple Computer Sec. Litig.,*
  886 F.2d 1109 (9th Cir. 1989) ...........................................................................21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................7

*In re Credit Suisse First Boston Corp.,*
  431 F.3d 36 (1st Cir. 2005) ...............................................................................16

*In re Daou Sys., Inc.,*
  411 F.3d 1006 (9th Cir. 2005) .....................................................................23, 24

ii

*In re Intuitive Surgical Sec. Litig.*,
2017 U.S. Dist. LEXIS 161098 (N.D. Cal. Sept. 29, 2017)...............................16

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017).......................................................................13, 15

*In re Zoran Corp. Derivative Litig.*,
511 F. Supp. 2d 986 (N.D. Cal. 2007) ...................................................................7

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002).  ..........................................................................21

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005)...................................................................................3

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)...............................................................................23

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)..................................................................................23

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008)...............................................................................23

*New Mexico State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011)...............................................................................18

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*
774 F.3d 598 (9th Cir. 2014)..................................................................................15

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)...............................................................................18

*Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc.*,
445 F. Supp. 2d 170 (D. Mass. 2006) ..................................................................16

*Schueneman v. Arena Pharms., Inc.*,
840 F.3d 698 (9th Cir. 2016)..................................................................................17

*SEC v. Todd*,
642 F.3d 1207 (9th Cir. 2011)..................................................................................3

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009)..................................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..........................................................................................17, 18

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ................................................................................................11

*Weiss v. Amkor Tech., Inc.*,
527 F. Supp. 2d 938 (D. Ariz. 2007)......................................................................25

iii

*Zucco Partners, LLC v. Digimarc Corp.*
  552 F.3d 981 (9th Cir. 2009)..................................................................21, 22

**Statutes**

15 U.S.C. §78j..................................................................................*passim*

15 U.S.C. §78t .................................................................................1, 2, 25

15 U.S.C. §78u-4..............................................................................*passim*

15 U.S.C. §78u-5.....................................................................................16

**Rules**

FED. R. CIV. P. 12 ....................................................................................18

Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace respectfully submit this memorandum in opposition to the March 3, 2025 motion (Dkt. No. 129) of Defendants Salvatore Galletti, Stephanie Dieckmann, Edward Gelfand, Paula Ciaramitaro, Marie Quintero-Johnson, and Sarah Galletti (the "Individual Defendants") to dismiss Plaintiffs' Second Amended Class Action Complaint ("SAC") (Dkt. No. 124).[1]  The Court should deny this motion because Plaintiffs have stated claims under §10(b) and §20(a) of the Securities Exchange Act, 15 U.S.C. §§78j(b), 78t(a), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## I.    INTRODUCTION

Following the Court's instructions, Plaintiffs have amended the complaint by specifying Defendants' false statements (*e.g.*, ¶47 (listing false statements); ¶136), adding allegations of false statements (¶62; ¶99), and identifying statements from an additional Confidential Witness ("CW") (¶¶168–169 (CW#5)).  These amendments, considered together with the existing allegations, are more than sufficient to state a §10(b) claim.

Plaintiffs' claims arise from an egregious case of accounting fraud that resulted in the bankruptcy of Tattooed Chef, Inc. ("TCI"), wiping out the value of its stock held by Plaintiffs and other public shareholders.  Having gone public through a special purpose acquisition company, TCI's internal financial controls were deficient from the start.  ¶¶ 24–25, 58–59, 73, 76, 78.[2]  The Individual Defendants orchestrated the fraud through a relatively unsophisticated accounting scheme of misclassifying promotional and slotting fees as "operating expenses" instead of reductions to revenue, as required by

---

[1] Plaintiffs incorporate by reference all arguments made in their oppositions to the motions of Defendants Charles F. Cargile and BDO USA, P.C. (f/k/a BDO USA, LLP) ("BDO") to dismiss the SAC (Dkt. Nos. 127, 128).

[2] The allegations in the SAC are cited as "¶___."  Unless otherwise noted, all emphases in quoted texts are added.

GAAP.[3]  *E.g.*, ¶¶ 47, 58, 71–75, 83–86, 92–104.  This allowed TCI to report inflated revenue growth rates, temporarily satisfying stock analysts and allowing Defendant Salvatore (Sam) Galletti to engage in insider selling.  ¶81.

TCI was ultimately forced to restate its financial results, admitting that its prior results were materially false.  Defendants' scienter is particularly alleged through detailed CW allegations, as well as Sam Galletti's suspicious, unusual Class-Period stock sales.  ¶¶81–82; *see also* ¶¶122, 138–139, 166–168.  Sam Galletti, who had never before sold any shares, disposed of 1.3 million shares on April 15, 2021—not pursuant to a Rule 10b5-1 plan.  ¶82.

Plaintiffs also sufficiently allege loss causation because in response to the Company's corrective disclosures in October–November 2022, the price of TCI's stock immediately declined by 9.8%, 14.7%, 12.4%, and 10.6%, respectively.  ¶¶148, 153, 156, 159.  All told, Plaintiffs have stated a §10(b) claim.

Plaintiffs have also stated a claim for control-person liability under §20(a) because they have sufficiently alleged that the Individual Defendants controlled TCI and its financial reporting.  ¶¶19, 34, 188, 198.  The Individual Defendants have waived any contest to the sufficiency of these allegations.  The Court should therefore deny their motion with respect to the §20(a) claim.

Accordingly, the Court should deny Defendants' motion in its entirety and allow Plaintiffs to prosecute their meritorious claims.

///

///

///

///

///

---

[3] Generally Accepted Accounting Principles.

## II.   ARGUMENT

**A.   Plaintiffs Have Sufficiently Stated a §10(b) Claim for Securities Fraud**

To state a §10(b) claim, a plaintiff need only allege a material misrepresentation or omission in connection with the purchase or sale of a security, scienter, reliance, economic loss, and loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). The Individual Defendants challenge only the SAC's sufficiency with respect to falsity, scienter, and loss causation. Their challenges are meritless.

**1.   Defendants' Statements Were Materially False and Misleading**

With respect to falsity, a plaintiff must show that the defendant made a statement that was "misleading as to a material fact." *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988). A statement is misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). A misrepresentation "is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Generally, whether a statement is misleading is a mixed question of fact and law to be decided by the jury unless the disclosures are so obviously immaterial that reasonable minds could not differ. *SEC v. Todd*, 642 F.3d 1207, 1220–21 (9th Cir. 2011).

**a.   Defendants Falsely Claimed That TCI Had Achieved 645% Growth with "No Spending on Marketing Promotion," and That TCI Could Maintain the Growth Rate, But Failed to Disclose That Its Marketing Expenses Would Have to Be Booked as Reductions to Revenue**

On December 15, 2020, the first day of the Class Period, Defendants made

statements during an Investor Day presentation that TCI had achieved 645% growth with "no spending on marketing promotion."  ¶46.  The statements were reduced to written form in the attached chart that was disseminated to analysts:



_Id_.  Defendants Sam and Sarah Galletti, Dieckmann, and Cargile told the analysts that TCI would launch its first advertising and marketing campaign in 2021, which would drive significant continued growth.  ¶¶38, 45, 50.  These statements were false and misleading because they failed to disclose the fact that, far from being premised on "no spending on marketing promotion," TCI's aggressive growth strategy was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that those expenses were required by GAAP to be booked as reductions to revenue and thus would decrease rather than increase the growth rate.  ¶47.  As a result, the Individual Defendants' statements about

4

revenue growth were materially misleading. *Id*.[4]

The Gallettis and Dieckmann, who collectively owned 51% of TCI's stock, also told investors that TCI planned to raise capital needed to fund its growth through investors' exercise of warrants. ¶¶49–51. The investors would receive stock and TCI would receive cash. ¶49.

¶48.

However, for TCI to be able to raise this cash, which would be up to $230 million, its stock needed to trade above $18 per share for 20 out of 30 trading days, as reflected by the following graph that the Gallettis and Dieckmann provided to analysts (¶49):

---

[4] The misrepresentations about TCI's current plan to maintain and increase its growth rate were not "forward-looking statements" and thus not protected by the PSLRA's safe-harbor provision.



## Capital Structure

| Name | Shares O/S | % |
| --- | --- | --- |
| Sam Galletti (and Family) | 32,786,538 | 50% |
| Public Shareholders | 20,093,584 | 31% |
| Fourm II Management | 5,555,000 | 9% |
| UMB Capital Corporation | 4,683,791 | 7% |
| Pizzo Food, SRL | 1,500,000 | 2% |
| Stephanie Dieckmann | 500,000 | 1% |
| | 65,118,913 | 100% |

| | | |
| --- | --- | --- |
| Warrants (TTCFW) | 20,000,000 | |

Exercisable @ $11.50
Callable by the company if share price trades > $18 for 20 of 30 trading days.
Could generate $230 million cash --- or Company can choose a cashless exercise.

Prior to the Investor Day presentation, TCI's stock was well below the price necessary to allow TCI to raise the needed cash through exercise of the warrants. ¶50. On December 2, 2020, the stock closed at $15.42. *Id.* After the Investor Day presentation was filed with the SEC on Form 8-K, however, the stock's price rose dramatically, increasing to $19.35 on December 15, 2020 on unusually heavy trading volume of 6.8 million shares, approximately ten times the normal volume. *Id.* The stock continued to increase in the ensuing days, reaching $24.69 by December 23, 2020 on unusually heavy trading volume, as reflected in the following chart (*id.*):

The SAC alleges that the statements were all false *because the undisclosed "slotting fees" were marketing expenses, which the Individual Defendants had falsely stated were zero*. ¶47. In addition, when Defendants were forced to restate their financial results, "they were forced to admit the true adverse extent of these significant additional expenses." ¶54. With respect to 2020, TCI admitted that "[its] gross profits for 2020 were only $22.358 million, not $23.7 million, and gross margins for 2020 were only 15.1%, not 15.9%." ¶60. Thus, significant additional, previously undisclosed expenses existed in 2020, increasing TCI's expenses and reducing both reported EBITDA and gross margins. ¶¶54, 60. In addition, the statements about TCI's ability to maintain its growth rate through increasing market expenses were false because, as noted *supra*, the Individual Defendants concealed the fact that such expenses would have to be booked as reduction to revenue and thus would lower the growth rate.

These facts are more than sufficient to plead falsity. In *In re Zoran Corp. Derivative Litigation*, plaintiffs alleged that Zoran's financial statements falsely stated that it was in compliance with GAAP while certain executive compensation expenses were misstated and required restatement. 511 F. Supp. 2d 986, 1011 (N.D. Cal. 2007). The court held that the requirement of restatement supported a finding of falsity and materiality for purposes of stating a §10(b) claim. *Id.*; *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486–87 (S.D.N.Y. 2004) ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made"). Where, as here, a complaint specifies each statement alleged to be misleading, and the reasons why the statement was misleading, falsity is sufficiently alleged. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1179–80 (9th Cir. 2009) (reversing dismissal).

**b.      Defendants Made False Statements in the Annual and Quarterly Reports**

The SAC also alleges in detail the falsity of TCI's 2020 and 2021 Annual Reports on Form 10-K, which were signed by the Individual Defendants.  On March 19, 2021, after market hours, TCI filed with the SEC its 2020 Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report").  ¶56.  The Annual Report was signed by Defendants Galletti, Cargile, Gelfand, Ciaramitaro, and Quintero-Johnson.  *Id.*[5]  The 2020 Annual Report falsely reported TCI's financial results and falsely stated that "*our consolidated financial statements present fairly, in all material respects, our financial position, results of operations and cash flows for the periods disclosed in conformity with U.S. GAAP.*"  ¶58.  The figures reported in this Annual Report were later admitted to be false, "[TCI's] gross profits for 2020 were only $22.358 million, not $23.7 million, and gross margins for 2020 were only 15.1%, not 15.9%."  ¶60.

When it came time to report financial results for 2021, the amount of slotting fees, marketing expenses, and promotional discounts had become so large that they interfered with TCI's ability to report the "supercharg[ed] … growth" in revenues that it hoped would convince the market that it was a high-growth company. ¶44.  The stock market places a premium on significant increases in revenues, even if profits suffer, and thus will assign a higher multiple (and thus stock price) to high-growth companies. ¶104.  The rationale is that if revenues increase fast enough, a company will eventually be able to achieve economies of scale and reduce expenses, thus becoming more profitable. *Id*.; ¶36.

---

[5] In addition, attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Galletti and Cargile attesting to the accuracy of financial reporting, the disclosure of any material changes to TCI's internal control over financial reporting, and the disclosure of any fraud.  ¶56.

But during 2021 the Individual Defendants faced a problem: they had promised very large promotions, slotting fees, and discounts to customers to convince them to buy TCI's products. And because GAAP required such expenses to be accounted for as reductions to revenue, correctly accounting for the costs would torpedo Defendants' high-growth narrative. ¶104. Thus, Defendants embarked on a scheme to book more amounts of revenue than warranted and misclassify the slotting and promotional fees as operational expenses instead of reductions to revenue:

> [TCI's] aggressive growth strategy was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that the Individual Defendants intended to mischaracterize those expenses as "operating expenses" instead of reductions to revenue, as required by GAAP.

¶47.

As a result, the Defendants' statements about revenue growth were false; had the slotting fees and in-store promotion fees been deducted from the revenue figures, the revenue growth would have been materially lower, the market would have assigned a lower multiple to the stock, and the stock price would have been much lower. ¶¶47, 104; *see also* ¶71.

The SAC specifically alleges the falsity of each quarterly and annual statement issued by Defendants in 2021, and includes graphs highlighting in yellow the changes between the original reported financial information and the correct information which was only disclosed after the end of the Class Period, when TCI restated its financial results. For example, for Q1 2021, the complaint contains the following chart:

($ in thousands, except per share amounts)

**Condensed Consolidated
Statements of Operations and
Comprehensive Income**

9

| For the three months ended March 31, 2021 | As Reported | Adjustments | As Restated |
|---|---|---|---|
| REVENUE | 52,469 | (2,054) | 50,415 |
| COST OF GOODS SOLD | 45,289 | 119 | 45,408 |
| GROSS PROFIT | 7,180 | (2,173) | 5,007 |
| OPERATING EXPENSES | 14,196 | (3,025) | 11,171 |
| LOSS FROM OPERATIONS | (7,016) | 852 | (6,164) |
| LOSS BEFORE PROVISION FOR INCOME TAXES | (9,717) | 852 | (8,865) |
| INCOME TAX BENEFIT (EXPENSE) | 1,475 | (239) | 1,236 |
| NET LOSS | (8,242) | 613 | (7,629) |
| NET LOSS PER SHARE | | | |
| Basic | (0.10) | — | (0.10) |
| Diluted | (0.11) | 0.01 | (0.10) |
| COMPREHENSIVE LOSS | (8,133) | 613 | (7,520) |

¶71. The SAC provides similar particularized details regarding the falsity of the Q2 2021 Form 10-Q by including a graph showing the original (false) information and the correct information provided when the results were restated (¶89):

| ($ in thousands except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) | | |
|---|---|---|---|
| For the three months ended June 30, 2021 | As Reported | Adjustment | As Restated |
| REVENUE | 50,270 | (3,010) | 47,260 |
| COST OF GOODS SOLD | 41,953 | (822) | 41,131 |
| GROSS PROFIT | 8,317 | (2,188) | 6,129 |
| OPERATING EXPENSES | 16,419 | 427 | 16,846 |
| LOSS FROM OPERATIONS | (8,102) | (2,615) | (10,717) |
| LOSS BEFORE PROVISION FOR INCOME TAXES | (7,463) | (2,615) | (10,078) |
| INCOME TAX EXPENSE | (50,009) | 724 | (49,285) |
| NET LOSS | (57,472) | (1,891) | (59,363) |
| NET LOSS PER SHARE | | | |
| Basic | (0.70) | (0.02) | (0.72) |

| | | | |
|---|---|---|---|
| Diluted | (0.70) | (0.02) | (0.72) |
| COMPREHENSIVE LOSS | (57,682) | (1,891) | (59,573) |

| ($ in thousands except per share amounts) | Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) | | |
|---|---|---|---|
| For the six months ended June 30, 2021 | As Reported | Adjustment | As Restated |
| REVENUE | 102,739 | (5,064) | 97,675 |
| COST OF GOODS SOLD | 87,242 | (703) | 86,539 |
| GROSS PROFIT | 15,497 | (4,361) | 11,136 |
| OPERATING EXPENSES | 30,615 | (2,598) | 28,017 |
| LOSS FROM OPERATIONS | (15,118) | (1,763) | (16,881) |
| LOSS INCOME BEFORE PROVISION FOR INCOME TAXES | (17,180) | (1,763) | (18,943) |
| INCOME TAX EXPENSE | (48,534) | 485 | (48,049) |
| NET LOSS | (65,714) | (1,278) | (66,992) |
| | | | |
| NET LOSS PER SHARE | | | |
| Basic | (0.81) | (0.02) | (0.83) |
| Diluted | (0.81) | (0.02) | (0.83) |
| | | | |
| COMPREHENSIVE LOSS | (65,815) | (1,278) | (67,093) |

In addition, TCI's restated financial results *admit* that "[t]he Company incorrectly recorded certain payments to customers as promotional and bad debt expenses within operating expenses rather than a reduction of revenue." ¶71. The Individual Defendants ignore these fact-specific allegations.[6]

---

[6] The Individual Defendants do not argue that the statements were immaterial. Even if they had not waived the argument, materiality is not subject to any heightened pleadings standard and merely requires an allegation that the false statement or omission "would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A company is only required to restate financial results if the amounts are material, and thus materiality is clearly alleged here. *Hemmer Grp. v. Sw. Water Co.*, 527 F. App'x 623, 626 (9th Cir. 2013) ("allegations [of corrected statements] especially when combined with the fact that the [company] restated its financials, are sufficient to plead materiality").

11

The SAC also alleges that "[t]he 2020 Annual Report and the Q1 2021 Form 10-Q were … false and misleading because they failed to disclose the risk to [TCI's] liquidity from higher-than-disclosed promotional fees and discounts, slotting fees, and other marketing costs for [its] products."  ¶72.  Moreover, "[b]ecause [TCI's] line of credit was tied to the net amount of [its] accounts receivables, slotting and promotional fees and/or discounting of [its] products reduced the amount of liquidity available under [its] line of credit."  *Id*. "Defendants knew that [TCI] would need additional liquidity due to ongoing problems with [its] business."  *Id*.  "[TCI] was paying high promotional and slotting fees for its products, which was causing it to receive less net revenue/accounts receivable for the sale of its products, since such fees were required to be deducted from both revenues and accounts receivable under GAAP."  *Id*.  "As a result, Defendants knew [TCI] would need to raise additional capital to fund its growth."  *Id.*

Indeed, these undisclosed risks to TCI's liquidity came to fruition when TCI was forced to restate its financial results:  revenues and accounts receivable were materially reduced, thus reducing the credit available to TCI.  ¶122. According to Confidential Witness #3 ("CW#3"), TCI was failing to pay its suppliers.  ¶138.  The situation was so dire that Defendant Sam Galletti was forced to provide a personal $5 million loan to TCI to keep it afloat.  ¶76.  These facts support a finding of the Individual Defendants' scienter regarding the liquidity problem.

The 2021 Annual Report on Form 10-K, signed by the Individual Defendants, was false because it "overstated revenue by $5,436,000 and overstated gross profit by $4,975,000."  ¶100.  "The Individual Defendants violated GAAP and knowingly inflated [TCI's] revenues and gross profit, which were the two key metrics emphasized by [TCI] to the stock market and

12

securities analysts that followed [TCI]."    *Id.*  The motive of the Individual Defendants to falsely portray TCI as a "high-growth" company was revealed in the 10-K, in which Defendants hyped false growth figures that were later reduced.  ¶101.  This statement was false because "[TCI's] revenues had not increased to $213.4 million and the growth rate was not 43.7%.  In reality, revenues had only increased to $207.994 million and the growth rate was only 40%."  ¶102.  The filing of the 2021 Annual Report caused TCI's stock price to increase from $11.06 on March 15, 2022 to $12.23 on March 17, 2022—a 10.6% increase on heavy trading volume.  ¶103.

> **c.**    **The Statements About TCI's Internal Controls Were False and Misleading**

The 2021 Annual Report was also false and misleading because it concealed additional *known, then-existing material deficiencies in TCI's internal controls.*[7]  Most importantly, the 2021 Annual Report failed to disclose that, in addition to the lack of adequate internal controls  over the tracking and accounting of promotional allowances granted to customers, including applicable adjustments to revenue for related variable consideration, that *management (specifically including the Gallettis and Dieckmann) were intentionally overriding the controls that existed in order to misclassify slotting fees and promotional allowances as "operating expenses" so as to artificially inflate TCI's reported Net Revenues and Gross Profits*.  ¶107.

The SAC contains detailed allegations from numerous "confidential witnesses."  For example, according to Confidential Witness #1 ("CW#1"), who served as TCI's Director of SOX Compliance during the Class Period and

---

[7] The misrepresentations about the current status of TCI's internal controls were not "forward-looking statements" and thus not protected by the PSLRA's safe-harbor provision.  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts").

13

reported directly to Defendant Dieckmann, who, along with Defendant Cargile (Dieckmann's predecessor), bore primary responsibility for addressing the material weaknesses in TCI's internal controls, at least nine material weaknesses had been identified by BDO at year end in 2020.  ¶73.  According to CW#1, the need to hire additional personnel in certain positions was a large component in addressing the material weaknesses identified by BDO, but CEO Galletti did not want to or was unwilling to spend the money necessary to hire enough people.  *Id.* As part of a review of the revenue recognition practices, a review was conducted of some of TCI's larger contracts.   That review determined that TCI was not adhering to GAAP with respect to some of TCI's more complex contracts due to the manner in which it was accounting for expenses. ¶74.  CW#1 worked with BDO on the relevant issues, with BDO ultimately determining that the problems were material and would require a restatement of TCI's financial results.  ¶75.

Confidential Witness #2 ("CW#2") was employed by TCI during the Class Period as an A/R (Accounts Receivable) Specialist beginning in December 2021, reporting directly to Controller Mary Chesley, who in turn reported directly to Defendant CFO Dieckmann.  ¶77.  CW#2 was responsible for the receipt of and posting of payments from vendors that sold TCI products, including, but not limited to Wal-Mart, Trader Joe's, Albertson's and KeHE.  ¶78.   CW#2 provided specific examples of customers such as KeHE where more than half of the invoiced amount represented promotions or slotting fees that the customer was not required to pay, thus inflating the reported revenues figures because TCI had applied incorrect accounting treatment.   ¶79.   According to CW#2, the Individual Defendants were recognizing the full amount of revenue and then booking the promotions and discounts as "operational expenses," contrary to GAAP.  ¶80.

14

These detailed allegations, which Defendants ignore, are more than sufficient to demonstrate both the falsity of Defendants' statements and their scienter. *See Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023) ("[t]he PSLRA was designed to eliminate frivolous or sham actions, but not actions of substance"). In *Glazer*, as here, the complaint's allegations regarding the company's financial results were supported by particularized "confidential witness" allegations.

Moreover, none of the SAC's allegations represent mere "statements of optimism," "opinion," or "puffery." All the statements referred or were related to specific metrics of TCI's financial results. In rejecting a similar claim of "optimism" and "puffery," the Ninth Circuit reasoned that even a vague statement, such as "everything [was] going fine," could be misleading and thus actionable if the speaker knew that the contrary was true. *See Quality Sys.*, 865 F.3d at 1143–1144. Here, the Individual Defendants' statements regarding TCI's aggressive growth strategy and compliance with GAAP are neither statements of optimism or puffery because, viewed in context, these statements are materially false. *See id.*; *see also Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (finding actionable a statement that the company "anticipates a continuation of its accelerated expansion schedule" because the statement "could reasonably be interpreted as conveying a level of confidence in the continued viability of the expansion program not borne out by the adverse facts allegedly known to the defendants").[8]

---

[8] *Oregon Public Employees Retirement Fund v. Apollo Group Inc.* is distinguishable because that case involved only "vague" statements of "inherently subjective 'puffing'" that did "not set out with specificity the reasons for … revenue growth." 774 F.3d 598, 606 (9th Cir. 2014). In contrast, TCI's statements specified an "aggressive growth strategy [that] was premised on paying significant slotting fees and in-store promotion fees to get its products into the frozen food section of grocery stores, and that the Individual Defendants intended to mischaracterize those expenses as 'operating expenses' instead of reductions to revenue, as required by GAAP." ¶47.

15

In light of the facts pleaded showing the Individual Defendants' knowledge that it was impossible for TCI to maintain high revenue growth and, at the same time, comply with GAAP (*see* ¶ 104), their alleged false statements are actionable. *In re Intuitive Surgical Sec. Litig.*, 2017 U.S. Dist. LEXIS 161098, at *17 (N.D. Cal. Sept. 29, 2017); *see also, e.g., In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48 (1st Cir. 2005) ("if a plaintiff adequately pleads that a statement of opinion was subjectively false when made, the complaint will … satisfy the pleading requirements"); *Rosenbaum Capital L.L.C. v. Boston Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170 (D. Mass. 2006) (defendant's false statements about patent litigation were made actionable because the complaint alleged facts showing defendant did not believe statements).

### d.    Plaintiffs Have Alleged False Statements About the Line of Credit

Defendants' contention that Plaintiffs have not adequately alleged the falsity of the statements about the line of credit (¶¶ 61, 122, 133–134) is unavailing.  As to these statements, it is true that the statements are "forward looking" because they state that Defendants "believe that our cash will be sufficient to support our planned operations for at least the next 12 months." ¶ 122.  The statements, however, are not protected by the PSLRA's safe-harbor provision because (1) they were not accompanied by meaningful cautionary language; and (2) the SAC alleges that the Individual Defendants had actual knowledge of the falsity of the statements at the time.  First, no meaningful cautionary language accompanied this statement.  To be "meaningful," the cautionary language must "identify[] important factors that could cause actual results to differ."  15 U.S.C. § 78u-5(c)(1)(A)(i).  Here, Defendants do not cite to any cautionary language that accompanied paragraphs 61, 122, and 133–134 of the SAC, and instead only refer to generic statements that accompanied other

16

false statements which were unrelated to the statements about the line of credit. Thus, the statements are not protected by the safe-harbor provision. *See Glazer Capital*, 63 F.4th at 769 ("[d]efendants cannot rely on boilerplate language describing *hypothetical* risks to avoid liability for the failure to disclose that the company *already* had information suggesting the merger might not ensue") (emphases in original).

Even if they had been accompanied by specific cautionary language, the statements are actionable because the SAC alleges that the Individual Defendants knew the statements were false when made. ¶123. Thus, the SAC adequately alleges the falsity of the statements about the line of credit. *See Glazer Capital*, 63 F.4th at 781 ("[d]efendants cannot invoke safe-harbor protection on the basis that they lacked 'actual knowledge of falsity'").

### 2.    Plaintiffs Have Adequately Alleged Scienter

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "A defendant is liable … when he acts with scienter, a 'mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). "Deliberate recklessness is 'an extreme departure from the standards of ordinary care … which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Schueneman*, 840 F.3d at 705 (italics in original). In ruling on a motion to dismiss, the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*,

17

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) (italics in original). "A securities fraud complaint will survive a motion to dismiss under Rule 12(b)(6) 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting *Tellabs*, 551 U.S. at 324).

Here, the Individual Defendants' scienter is alleged with great particularity. The SAC contains detailed allegations derived from three separate confidential witnesses demonstrating that Defendants intentionally overrode TCI's internal controls and recognized inflated revenue during the Class Period despite knowing that GAAP required the substantial promotional and slotting fees that TCI had offered to customers to be booked as reductions to revenue rather than operating expenses. *See* ¶¶73–80. Defendants' challenge to the sufficiency of the "CW" allegations is unwarranted because they argue for a standard for confidential witness allegations that has been specifically rejected by the Ninth Circuit. *See Glazer Capital*, 63 F.4th at 771 ("the adequacy of the [complaint] does not depend on each CW possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made."); *id.* at 769 ("[r]equiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one"). Plaintiffs' CW allegations are more than sufficient because the SAC specifically alleges the CWs' roles, to whom they reported, and why they were in a position to know the facts about the fraud.

The Individual Defendants' cited cases are inapposite. In *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014), the complaint only alleged "a single statement by a lone witness, a clinical sales representative in

18

Florida who worked for Intuitive for three months and said, '100% that hospitals were cutting back.'" *Id.*, 759 F.3d at 1063. Further, the sole witness was a "low-level employee." *Id.* Here, in contrast, the complaint contains three separate CWs, all of whom worked in the relevant areas affected by the fraud and reported either directly to defendants or to high-level executives. For example, CW#3 "worked at [TCI's] headquarters during the Class Period from March 2021 to December 2022 and had frequent interactions with Defendants Galletti and Dieckmann." ¶ 136. CW#3 also "worked at [TCI's] headquarters in Paramount, California and reported to Cosmo Briguglio, who reported directly to his cousin, CEO Sam Galletti." ¶138. Thus, CW#3 experienced TCI's internal-control problem first-hand — stating that "[*TCI*] *was routinely not paying its bills and creditors*." ¶136 (emphasis in original). In addition, CW#3 had direct discussions of these payment problems with "Defendant Sam Galletti[, who] was aware of these problems … [and] was not at all surprised to hear suppliers were not being paid." ¶138. As one example, CW#3 told Galletti that the corrugated cardboard supplier Neway had refused to supply any more product until a payment was made. *Id.* CW#3 indicated Dieckmann was also aware of the problem because Galletti told CW#3 that Galletti indicated he had spoken with CFO and Defendant "Stephanie Dieckmann about the problems after the conversation between CW#3 and Galletti." *Id.*

The allegations regarding CW#1 are likewise particularized and cogent. CW#1 "served as [TCI's] Director of SOX Compliance during the Class Period and reported directly to Defendant Dieckmann (who, along with Defendant Cargile who was the CFO prior to Dieckmann, bore primary responsibility for addressing the material weaknesses in TCI's internal controls), at least nine material weaknesses had been identified by BDO at year end in 2020." ¶73. "CW1 also updated the Audit Committee on a quarterly basis and was the

19

person who informed the Audit Committee when it was determined that a restatement was necessary." ¶75. The members of TCI's Audit Committee at the time were Edward Gelfand (Chair), Paula Ciaramitaro, and Marie Quintero-Johnson. *Id*. BDO worked directly with Defendant Cargile, TCI's CFOs (Cargile, and then Dieckmann), and with the members of the Audit Committee.[9] *Id*. Thus, "Defendants Cargile, Dieckmann, Gelfand, Ciaramitaro and Quintero-Johnson had actual knowledge of the improper accounting and the fact that TCI's financial statements were materially false and misleading because they did not comply with GAAP." ¶75. They also knew about TCI's lack of liquidity during the Class Period. ¶138. A finding of their knowledge is bolstered by the statements of CW#5, a TCI Data Analyst who reported to Dieckmann and identified data-integrity and internal-control issues. ¶168.

CW#2 was employed by TCI during the Class Period as an A/R (Accounts Receivable) Specialist beginning in December 2021, reporting directly to Controller Mary Chesley, who in turn reported directly to Defendant CFO Dieckmann. ¶77. CW#2 was responsible for the receipt of and posting of payments from vendors that sold TCI products, including Wal-Mart. ¶78. CW#2 recalled once receiving only approximately $50,000 from KeHE for invoices that were worth approximately $1 million before discounts were applied. ¶79. CW#2 indicated that the Individual Defendants were recognizing the full amount of revenue and then booking the promotions and discounts as "operational expenses." ¶80.

---

[9] The Individual Defendants are not entitled to a favorable inference based on the allegation that "[TCI] did not hide the expenses from BDO" (¶112). *SEC v. Yuen*, 2006 U.S. Dist. LEXIS 33938, at *113 (C.D. Cal. Mar. 16, 2006) (refusing to negate scienter based on reliance-on-auditor defense). To the contrary, this allegation requires an inference of BDO's scienter. On this point, Defendants' reliance on *In re Taleo Corp. Securities Litigation* is misplaced because the inference of defendants' "innocent" intent there was drawn not from transparency to the auditor, but from the public disclosure of their accounting error. 2010 U.S. Dist. LEXIS 13696, at *29 (N.D. Cal. Feb. 17, 2010).

Sam Galletti's scienter is also indicated by his insider selling. On April 15, 2021, Galletti sold 800,000 shares of TCI stock at $10 per share. ¶81. The sale was not pursuant to a Rule 10b5-1 plan but instead was a sale that Galletti orchestrated the timing of in order to satisfy an obligation of "personal indebtedness" to a lender. *Id*. This demonstrates scienter because TCI's written policies regarding insider sales prohibited Galletti from selling stock outside of a Rule 10b5-1 plan. *Id*. The same day, Galletti gifted 500,000 shares of stock to an unidentified individual. *Id*. Galletti benefitted from the gift by receiving an income tax deduction for the full value of the stock price on the date of sale times the number of shares gifted (500,000). Thus, Galletti disposed of 1.3 million shares on April 15, 2021 at inflated prices. *Id*. His stock sale was unusual in timing and amount because he had not sold any TCI stock at any point previously and did not sell any shares after this date. ¶¶81–82. These facts are sufficient to show scienter. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989).

Arguing the contrary, the Individual Defendants cite no law to support their assertion, contrary to Plaintiffs' well-pleaded allegations, that Sam Galletti's stock sales were nothing "unusual" or "suspicious." *Zucco Partners, LLC v. Digimarc Corp.* is inapposite because plaintiffs there failed to provide any trading history of defendants. 552 F.3d 981, 1005–06 (9th Cir. 2009). Likewise inapposite is *Lipton v. Pathogenesis Corp.* because the insider stock sales there involved only "a tiny percentage of [defendant's] holdings." 284 F.3d 1027, 1037 (9th Cir. 2002). In contrast, the SAC lays out the unusual timing and the significant amount of shares in Sam Galletti's stock sales. ¶81.

Finally, this case is atypical in that TCI was very small, had only one operating segment, and Galletti and Dieckmann were the main decision makers. *See* ¶33 ("[w]e have one operating segment and one reportable

21

segment, as our chief decision maker, our Chief Executive Officer, reviews financial information on an aggregate basis for purposes of allocating resources and evaluating financial performance").   Until July 2020, the only other executive officer of TCI was Defendant Dieckmann.  *Id*. Galletti's daughter, Defendant Sarah Galletti, handled all TCI's marketing efforts and they collectively owned 50% of the stock, giving them a strong motive to commit fraud. ¶34.   The indisputable falsity of the defendants' statements, which mandated an accounting restatement, coupled with the small size of TCI and the hands-on involvement of the defendants in the sales and accounting matters that required the restatement (¶¶19, 33–35) are strongly indicative of scienter.  *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601 (N.D. Cal. 2019) ("falsity may itself be indicative of scienter where it is combined with allegations regarding a management's role in the company that are particular and suggest that the defendant had actual access to the disputed information, and where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter") (quoting *Zucco Partners*, 552 F.3d at 1000).

Based on similar allegations concerning a company's major product that was the driver of its growth (*see* ¶¶33 ("one operating segment"), 167 ("frozen food" as "core product"), 170), the Ninth Circuit routinely inferred scienter based on the core-operations doctrine.  *S. Ferry LP v. Killinger*, 542 F.3d 776, 785–86 (9th Cir. 2008); *see also*, *e.g.*, *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021) (scienter pled where security concerns were "highly material" to operations); *Okla. Police Pension and Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484–85 (9th Cir. 2019) (scienter pled where complaint "alleged overall importance of real-time Credit Check Alerts" to business model); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–88 (9th Cir. 2008).

### 3.    Plaintiffs Have Adequately Alleged Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the [economic] loss" faced by the plaintiff.  *Dura*, 544 U.S. at 342.  A complaint must give the defendant "notice" of this causal connection; in other words, "the complaint must allege that the defendant's share price fell significantly after the truth became known." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (internal citations omitted).  The misrepresentation need not be the "sole" reason for the decline as long as it is a "substantial cause," and the allegations, "if assumed true, are sufficient" to indicate a causal relationship between the company's "financial misstatements" and "the drop in [its] stock price." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1025–26 (9th Cir. 2005).

"At the pleading stage, however, the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity," rather than other factors. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014).  The ultimate question is "whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

Here, loss causation is more than adequately alleged by the SAC's allegations of four "corrective disclosures."  First, on October 12, 2022, TCI announced that it would have to restate its financial results.  ¶¶146–149.  That announcement resulted in a 9.8% stock price decline.  ¶149.  Second, on November 10, 2022, TCI filed its restated financial results, stating that its cash balance had decreased to just $14.2 million as of September 30, 2022, and had an accumulated deficit of $108.1 million.  ¶¶151–154.  That filing resulted in a 14.7% stock price decline.  ¶154.  Third, on November 16, 2022, TCI disclosed that its "ability to continue as a going concern had been materially impaired,"

and that "it was in violation of its lending covenants." ¶155. That disclosure resulted in a 12.4% stock price decline. ¶157. Finally, on November 28, 2022, TCI announced that it had received a $5 million loan from Defendant Sam Galletti. ¶159. That announcement resulted in a 10.6% stock decline. ¶160.

These well-plead facts are sufficient to plead loss causation. *See Daou*, 411 F.3d at 1006. In *Daou*, the court held that the plaintiff had pled loss causation based on allegations that major losses reported in an August 1998 quarterly report were causally connected to the company's premature recognition of revenue. *Id.* at 1026; *accord Berson*, 527 F.3d at 989–90. Here, similarly, the corrective disclosures announced the need to restate financial results based on improper recognition of revenue, which is the basis of the fraud alleged in the complaint.[10]

Of the four corrective disclosures pled, the Individual Defendants only dispute one: the October 12, 2022 partial disclosure. In so doing, the Individual Defendants improperly dispute the complaint's allegations, claiming the stock went up, when the complaint alleges "[TCI's] share price fell $0.44 per share, or 9.8%, from its close on October 12, 2022 to open on October 13, 2022 at $4.05 per share, damaging investors." ¶149. The Individual Defendants are wrong. The October 12, 2022 partial disclosure was made after-hours, and in fact did cause the stock to drop 9.8% when the market reopened the next morning. *Id.* Moreover, the Individual Defendants do not dispute the material stock drops in response to the November 10, 2022 disclosure, which resulted in a 14.7% stock decline, the November 16, 2022 disclosure, which resulted in a 12.4% stock decline, and the November 28, 2022 disclosure, which resulted in a 10.6% stock decline. ¶¶154, 157, 160. Each one of these disclosures provided

---

[10] *Brown v. Ambow Education Holding Ltd.*, 2014 WL 523166 (C.D. Cal. Feb. 6, 2014), is inapposite because all the disclosures related directly to the accounting fraud, as well as the restatement.

24

additional incremental information about TCI's accounting restatement, causing the stock to tank from $4.49 on October 12 to $1.44 on November 29—a combined drop of $3.05 (68%).

The Individual Defendants' cited cases are inapposite.[11] Both *Weiss* and *Hoang* involved a situation where the stock price in fact went up as a result of the purported curative disclosure. Here, in stark contrast, there were four corrective disclosures, all of which were made by the company itself and each of which not only disclosed the need for an accounting restatement but admitted that the specific reason requiring restatement was the same reason alleged by Plaintiffs here as the cause of the fraud. ¶146 (TCI had "incorrectly recorded expenses related to a multi-vendor mailer program with a large customer as operating expenses rather than as a reduction of revenue"). Also, there was not a temporary "dip followed by a rebound" in this case. As noted *supra*, TCI's stock tanked 68% from the date of the first disclosure to the last disclosure. Absent legal support, the Individual Defendants' challenges to loss causation should be rejected.

**B.    Plaintiffs Have Stated a §20(a) Claim**

As discussed above, Plaintiffs have stated a claim for primary violation. And Plaintiffs have alleged in detail that the Individual Defendants controlled TCI and its financial reporting. ¶¶19, 34, 108, 191, 201. Because the Individual Defendants do not challenge the sufficiency of the allegations of control, the Court should deny the Individual Defendants' motion with respect to the §20(a) claim, if the Court finds that Plaintiffs have stated a §10(b) claim. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

### III.    CONCLUSION

The Court should deny Defendants' motion.

---

[11] *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007); *Hoang v. ContextLogic, Inc.*, 2024 WL 4471316 (N.D. Cal. Aug. 22, 2024).

Dated:  April 14, 2025

Respectfully submitted,

BOTTINI & BOTTINI, INC.

s/ Francis A. Bottini, Jr.

Francis A. Bottini, Jr.
Albert Y. Chang
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:  (858) 914-2001
Facsimile:    (858) 914-2002
Email:         fbottini@bottinilaw.com
                    achang@bottinilaw.com

*Counsel for Plaintiffs John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hofait, and Marco Starace*

26

## Certificate of Compliance

The undersigned, counsel of record for John Hancock, Shashank Bagul, John Spadaro, Dr. Mustapha Hotait, and Marco Starace, certifies that this brief contains 6,998 words, which complies with the 7,000-word limit set by L.R. 11-6.1.

Dated:  April 14, 2025

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

1